# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAYTON COTE
8 N. 2nd Street
Towanda, PA 18848,

                    Plaintiff

      v.

U. S. SILICA COMPANY
8490 Progress Drive, Ste. 300
Frederick, MD 21701

        and

NORFOLK SOUTHERN CORPORATION
3 Commercial Plaza
Norfolk, VA 23510-2108

        and

SCHNELL INDUSTRIES
450 Roblin Blvd. East
Winkler, MB Canada R6W OH2

        and

FB INDUSTRIES
555 George Avenue
Winkler, MB Canada R6W 4A6,

             Defendants

NO.  4:18-CV-01440

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby files this Amended Complaint against Defendants:

1.      Plaintiff, Dayton Cote, is an adult individual, *sui juris*, residing at 8 N. 2nd Street, Towanda, PA 18848.

2. At all times material hereto, Plaintiff was employed by Northeast Freight Transfer, Inc.'s Shale Rail, LLC subsidiary located at 264 Wickwire Way, Wysox, PA 18848. Plaintiff's job duties included the transfer of frac sand from rail cars to tractor-trailers.

3. Defendant U.S. Silica Company (hereinafter "U.S. Silica"), is a corporation organized under the laws of Delaware with a registered corporate address at 8490 Progress Drive, Suite 300, Frederick, MD 21701.

4. At all times material hereto, U.S. Silica owned and operated a quarry located at 12942 Oriskany Road, Mapleton Depot, Pennsylvania.

5. At all times material hereto, U.S. Silica was responsible for loading operations at the Mapleton Depot facility.

6. At all times material hereto, U.S. Silica regularly engaged in business activities within the Commonwealth of Pennsylvania.

7. Defendant Norfolk Southern Corporation (hereinafter "Norfolk"), is a corporation organized under the laws of Virginia with a primary place of business located at 3 Commercial Plaza, Norfolk, VA 23510-2108.

8. At all times material hereto, Defendant Norfolk transported U.S. Silica's frac sand from the Mapleton Depot quarry to the Shale Rail transfer yard.

9. At all times material hereto, Norfolk regularly engaged in business activities within the Commonwealth of Pennsylvania.

10. Defendant Schnell Industries (hereinafter "Schnell"), is a foreign corporation organized under the laws of Canada, with a principal place of business at 450 Roblin Blvd. East, Winkler, MB Canada R6W OH2.

11. Schnell manufactures and markets and sells commercial equipment that is

distributed and sold throughout the United States.

12.　At all times material hereto, Schnell purposefully directed its activities to Pennsylvania.

13.　Defendant FB Industries (hereinafter "FB"), is a foreign corporation organized under the laws of Canada, with a principal place of business at 555 George Avenue, Winkler, MB Canada R6W 4A6.

14.　FB was created in 2008 in order to develop and improve frac sand storage/ hauling equipment.

15.　FB markets and sells commercial equipment that is distributed and sold throughout the United States.

16.　At all times material hereto, FB regularly engaged in business activities within the Commonwealth of Pennsylvania.

17.　At all times material hereto, Defendants acted by and through their duly authorized agents, ostensible agents, employees, workmen, and servants, all of whom were working in furtherance of the business interests of the Defendants herein.

18.　At all times material to this Complaint, Defendants acted or failed to act by their agents, servants, workmen and/or employees, who were then and there acting within the scope of their authority and course of their relationship with Defendants and in furtherance of Defendants' pecuniary interests.

19.　At all times material hereto, Defendants were vicariously or otherwise liable and responsible for the negligent, intentional, and/or willful acts or omissions of its employees, agents, ostensible agents, independent contractors, servants and/or workmen.

## JURISDICTION

20.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 as the matter in controversy exceeds the value of $150,000 and is between the citizens of different states.

21.     This Honorable Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.     Pennsylvania has specific jurisdiction over Defendant Schnell, which at all times material hereto, purposefully directed its activities to Pennsylvania, and specifically to derive benefits from this Commonwealth.

23.     More specifically, and at all times material hereto, Defendant Schnell had an exclusive distribution agreement with Defendant FB, whereby Defendant FB exclusively distributed, marketed and sold Schnell transloaders in Pennsylvania, including the product at issue as hereinafter described.

24.     Under said distribution agreement, Defendant Schnell was contractually obligated to provide both warranty service and parts for its transloaders in Pennsylvania.

25.     In fact, at all times material hereto, Defendant Schnell repeatedly acted **directly with its customers in Pennsylvania** for warranty, service and parts for its transloaders.

26.     In so doing, Defendant Schnell purposefully directed its activities to Pennsylvania.

27.     Further, and at all times material hereto, Defendant Schnell has issued **express certifications to the Commonwealth of Pennsylvania itself**, in order to derive benefits, sales and indeed **the Commonwealth's own grant funding**.

28.     Specifically, at all times material hereto, the Commonwealth of Pennsylvania has provided grant funding for the purchase of Defendant Schnell's transloaders.

29.     In order to obtain the Commonwealth's funding for such purchases, the manufacturer of the transloader -- in this case, Defendant Schnell -- must certify to the Commonwealth that at least 75% of its transloader materials are of United States origin.

30.     The certification form -- Commonwealth of Pennsylvania form ST-3 -- must be certified by both the treasurer and president of the manufacturer, and further, is expressly enforced under penalty of Pennsylvania law (18 P.S. § 4904).

31.     In fact, at all times material hereto, Defendant Schnell by and through its principals, has issued such certifications specifically to obtain Pennsylvania's grant funding for the purchase of transloaders by Northeast Rail Transfer, Plaintiff's employer.

32.     Indeed, by painstakingly analyzing and investigating its transloaders' materials, and certifying under Pennsylvania law for the specific purpose of obtaining the Commonwealth's funding, Defendant Schnell purposefully directed its activities to Pennsylvania, and in this case, literally.

**THE SAND**

33.     At all times material hereto, U.S. Silica produced and sold frac sand from its Mapleton Depot facility and other quarries.

34.     Railcars are loaded with various grades of frac sand at the Mapleton Depot plant for delivery by the Norfolk Southern Corporation to various locations, including the Shale Rail transfer yard in Wysox, Pennsylvania.

35.     At all times material hereto, Plaintiff's employer, Northeast Freight Transfer, was under contract with U.S. Silica to provide, inter alia, the transfer of U.S. Silica's frac sand from rail cars to tractor-trailers at the Shale Rail transfer yard in Wysox, Pennsylvania.

36.     U.S. Silica's frac sand is delivered to the Shale Rail facility via rail hopper car and is transferred to tractor trailers by gravity feeding the sand through a sliding gate at the bottom of the rail hopper car. The sand pours through the open gate from the rail hopper car onto a ramped conveyor belt, called a transloader. The transloader belt then raises the sand and dumps it into a tractor trailer for delivery by road.

37.     One function of the transloader is a Power Take Off (hereinafter "PTO"). The PTO is a hydraulically powered shaft on the transloader that connects to the gear on the rail cars' sliding gate assembly. A transloader PTO is used to open and close the rail car's sliding gate with a hydraulic lever, rather than cranking the gear by hand.

38.     The Northeast Freight Transfer employees who transferred the sand from rail car to tractor trailer via transloader routinely encountered difficulty with a particular grade of sand, 100 Mesh, from the Mapleton Depot quarry. More specifically, the sand was prone to clumping and solidifying due to excessive moisture such that it would not properly gravity feed out of the bottom of rail cars.

39.     The problem with the 100 Mesh sand from Mapleton Depot was such that entire hopper cars were sometimes unable to be emptied at the Shale Rail transfer yard because the sand load had solidified and lodged in the hopper car. In such circumstances, the rail cars were set aside and sat at the Shale Rail yard.

6

40.     It is believed, and therefore averred, that U.S. Silica was aware of the problems with their 100 Mesh sand by virtue of the loads of sand product that could not be transferred to waiting tractor trailers because it had solidified and become trapped in the rail hopper car.

41.     The quality of U.S. Silica's 100 Mesh sand from Mapleton Depot was so poor that the Northeast Freight Transfer employees at the Shale Rail transfer yard would routinely be required to reach into the bottom of the rail hopper car to break up solidified sand product so that it would gravity feed through the opening at the bottom of the hopper.

## THE PRODUCT

42.     At all times material hereto, Defendant, Schnell, designed, manufactured and sold commercial transloaders that they identified as model TLX36 (hereinafter "the Product").

43.     The Product was defective in its design in that the control level for the PTO failed to have lock out/tag out provisions, as required by OSHA and applicable industry standards.

44.     On or about July 25, 2014, Defendant, FB Industries, Inc., sold a Schnell Industries TLX36 transloader to Northeast Freight Transfer with the TLX36-GO Gate Opener feature.  Despite the $3,600 cost of the gate opener feature, it failed to contain lock out/tag out provisions that would prevent the railcar gate from being closed on a person.

## THE ACCIDENT

45.     On or about February 27, 2016, Dayton Cote and co-workers were attempting to unload a rail hopper car full of U.S. Silica's 100 Mesh sand at the Shale Rail transfer yard.

46.     The sand in the hopper car was wet and had solidified into large sections such that it would not gravity feed out of the sliding gate at the bottom of the hopper.

47.     As was the custom when attempting to unload the improperly loaded, wet, poor quality 100 Mesh sand from Mapleton Depot, the solidified sand required a Northeast Freight

7

Transfer employee to reach into the bottom of the hopper, though the sliding gate, to manually free up the sand so it would flow out of the gate and onto the transloader.

48.     While Mr. Cote had his hand in the hopper car in an effort to free up the sand, a co-worker used the PTO to slam the gate shut, not realizing that Mr. Cote's hand was reaching through the gate.

49.     The absence of lock out/tag out provisions on the PTO lever permitted Mr. Cote's co-worker to partially sever Mr. Cote's right dominant hand at the wrist when the PTO lever was engaged.

50.     Mr. Cote was then freed from the sliding gate assembly of the rail car and airlifted for emergency surgery to re-attach his hand.

**COUNT I**
**PLAINTIFF v. SCHNELL AND FB**
**NEGLIGENCE**

51.     Plaintiff hereby incorporates the averments contained in the preceding paragraphs as though same were fully set forth herein at length.

52.     The negligence and/or carelessness of Defendants, acting as aforesaid, consisted of the following:

a.     Designing, manufacturing and selling a dangerous and defective machine with a poor and ineffective safety switching system;

b.     Designing, manufacturing and selling a dangerous and defective machine with no lock out/tag out provisions;

c.     Designing, manufacturing and selling a dangerous and defective machine without hydraulic locking mechanisms to prevent operation of the gate opener while an operator was near the sliding gate;

d.     Designing, manufacturing and selling a dangerous and defective machine that exposes its operators to risk of bodily harm;

e.     Failure to conduct a thorough and proper failure mode analysis;

f.      Failure to provide adequate warnings, written or otherwise;

g.      Failure to comply with OSHA regulations pertaining to machine guarding/ pinch points, confined spaces and lockout/tagout (29 CFR § 1910.211-222; 29 CFR § 1910.146; 29 CFR § 1910.147);

h.      Failure to include all elements necessary to make the Product safe for its intended use;

i.      Mandating a dangerous mode of operation to accommodate design deficiencies within the Product;

j.      Violating the applicable industry standards regarding safeguarding machinery (ANSI B15.1); and

k.      Negligently retaining product designers, regulatory compliance and safety personnel.

53.      Said dangerous condition created a reasonably foreseeable risk of the kind of injuries which were incurred by Plaintiff.

54.      The aforesaid incident was due solely as a result of the negligence and/or carelessness of Defendant, acting as aforesaid, and was due in no manner whatsoever to any act or failure to act on the part of Plaintiff.

55.      As a direct and proximate result of the aforementioned incident, Plaintiff has suffered injuries which are or may be serious and permanent in nature, including but not limited to, laceration, fractured radius, fractured ulna, severed and injured tendons, the need for invasive surgery to repair said injuries, nerve injury; the loss of the use of the dominant right hand; infection; significant physical and emotional pain and suffering; loss of sleep; increased risk of medical complications; burning, numbness and tingling; damage to the nervous system; and other ailments that Plaintiff's physicians may diagnose.

56.      As a further direct and proximate result of the aforementioned incident, Plaintiff has been and will be forced to receive and undergo medical attention and care and to expend

various sums of money and to incur various expenses and may be required to continue to expend such sums or incur such expenses for an indefinite time in the future.

57.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered medically determinable physical and/or mental impairment which prevented Plaintiff from performing all or substantially all of the material acts and duties which constituted Plaintiff's usual and customary activities prior to the incident.

58.     As a further direct and proximate result of the aforementioned incident, Plaintiff has or may hereinafter incur other financial expenses which do or may exceed amounts which Plaintiff may otherwise be entitled to recover including, but not limited to, excess medical expenses.

59.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered severe physical pain and mental anguish and humiliation and may continue to suffer same for an indefinite time in the future.

60.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered a loss of past, present, and future earnings and earning potential.

61.     As a further direct and proximate result of the aforementioned incident, Plaintiff has been and will continue to be unable to pursue his chosen avocation or to engage in gainful employment to support himself as he has done in the past.

WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), together with delay damages, interest, costs, and such other just and equitable relief as this Court deems proper.

**COUNT II**
**PLAINTIFF v. SCHNELL and FB**
**STRICT LIABILITY**

62.     Plaintiffs hereby incorporate the averments contained in all of the preceding paragraphs as though same were fully set forth herein at length.

63.     Defendants, Schnell, is strictly liable in tort to Plaintiff pursuant to § 402(a) of the Restatement (Second) of Torts, as adopted by the Courts of this Commonwealth as a designer, manufacturer, and seller of the defective Product.

64.     Defendant, FB, is strictly liable in tort to Plaintiff pursuant to § 402(a) of the Restatement (Second) of Torts, as adopted by the Courts of this Commonwealth as a seller/distributor of the defective Product.

65.     The Product that injured Plaintiff was defective and dangerous.

66.     The Product that injured Plaintiff reached its users without substantial change from the condition it was in when it left the control of the Defendants.

67.     The Product left the control of Defendants while lacking elements necessary to make it safe for its intended use.

68.     As of the date of Plaintiff's injuries, there were numerous technically and economically feasible alternative designs available to Defendants to make the product safe for its intended use.

69.     The danger presented by the Product is unknowable and unacceptable to the average or ordinary consumer.

70.     A reasonable person would conclude that the probability and seriousness of harm cause by the Product outweighs the burden or costs of taking precautions.

71.    Pursuant to <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328 (Pa. 2014), Plaintiff avers that the Product is defective under the "consumer expectations test."

72.    Pursuant to <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328 (Pa. 2014), Plaintiff avers that the Product is defective under the "risk-utility test."

73.    The Product that injured Plaintiff was defective in its design in that it:

    a.    Contained a poor and ineffective safety switching system;

    b.    Failed to have lock out/tag put provisions for the gate opener;

    c.    Exposes its operators to risk of bodily harm;

    d.    Was not the subject of a thorough and proper failure mode analysis;

    e.    Lacks adequate warnings, written or otherwise;

    f.    Fails to comply with OSHA regulations pertaining to machine guarding/ pinch points, confined spaces and lockout/tagout (29 CFR § 1910.211-222; 29 CFR § 1910.146; 29 CFR § 1910.147);

    g.    Does not include all elements necessary to make the Product safe for its intended use; and

    h.    Violates the applicable industry standards regarding safeguarding machinery (ANSI B15.1).

74.    As a direct and proximate result of the aforementioned incident, Plaintiff has suffered injuries which are or may be serious and permanent in nature, including but not limited to, laceration, fractured radius, fractured ulna, severed and injured tendons, the need for invasive surgery to repair said injuries, nerve injury; the loss of the use of the dominant right hand; infection; significant physical and emotional pain and suffering; loss of sleep; increased risk of medical complications; burning, numbness and tingling; damage to the nervous system; and other ailments that Plaintiff's physicians may diagnose.

75.     As a further direct and proximate result of the aforementioned incident, Plaintiff has been and will be forced to receive and undergo medical attention and care and to expend various sums of money and to incur various expenses and may be required to continue to expend such sums or incur such expenses for an indefinite time in the future.

76.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered medically determinable physical and/or mental impairment which prevented Plaintiff from performing all or substantially all of the material acts and duties which constituted Plaintiff's usual and customary activities prior to the incident.

77.     As a further direct and proximate result of the aforementioned incident, Plaintiff has or may hereinafter incur other financial expenses which do or may exceed amounts which Plaintiff may otherwise be entitled to recover including, but not limited to, excess medical expenses.

78.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered severe physical pain and mental anguish and humiliation and may continue to suffer same for an indefinite time in the future.

79.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered a loss of past, present, and future earnings and earning potential.

80.     As a further direct and proximate result of the aforementioned incident, Plaintiff has been and will continue to be unable to pursue his chosen avocation or to engage in gainful employment to support himself as he has done in the past.

WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), together with delay damages, interest, costs, and such other just and equitable relief as this Court deems proper.

## COUNT III
## PLAINTIFF v. NORFOLK
## NEGLIGENCE

81.     Plaintiff hereby incorporates the averments contained in the preceding paragraphs as though same were fully set forth herein at length.

82.     The negligence and/or carelessness of Defendants, acting as aforesaid, consisted of the following:

   a.     Failing to monitor the loading process;

   b.     Failing to keep the loads dry during transportation;

   c.     Permitting product to be loaded that could not be reasonably expected to be safely unloaded;

   d.     Failure to report unloading issues prior to the accident;

   e.     Failure to properly supervise;

   f.     Failure to comply with OSHA regulations regarding hopper cars and inspections (49 CFR § 215.9; 49 CFR § 231.2);

   g.     Violating the applicable industry standards regarding safety inspections; and

   h.     Negligently retaining and/or training personnel.

83.     Said dangerous condition created a reasonably foreseeable risk of the kind of injuries which were incurred by Plaintiff.

84.     The aforesaid incident was due solely as a result of the negligence and/or carelessness of Defendant, acting as aforesaid, and was due in no manner whatsoever to any act or failure to act on the part of Plaintiff.

85.     As a direct and proximate result of the aforementioned incident, Plaintiff has suffered injuries which are or may be serious and permanent in nature, including but not limited to, laceration, fractured radius, fractured ulna, severed and injured tendons, the need for invasive

surgery to repair said injuries, nerve injury; the loss of the use of the dominant right hand; infection; significant physical and emotional pain and suffering; loss of sleep; increased risk of medical complications; burning, numbness and tingling; damage to the nervous system; and other ailments that Plaintiff's physicians may diagnose.

86.     As a further direct and proximate result of the aforementioned incident, Plaintiff has been and will be forced to receive and undergo medical attention and care and to expend various sums of money and to incur various expenses and may be required to continue to expend such sums or incur such expenses for an indefinite time in the future.

87.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered medically determinable physical and/or mental impairment which prevented Plaintiff from performing all or substantially all of the material acts and duties which constituted Plaintiff's usual and customary activities prior to the incident.

88.     As a further direct and proximate result of the aforementioned incident, Plaintiff has or may hereinafter incur other financial expenses which do or may exceed amounts which Plaintiff may otherwise be entitled to recover including, but not limited to, excess medical expenses.

89.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered severe physical pain and mental anguish and humiliation and may continue to suffer same for an indefinite time in the future.

90.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered a loss of past, present, and future earnings and earning potential.

91.     As a further direct and proximate result of the aforementioned incident, Plaintiff

has been and will continue to be unable to pursue his chosen avocation or to engage in gainful

employment to support himself as he has done in the past.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of

One Hundred Fifty Thousand Dollars ($150,000.00), together with delay damages, interest,

costs, and such other just and equitable relief as this Court deems proper.

**COUNT IV**
**PLAINTIFF v. U.S. SILICA**
**NEGLIGENCE**

92.     Plaintiff hereby incorporates the averments contained in the preceding paragraphs

as though same were fully set forth herein at length.

93.     The negligence and/or carelessness of Defendant, acting as aforesaid, consisted of

the following:

a.     Improperly loading moist and/or wet sand product into hopper cars;

b.     Loading sand product that could not reasonably be unloaded in a safe manner;

c.     Loading and transporting sand of deficient quality;

d.     Permitting sand product to solidify and/or clump such that it could not be unloaded via gravity feeding;

e.     Failing to act on notice that hopper cars of its 100 Mesh sand product were difficult and/or impossible to unload due to the manner in which they were loaded and/or the quality of the sand product;

f.     Failure to properly supervise the loading process;

g.     Failure to provide adequate policies and procedures to ensure that hopper cars full of its sand product could be safely unloaded;

h.     Failure to comply with OSHA regulations regarding inspections (49 CFR § 215.9);

i.      Failure to include all elements necessary to make unloading the sand product safe;

j.      Violating the applicable industry standards regarding moisture and safety inspections; and

k.      Negligently retaining, regulatory compliance and safety personnel.

94.     Said dangerous condition created a reasonably foreseeable risk of the kind of injuries which were incurred by Plaintiff.

95.     The aforesaid incident was due solely as a result of the negligence and/or carelessness of Defendant, acting as aforesaid, and was due in no manner whatsoever to any act or failure to act on the part of Plaintiff.

96.     As a direct and proximate result of the aforementioned incident, Plaintiff has suffered injuries which are or may be serious and permanent in nature, including but not limited to, laceration, fractured radius, fractured ulna, severed and injured tendons, the need for invasive surgery to repair said injuries, nerve injury; the loss of the use of the dominant right hand; infection; significant physical and emotional pain and suffering; loss of sleep; increased risk of medical complications; burning, numbness and tingling; damage to the nervous system; and other ailments that Plaintiff's physicians may diagnose.

97.     As a further direct and proximate result of the aforementioned incident, Plaintiff has been and will be forced to receive and undergo medical attention and care and to expend various sums of money and to incur various expenses and may be required to continue to expend such sums or incur such expenses for an indefinite time in the future.

98.     As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered medically determinable physical and/or mental impairment which prevented

Plaintiff from performing all or substantially all of the material acts and duties which constituted Plaintiff's usual and customary activities prior to the incident.

99.     As a further direct and proximate result of the aforementioned incident, Plaintiff has or may hereinafter incur other financial expenses which do or may exceed amounts which Plaintiff may otherwise be entitled to recover including, but not limited to, excess medical expenses.

100.    As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered severe physical pain and mental anguish and humiliation and may continue to suffer same for an indefinite time in the future.

101.    As a further direct and proximate result of the aforementioned incident, Plaintiff has suffered a loss of past, present, and future earnings and earning potential.

102.    As a further direct and proximate result of the aforementioned incident, Plaintiff has been and will continue to be unable to pursue his chosen avocation or to engage in gainful employment to support himself as he has done in the past.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), together with delay damages, interest, costs, and such other just and equitable relief as this Court deems proper.

**VILLARI, LENTZ & LYNAM, LLC**

Thomas A. Lynam, III
_____
THOMAS A. LYNAM, III, ESQUIRE
LEONARD G. VILLARI, ESQUIRE
JOSHUA G. VILLARI, ESQUIRE
Attorneys for Plaintiff
Attorney ID 83817/ 68884/ 85899
100 N. 20th Street, Suite 302
Philadelphia, PA 19103
(215) 568-1990
(215) 568-1920 (fax)
tlynam@vll-law.com / lgvillari@aol.com/
jvillari@vll-law.com