## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAYTON COTE,

       Plaintiff,

    v.

U.S. SILICA COMPANY, NORFOLK
SOUTHERN CORPORATION,
SCHNELL INDUSTRIES, and FB
INDUSTRIES,

       Defendants.

No. 4:18-CV-01440

(Chief Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 16, 2021

In February 2016, Dayton Cote nearly lost his hand while operating a large, industrial machine used to transport frac sand. After the accident, Cote filed suit against four defendants: (1) Schnell Industries, the manufacturer of the machine; (2) FB Industries, Schnell's exclusive distributor in North America and the company that sold the machine to Cote's employer; (3) U.S. Silica Company, the owner of the quarry where the sand originated; and (4) Norfolk Southern Corporation, the company that transported the U.S. Silica's sand from its quarry to Cote's worksite. Cote brought two products liability claims against Schnell and FB Industries, sounding in negligence and strict liability, and separate negligence claims against U.S. Silica and Norfolk Southern. Relevant here, U.S. Silica also filed a crossclaim against Norfolk Southern for contribution.

After concluding discovery, Schnell, FB Industries, and U.S. Silica moved for summary judgment on the claims brought by Cote. Norfolk Southern likewise filed a motion for summary judgment as to U.S. Silica's crossclaim. However, the evidence presented establishes genuine factual disputes on the issues material to Cote's claims against Schnell, FB Industries, and U.S. Silica as well as to U.S. Silica's crossclaim against Norfolk Southern. For this reason, as further explained below, the motions for summary judgment are denied.

## I.    BACKGROUND

The accident occurred on February 27, 2016 at the transfer yard in Wysox, Pennsylvania owned and operated by Shale Rail, LLC, a subsidiary of Northeast Freight Transfer, Inc.[1] At the time, Cote worked for Shale Rail, transferring frac sand from railcars to tractor-trailers using a piece of equipment called a transloader.[2] Under ideal conditions, Cote used the transloader to open a sliding gate on the bottom of the railcars, out of which sand flowed freely—a process known as "gravity feeding."[3] But if the sand inside a rail car became wet, it would not always flow freely onto the transloader (i.e., it would not "gravity feed").[4] To

---

[1]   Doc. 51 ¶¶ 2, 45.
[2]   *Id.* ¶ 2; *see also* Doc. 146, Ex. I (Feb. 6, 2020 D. Cote Dep.) 16:23–17:8.
[3]   Doc. 51 ¶ 36; *see also* Doc. 169, Ex. 1 (Tarkanian Report).
[4]   Doc. 146, Ex. R (Eagar Report) at 1.

extract wet, clogged sand from a railcar, Cote and his coworkers had to reach inside the railcar and manually dislodge the sand.[5]

On the day of the accident, Cote was unloading sand with his Shale Rail coworkers Caleb Spencer and Mitchell Jones.[6] Although it was neither raining nor snowing, all railcars that Cote unloaded that day contained wet sand.[7] At around 6:30 pm, Cote, Spencer, and Jones were unloading a railcar when the wet sand inside clogged, preventing it from gravity-feeding from the railcar to the transloader.[8] Cote went down to inspect the railcar's sliding gate, while Spencer and Jones remained at the rear side of the transloader.[9] Cote attempted to dislodge the sand by adjusting the railcar door and banging on the outside of the railcar with a hammer, but these efforts proved ineffective.[10] Cote then reached his hand inside the railcar to manually break up the sand clumps.[11]

While Cote was dislodging the sand, Spencer used the transloader to close the railcar gate.[12] The gate closed on Cote's hand, nearly severing it from his arm.[13]

---

[5]   Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 32:24–33:10, 119:6–120:18; Doc. 146, Ex. P (Feb. 6, 2020 C. Spencer Dep.) 22:6–23:1, 63:16–64:17.

[6]   Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 42:12–24.

[7]   *Id*. at 96:23–97:6.

[8]   *Id*. at 65:3–8; Doc. 146, Ex. P (Feb. 6, 2020 C. Spencer Dep.) 27:13–29:4.

[9]   Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) at 42:12–43:7, 58:14–20.

[10]   *Id*. at 100:3–14, 188:16–189:19, 198:3–7.

[11]   *Id*. at 194:16–195:14.

[12]   Spencer did not realize that Cote's hand was inside the railcar. *See* Doc. 146, Ex. P (Feb. 6, 2020 C. Spencer Dep.) 63:14–64:9; Doc. 169, Ex. 5 (C. Spencer Post-Incident Investigation Statement).

[13]   Doc. 146, Ex. P (Feb. 6, 2020 C. Spencer Dep.) 93:22–95:5.

### A.    The Transloader

The transloader involved in Cote's accident—a model TLX36—was designed, manufactured, and sold by Defendant Schnell.[14] Schnell had an exclusive distribution agreement with FB Industries, granting FB Industries sole authority to distribute the TLX36 transloader in North America.[15] As such, FB Industries sold the transloader involved in Cote's accident to Northeast Freight Transfer, Cote's employer.[16] The transloader was designed to transfer frac sand from railcars to separate holding or transport containers.[17] It was equipped with a "power takeoff" ("PTO"), which opened and closed the railcar's sliding gate with a hydraulic lever, rather than a hand crank.[18] Once the PTO opened the railcar's sliding gate, sand would gravity-feed from the railcar to the transloader's stinger for sifting.[19] The sand was then carried via conveyor belt to the separate containers.[20]

In a report analyzing the TLX36 transloader, Cote's engineering expert, Michael Tarkanian, P.E., opined that the transloader was defective in the following respects:

---

[14]   Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) 50:14–21.
[15]   *Id*. at 105:3–12.
[16]   *See id*. at 59:1–12, 133:1–16 (objections omitted); Doc. 144, Ex. D (Jan. 8, 2020 B. Dueck Dep.) 121:6–122:16.
[17]   *See* Doc. 146, Ex. R (Eagar Report) at 1.
[18]   Doc. 169, Ex. 1 (Tarkanian Report) at 7–9.
[19]   *Id*.
[20]   *Id*.

- It failed to contain a "lock out" or "tag out" device to protect users from hazardous energy;[21]

- The PTO control panel was located at the rear of the machine, obstructing the operator from observing the transloder's stinger;[22] and

- The accompanying product manual did not address required regulatory safety procedures and contained incomplete and contradictory safety instructions.[23]

Tarkanian attributed these defects to a lack of engineering input during the design process.[24] Schnell's chief principal, Fred Dueck, designed the TLX36 transloader, but he was not an engineer and Schnell had no engineers on staff.[25] FB Industries likewise "had no expertise in engineering,"[26] and neither company engaged a third-party engineer to certify compliance with industry safety standards.[27] Indeed, FB industries' founder and president testified that the company's clients have a right to

---

[21]  *Id*. at 2–4, 16–17. Schell argues that per OSHA regulations, the ignition key on the TLX36 transloader "is an energy isolating device" that qualifies as a "lockout" because "turning off the ignition and removing the key would have prevented the closure of the hopper gate." Doc. 156 at 22 (citing 29 CFR 1910.147). Tarkanian rejected this assertion, arguing that "a keyed ignition is not a lock out device" and, thus, "[t]here is no lock out device on the TLX36 according to OSHA 1910.147." Doc. 169, Ex. 1 (Tarkanian Report) at 3.

[22]  Doc. 169, Ex. 1 (Tarkanian Report) at 9.

[23]  *Id*. at 4–6.

[24]  *Id*. at 2–3 ("The lack of engineers, failure to hire third-party engineers, and lack of experience with OSHA, ANSI and other relevant standards, all contributed to the defective design of improperly relying on a keyed ignition to be a lock out device.").

[25]  Doc. 156, Ex. 15 (Jan. 8, 2020 B. Dueck Dep.) 33:1–25. FB Industries was fully aware of this fact. *See* Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) 50:14–21 ("Q. Okay. When you asked Fred [Dueck] to get involved in designing a trans loader, were you aware of the fact that there were no engineers working for the company? A. Yes. Q. Were you aware of the fact that he had never built a trans loader before? A. Yes.").

[26]  Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) 56:10–12 ("So am I correct that FB had no expertise in engineering? A. Correct.").

[27]  Doc. 69, Ex. 1 (Tarkanian Report) at 1–3.

expect that the company is complying with regulatory and standards[28] and that the company regularly engaged third-party contractors to ensure that its other products complied with these standards;[29] however, FB Industries made no attempt to do so with the TLX36 transloader.[30]

Tarkanian opined that these design defects "directly contributed to the injury of Mr. Cote."[31] In Tarkanian's opinion, an alternative design—specifically, equipping the transloader with a lock out device that deactivates the PTO while permitting the transloader's separate components (i.e., the stinger and conveyor belt) to remain operational—would have prevented the accident:

> [A] lock out dedicated specifically for the PTO hydraulics would be required to prevent injuries like Mr. Cote's. As Frederick Dueck confirmed in his testimony, it is feasible to install a solenoid in the hydraulic circuit, after the PTO control valve, that would prevent hydraulic pressure from flowing to the PTO when activated.[32]

---

[28] Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) 29:12–20.

[29] *Id*. at 23:15–22, 34:17–35:2.

[30] *Id*. at 56:10–57:6, 59:6–12 (objections omitted).

[31] Doc. 169, Ex. 1 (Tarkanian Report) at 17; *see also id*. at 2 ("The lack of engineers at Schnell Industries Inc. and FB Industries Inc. directly contributed to one design defect—the lack of lock out capability—in the TLX36 transloader, which in turn contributed to the injury of Mr. Cote.").

[32] *Id*. at 7. Tarkanian opined that "[o]ne such device, a hydraulic directional control valve, costs approximately $170 at retail." *Id*. For context, the TLX36 transloader costs approximately $136,000. Doc. 168 at 31.

Schnell's engineering expert admitted that if the TLX36 transloader had been equipped with a PTO-specific lock out device, the accident would not have occurred.[33]

## B.    The Sand

As noted, Cote suffered the injury at issue while attempting to dislodge wet frac sand clogged inside a railcar on Shale Rail's Wysox Rail Yard. At the time of the incident, Defendant U.S. Silica owned all the frac sand transported to and through the Shale Rail facility.[34] U.S. Silica contracted with Defendant Norfolk Southern to transport frac sand from its quarries—including its Mapleton Depot plant located in Mapleton, Pennsylvania—to the Wysox Rail Yard.[35] U.S. Silica loaded its frac sand into Norfolk Southern's cars, which were designed to prevent moisture from entering the railcars.[36] Norfolk Southern then transported the loaded railcars to the Shale Rail transfer yard.[37]

U.S. Silica contracted with Shale Rail to "transload" the sand from Norfolk Southern's railcars to trucks owned by U.S. Silica's fracking customers.[38] Per the

---

[33]    Doc. 169, Ex. 9 (Feb. 18, 2021 A. de Richmond Dep.) 96:2–18 ("Q. Okay. You would agree with me that if there was such a lockout system in place that shut off all of the hydraulic circuits except for the belt while clearing a jam that would have completely eliminated the possibility that this accident could occur, correct? . . . A. My answer was yes.") (objection omitted).

[34]    Doc. 146, Ex. 1 (Feb. 7, 2020 D. Cote Dep.) 299:11–13; Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 27:10–15. Although U.S. Silica manufactured various sand products, the sand at issue here is 100 Mesh frac sand. *See* Doc. 155 at 1 (citing Doc. 146, Ex. C (Sept. 30, 2020 F. Razzano Dep.) 27:16–22; Doc. 146, Ex. D (Oct. 21, 2020 J. Tanner Rice Dep.) 23:21–24:4).

[35]    *See* Doc. 51 ¶¶ 34–35; Doc. 63 ¶¶ 34–35; Doc. 143 ¶ 12.

[36]    Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 203:6–24.

[37]    Doc. 143 ¶ 12.

[38]    Doc. 146, Ex. E (U.S. Silica-Shale Rail Contract).

contract, Shale Rail was responsible "for the entire transloading and storage operation," which required Shale Rail to "provide sufficient personnel, with appropriate qualifications, equipment, and tools necessary to perform the Services required by this Agreement."[39] This contract was "exclusive," meaning that Shale Rail transloaded sand coming only from U.S. Silica.[40]

Cote testified that when he first started working at Shale Rail, U.S. Silica typically delivered only dry sand; however, over time, Shale Rail employees increasingly encountered wet sand that was difficult to unload.[41] Cote stated that by the winter of 2015–2016, U.S. Silica's sand was always wet.[42] As noted, wet sand in the railcars disrupted the transloading process because clogging prevented the sand from gravity-feeding onto the transloader's conveyor belt.

Shale Rail maintained a written standard operating procedure ("SOP") for employees to follow when unloading a railcar containing wet sand.[43] The SOP provided guidance on troubleshooting sand flow issues, including an explicit prohibition on placing appendages through the railcar gate to encourage sand flow; only tools were permitted through the gate to dislodge clogged sand.[44] And Shale

---

[39]  *Id*. ¶¶ 1(b), 1(h)(vi).

[40]  *Id*. ¶ 3.

[41]  Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 32:21–33:10.

[42]  *Id*.; *see also id.* at 80:18–23; Doc. 146, Ex. O (Feb. 6, 2020 J. Brink Dep.) 39:1–18 (testifying that the frac sand from U.S. Silica was "horrible, horrible, horrible sand as far as trying to transload it.").

[43]  Doc. 146, Ex. N (Wet Sand SOP). Cote asserts that the SOP was not in place when the accident occurred. *See* Doc. 170 at 16–18. U.S. Silica argues otherwise. *See* Doc. 155 at 6 n.2.

[44]  Doc. 146, Ex. N (Wet Sand SOP) at 2 ("If it is deemed necessary to dislodge sand to encourage flow, no appendage may breach or enter the opening of hopper door, only approved tools.").

Rail provided its employees with tools to dislodge wet sand.[45] Nevertheless, Cote

testified that through watching coworkers, he learned to unclog wet sand using his

hand.[46] Cote explained that the tools Shale Rail provided were generally

ineffective,[47] and that oftentimes the "only way" to dislodge wet sand was by

reaching through the railcar gate with a hand to punch or poke a hole in the

clogged sand.[48]

Cote's second engineering expert, Thomas Eagar, opined that U.S. Silica's

process for loading its frac sand caused moisture condensation inside the railcars

during sufficiently cold temperatures:

> The US Silica Company's Mapleton plant's practice of
> loading hot sand into cold steel rail cars promotes
> moisture condensation in a matter of minutes at a
> boundary layer between the sand and the cold steel,
> creating a layer of caked, jammed sand. As the bulk hot
> sand continues to cool over the span of days, all of the air
> available in the porosity of the sand will continue to
> condense and contribute to jamming. US Silica designed
> the loading process using hot sand with its low relative
> humidity process, so it would flow readily when being
> loaded. Unfortunately, when this hot sand cools down
> after loading, the sand still contains its original moisture,
> which at low temperatures produces high humidity,
> moisture condensation, and clumped sand which makes
> unloading more difficult.[49]

---

[45]   Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 61:22–62:19.
[46]   Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 32:21–33:10, 119:6–120:2.
[47]   *Id*. at 99:2–10, 198:17–199:2.
[48]   *Id*. at 80:2–6, 100:6–16, 120:21–121:3.
[49]   Doc. 146, Ex. R (Eagar Report) at 15.

U.S. Silica's expert in the manufacturing and shipment of frac sand, Michael Wick, P.E., disputes Eagar's findings[50] as well as certain factual assumptions underlying Eagar's analysis.[51] The parties similarly disagree on the number of railcars containing U.S. Silica 100 Mesh sand at the Wysox Rail Yard on February 27–28, 2016, and the temperature of the railcars when unloaded by Cote and his colleagues.[52] However, during his deposition, Wick acknowledged that U.S. Silica was required to load sand in a manner that made it safe for unloading.[53]

---

[50] Doc. 146, Ex. F (Wick Report).

[51] For example, Wick challenges Eagar's assumption that hot sand is loaded into cold railcars, explaining that sand is stored in metal storage silos before being loaded into Norfolk Southern's railcars. *Id*. at 7–8. U.S. Silica argues that "[i]f the sand does not become wet and clumpy through condensation while sitting in metal storage silos, which are exposed to the same atmospheric conditions as the railcars used to transport sand, then it makes no sense that the sand would do so when loaded into the railcars. Doc. 173 at 14 n.5. In response, Cote highlights the deposition testimony of U.S. Silica's project manager, Frank Razzano: "And you'd agree with me that the sand, after it is – is heated through the dryer system, it remains hot for the rest of that process; correct? A. It does." Doc. 146, Ex. C (Sept. 30, 2020 F. Razzano Dep.) 31:4–8 (objections omitted).

[52] U.S. Silica argues that "[o]n the date of Cote's incident, there were 48 rail cars containing U.S. Silica sand at the [Shale Rail] Yard, 34 or which contained 100 Mesh sand," and that "[t]here is no evidence to establish which of the 34 rail cars of 100 Mesh sand Cote and his co-workers were attempting to transload when the incident occurred." Doc. 155 at 3–4 (citing Doc. 146, Ex. T (Feb. 27, 2016 Snapshot Report)). U.S. Silica contends that "it takes several days for rail cars to travel from the Mapleton Depot plant to the Wysox Rail Yard" and that "rail cars would not always be transloaded immediately upon arrival at the Wysox Rail Yard." *Id*. Based on the "Snapshot Report" prepared by U.S. Silica and a railcar "release report" produced by Shale Rail, Cote asserts that fifteen railcars were unloaded at the Shale Rail transfer yard during the dates in question (February 27–28, 2016), and the railcars were shipped from either the Mapleton Depot or U.S. Silica's plants in Peru, Illinois and Sparta, Wisconsin. Doc. 166 at 35–36. Cote presents weather reports from those locations as of February 2016 as evidence that "the temperature was low or lower than the sample temperatures utilized in Eagar's report." *Id*. at 37–38.

[53] Doc. 146, Ex. G (Feb. 3, 2021 M. Wick Dep.) 88:7–9 ("Q. Did US Silica have an obligation to load the sand in a manner that made it safe to unload? A. Yes."), 127:16–22 ("Q. And you already agreed with us, that US Silica has an obligation to load sand in a way that does not create a hazard to unload, correct? A. Yes, they should not load sand—if they can foresee a hazard, they should not load product.") (objection omitted).

Separately, Wick opined that moisture could enter railcars either during transit or while sitting at the transloading yard:

> Moisture can enter railcars through numerous avenues. Once the railcar leaves the loading facility it is in the hands of the railroad. Speculating that condensation is the only cause of wet or damp sand is erroneous. Bulk covered railcars are not insulated, notoriously leaking, and not air tight. Moisture can enter through damaged welded seams, damaged doors, damaged hatches and other avenues.[54]

Employees of both U.S. Silica and Shale Rail similarly acknowledged that rain could enter "poor performing [rail]cars" that are "not sealed correctly."[55] However, there is no indication that any of the railcars that Cote unloaded on February 27, 2016 suffered any physical defects that allowed external water to enter the cars.[56]

---

[54]   Doc. 146, Ex. F (Wick Report) at 9.

[55]   Doc. 146, Ex. D (Oct. 21, 2020 J. Tanner Rice Dep.) 29:11–30:2 ("A. . . . [U]ltimately, once the sand is pulled out of our mine and sent out, you know, we don't really have control over. You know, the quality, we are relying on vendors and our partners to take good care of it.  Q. Is that for circumstances that occur after it's removed from the train cars loaded by U.S. Silica? A. There could be a number of circumstances. You know, for example, sand, if a railcar is not sealed correctly, and it rains, you know, you could have wet sand arise that way."); Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 129:6–12, 130:3–6 ("Q. Okay. All right. Do you have any knowledge whosoever of this particular railcar as to – how the degree of wetness of the sand that was contained therein may have changed during transport?  A. There's all kinds of factors. That's a great question. . . . Or sometimes it's a poor performing car. And even though the sand was put in dry, it sits for a while or it goes through a very nasty weather area, now you have a car that is wet, even though it was put in dry.").

[56]   Doc. 166 at 31.

### C.    Procedural Posture

Cote initiated the instant action on February 26, 2018.[57] In response, U.S. Silica and Norfolk Southern brought crossclaims against each other, and against Schnell and FB Industries, for contribution and indemnification.[58]

In January 2019, Schnell moved to dismiss Cote's claims against it,[59] and in March 2019, filed motions dismiss U.S. Silica's and Norfolk Southern's crossclaims.[60] On June 12, 2019, the Court denied Schnell's motion to dismiss Cote's claims, explaining that the Court "has specific personal jurisdiction over Schnell" and that the allegations in Cote's Amended Complaint stated claims of negligence and strict liability.[61] The Court similarly denied Schnell's motion to dismiss the contribution crossclaims brought against it, but it dismissed the indemnification crossclaims brought by both U.S. Silica and Norfolk Southern.[62]

At the conclusion of discovery, four of the five parties involved in this litigation—Cote, Schnell, FB Industries, and Norfolk Southern—stipulated and

---

[57]   Doc. 1; Doc. 51.

[58]   Doc. 52 (Norfolk Southern's crossclaims against U.S. Silica and FB Industries); Doc. 76 (Norfolk Southern's crossclaim against Schnell); Doc. 59 (U.S. Silica's crossclaims against Norfolk Southern and FB Industries); Doc. 82 (U.S. Silica's crossclaim against Schnell).

[59]   Doc. 58.

[60]   Doc. 83 (Schnell's motion to dismiss Norfolk Southern's crossclaim against it); Doc. 86 (Schnell's motion to dismiss U.S. Silica's crossclaim against it).

[61]   Doc. 90 at 3–7.

[62]   *Id*. at 7–8.

agreed to dismiss Norfolk Southern from the case.[63] U.S. Silica rejected the

stipulation and maintains its contribution crossclaim against Norfolk Southern.[64]

Earlier this year, Schnell, FB Industries, and U.S. Silica filed motions for

judgment on the claims brought by Cote, and Norfolk Southern moved for

summary judgment on U.S. Silica's contribution crossclaim.[65] These motions have

been fully briefed[66] and are now ripe for disposition.

## II.    LAW

"One of the principal purposes of the summary judgment rule is to isolate

and dispose of factually unsupported claims or defenses."[67] The Supreme Court of

the United States has advised that Federal Rule of Civil Procedure 56 "should be

interpreted in a way that allows it to accomplish this purpose."[68] Summary

judgment is appropriate where "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."[69]

Material facts are those "that could alter the outcome" of the litigation, "and

disputes are 'genuine' if evidence exists from which a rational person could

---

[63]   Doc. 143, Ex. B (Joint Stipulation and Dismissal).
[64]   Doc. 159.
[65]   Doc. 150 (Schnell's motion for summary judgment); Doc. 144 (FB Industries' motion for summary judgment); Doc. 146 (U.S. Silica's motion for summary judgment). Doc. 143 (Norfolk Southern's motion for summary judgment).
[66]   Schnell's motion for summary judgment (Doc. 156; Doc. 168; Doc. 174; Doc. 185); FB Industries' motion for summary judgment (Doc. 145; Doc. 170; Doc. 179); U.S. Silica's motion for summary judgment (Doc. 155; Doc. 166; Doc. 173); Norfolk Southern's motion for summary judgment (Doc. 151; Doc. 159; Doc. 162).
[67]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).
[68]   *Id*. at 324.
[69]   Fed. R. Civ. P. 56(a).

conclude that the position of the person with the burden of proof on the disputed issue is correct."[70] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[71] And a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[72]

A judge's task when "ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[73] Thus, if "the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[74]

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."[75] Part of the judge's role at this stage is to ask "whether there is [evidence] upon which a jury can properly proceed

---

[70] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[71] *Clark*, 9 F.3d at 326.

[72] *Id*.

[73] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[74] *Id*.

[75] *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alterations in original).

to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."[76] In answering that question, the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[77] The evidentiary record at trial will typically never surpass what was compiled during discovery.

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[78] For example, while "at the motion-to-dismiss stage of proceedings a district court is obligated to accept the allegations in a plaintiff's complaint as true, it does not accept mere allegations as true at the summary judgment stage."[79] The moving party must identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[80] "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[81]

---

[76] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)) (alteration and emphasis in original).

[77] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[78] *Celotex*, 477 U.S. at 323.

[79] *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 330 (3d Cir. 2016).

[80] *Id.* (internal quotations omitted).

[81] *Id.*

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (1) citations to particular parts of materials in the record that go beyond mere allegations; (2) a showing that the materials cited do not establish the absence or presence of a genuine dispute; or (3) a display that an adverse party cannot produce admissible evidence to support the fact.[82]

Summary judgment is effectively "put up or shut up time" for the nonmoving party.[83] When the movant properly supports his motion, the nonmoving party must show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[84] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[85] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[86] Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[87] On a motion for summary judgment, "the

---

[82] Fed. R. Civ. P. 56(c)(1).

[83] *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (Fisher, J.).

[84] *Liberty Lobby*, 477 U.S. at 250.

[85] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[86] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002).

[87] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

court need consider only the cited materials, but it may consider other materials in the record."[88]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[89] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[90]

## III.   ANALYSIS

The parties have four separate motions for summary judgment pending before the Court. Defendants Schnell, FB Industries, and U.S. Silica seek summary judgment as to the claims filed by the Plaintiff, Cote. Defendant Norfolk Southern moved for summary judgment on the crossclaim brough by U.S. Silica. The Court addresses each motion in turn.

### A.   Schnell's Motion for Summary Judgment

In the Amended Complaint, Cote asserts two claims against Schnell, sounding in negligence and strict liability, based on its design, manufacture, and sale of the allegedly defective TLX36 transloader.[91] Schnell moves for summary judgment, arguing that based on the evidence available, Cote cannot establish that the transloader was negligently designed or suffered a material defect, and likewise

---

[88]   Fed. R. Civ. P. 56(c)(3).
[89]   *Liberty Lobby*, 477 U.S. at 249.
[90]   *Id*. at 249–50 (internal citations omitted).
[91]   Doc. 51 (Counts I and II).

cannot prove that any alleged defect caused Cote's injuries.[92] Further, Schnell contends that Cote failed to show that the Court can exercise personal jurisdiction over Schnell.[93] The Court finds these arguments unpersuasive and denies Schnell's motion for summary judgment.

### 1.    Negligence (Count I)

To establish negligent design and negligent manufacture under Pennsylvania law, a plaintiff "must show that (1) the manufacturer [owed] a duty to the plaintiff, (2) the duty was breached, and (3) such a breach was the proximate cause of [the] plaintiff's injuries."[94] Here, the evidence establishes that all three elements are either satisfied or subject to a genuine factual dispute.

First, Schnell does not dispute that it owed a duty to Cote as a user of its product.[95] As such, the first element has been satisfied.

Second, to establish that a defendant in a negligent design case breached its duty, the plaintiff must "show[] that the Defendant failed to exercise due care in manufacturing or supplying the product."[96] This inquiry typically "turns on whether an alternative, feasible, safer design would have lessened or eliminated the

---

[92]   Doc. 156 at 21–33.

[93]   *Id*. at 33–35.

[94]   *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 753 (E.D. Pa. 2007) (citing *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003); *Dauphin Deposit Bank & Trunk v. Toyota*, 596 A.2d 845, 849–50 (Pa. Super. 1991)).

[95]   *See* Doc. 156 at 21–26 (contesting only the negligent design and proximate cause prongs of Cote's negligence claim).

[96]   *Soufflas*, 474 F. Supp. 2d at 754; *see also Kline v. Zimmer Holdings, Inc.*, 662 Fed. Appx. 121, 123 (3d Cir. 2016) ("Demonstrating breach requires showing that the defendant acted unreasonably.") (citing *Phillips*, 841 A.2d at 1008).

injury [the] plaintiff suffered."[97] Under Pennsylvania law, "expert evidence is

generally required" to establish that a viable alternative design exists.[98] After a

plaintiff presents expert testimony that a proposed alternative would have

prevented the accident, "disagree[ments] about the feasibility and efficacy of [the

alternative design] proposal" constitute "dispute[s] of fact requiring resolution at

trial."[99]

For evidence of Schnell's alleged breach, Cote directs the Court to the

findings of his engineering expert, Michael Tarkanian, P.E. Tarkanian opined that

Schnell "did not follow proper engineering protocols or safety standards when

designing, manufacturing and distributing the TLX36 transloader," and that

"simple, cost-effective" alternative designs would have addressed the design

defects that caused Cote's injuries.[100] Specifically, Tarkanian noted that Schnell

- declined to employ engineers or engage third-party experts in safety to certify compliance with lock out standards or requirements;

- designed the TLX36 transloader "without a lockout/tagout device to protect users from hazardous energy";

- placed "the PTO controls behind the machine where the view of the stringer is obstructed";

---

[97] *Berrier v. Simplicity Manufacturing, Inc.*, 563 F.3d 38, 64 (3d Cir. 2009) (internal quotation marks and emphasis omitted).

[98] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000).

[99] *Capece v. Hess Maschinefabrik GmbH & Co. KG*, 2015 WL 1291798, at *6 (M.D. Pa. Mar. 20, 2015) (Mariani, J.).

[100] Doc. 169, Ex. 1 (Tarkanian Report) at 1, 7.

- issued "a product manual that does not address various safety procedures as mandated by OSHA/ANSI, and is confusing to users"; and

- failed "to conduct any risk assessment during the design phase, particularly as to hazardous energy control and energy-isolating devices."[101]

Tarkanian concluded that these design defects "directly contributed to the injury of Mr. Cote."[102] In Tarkanian's opinion, Cote's injury could have been avoided if Schnell "install[ed] a solenoid in the hydraulic circuit, after the PTO control valve, that would prevent hydraulic pressure from flowing to the PTO when activated."[103] Tarkanian opined that "[o]ne such device, a hydraulic directional control valve, costs approximately $170 at retail."[104] For context, the TLX36 transloader costs approximately $136,000.[105]

Notwithstanding Tarkanian's opinions, Schnell argues that "there is no evidence to establish the transloader was negligently designed."[106] Specifically, Schnell asserts that per OSHA regulations, the ignition key on the TLX36 transloader "is an energy isolating device" that qualifies as a "lockout" because "turning off the ignition and removing the key would have prevented the closure of the hopper gate."[107] Cote disputes this opinion, noting that Tarkanian opined that

---

[101] Doc. 168 (citing Doc. 169, Ex. 1 (Tarkanian Report) at 1–9).
[102] Doc. 169, Ex. 1 (Tarkanian Report) at 17.
[103] *Id*. at 7.
[104] *Id*.
[105] Doc. 168 at 31.
[106] Doc. 156 at 27.
[107] Doc. 156 at 22 (citing 29 CFR 1910.147).

"a keyed ignition is not a lock out device" and, thus, "[t]here is no lock out device on the TLX36 according to OSHA 1910.147."[108]

Additionally, Schnell argues that the proposed alternative design is "not safer because even with the PTO deactivated, Cote would be in contact with or be in the vicinity of other moving parts of the transloader while energized." [109] As such, Schnell asserts that "[t]here is no evidence to establish that the alternative design proposed by Tarkanian [would have] lessened or eliminated the injury [Cote] suffered."[110] Again, Cote disputes Schnell's characterization of the evidence, arguing that both Tarkanian and Schnell's expert, Albert de Richemond, acknowledged "that if such a lockout system were in place, this accident would not have occurred."[111]

As explained, on summary judgment, the Court's responsibility is to assess only "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented"[112]—that is, whether facts material to the claim are "genuinely disputed."[113] The Court finds that the parties' "disagree[ments] about the feasibility

---

[108]  Doc. 168 at 19 (citing Doc. 169, Ex. 1 (Tarkanian Report) at 3).
[109]  Doc. 156 at 23.
[110]  *Id.*
[111]  Doc. 168 at 21–22 (citing Doc. 169, Ex. 1 (Tarkanian Report) at 17; Doc. 169, Ex. 9 (Feb. 18, 2021 A. de Richmond Dep.) 96:2–18).
[112]  *Liberty Lobby*, 477 U.S. at 252.
[113]  Fed. R. Civ. P. 56(c)(1).

and efficacy of [the alternative design] proposal" are predicated on genuine "dispute[s] of fact."[114] Such factual disputes "requir[e] resolution at trial."[115]

The third and final element of the negligent design claim concerns causation: the plaintiff must show that the defendant's "breach was the proximate cause of [the] plaintiff's injuries."[116] To establish proximate cause, "there must be a finding that [the] product defect was a substantial factor in bringing about the accident."[117] Notably, "[t]he breach need not be the exclusive cause of the injury, but merely a substantial cause regardless of whether other factors contributed to the injury."[118]

Schnell argues that "[t]he alleged absence of a lockout was not the cause of Cote's injuries"; rather, the accident was caused by human error: "No one operating the machine intended to utilize a lockout but, instead, intended to keep the machine energized and the hopper gate operational."[119] As a preliminary matter, the Court finds this argument highly suspect. In effect, Schnell is asserting that because Cote and his colleagues did not shut off the TLX36 transloader, they would not have used any alternative safety mechanism—a superseding event that should doom Cote's negligent defect claim for lack of causation. If given legal

---

[114] *Capece*, 2015 WL 1291798 at *6.

[115] *Id.*

[116] *Soufflas*, 474 F. Supp. 2d at 753.

[117] *DeJesus v. Knight Industries & Associates, Inc.*, 2016 WL 4702113 at *10 (E.D. Pa. Sept. 8, 2016) (citing *Pa. Dep't of Transp. V. Phillips*, 488 A.2d 77, 86 (Pa. 1984) *abrogated on other grounds by Mascaro v. Youth Study Center*, 523 A.2d 1118 (Pa. 1987)).

[118] *Cataldo*, 2007 WL 9761661 at *9 (citing *Hamil v. Bashline*, 392 A.2d 1280, 1284–85 (Pa. 1978)).

[119] Doc. 156 at 25.

effect, this logical leap would bar the judicial gates on a multitude of otherwise viable products liability claims. Unsurprisingly, Schnell does not cite any legal authority for this argument.

Be that as it may, Cote presents evidence that directly conflicts this purported superseding cause. Specifically, Cote notes that Tarkanian and several fact witnesses stated that "[w]hen clearing jammed sand from the hopper car, the conveyor belt of the transloader must stay running to move the sand that is cleared."[120] If deactivated, the transloader would have been unable to move the dislodged sand along the conveyor belt, causing the sand to build up on, and potentially spill off, the transloader.[121] As such, Cote asserts that deactivating the transloader was not an option, and his failure to do so provides no insight into how he and his colleagues would have used Tarkanian's proposed alternative design, which deactivates only the PTO and thus permits the conveyor belt to continue operating.[122]

Further, Cote reiterates that Tarkanian found that the TLX36 transloader "design defects . . . directly contributed to the injury of Mr. Cote."[123] As explained, Tarkanian's report details the transloader's alleged design defects, concludes that

---

[120] Doc. 168 at 2–3 (citing Doc. 169, Ex. 1 (Tarkanian Report) at 7; Doc. 169, Ex. 2 (Feb. 7, 2020 D. Cote Dep.) 190:12–192:24; Doc. 169, Ex. 3 (Feb. 6, 2020 C. Spencer Dep.) 57:11–20, 59:2–4; Doc. 169, Ex. 6 (Feb. 6, 2020 M. Jones Dep.) 56:12–21; Doc. 169, Ex. 7 (Jan. 15, 2021 M. Tarkanian Dep.) 34:12–35:3, 38:16–20).
[121] *Id*.
[122] *Id*. at 36–37.
[123] Doc. 169, Ex. 1 (Tarkanian Report) at 17.

the defects contributed the Cote's injury, and then offers a proposed solution that

arguably would have prevented the accident:

> The lack of engineers at Schnell Industries Inc. and FB
> Industries Inc. directly contributed to one design defect—
> the lack of lock out capability—in the TLX36
> transloader, which in turn contributed to the injury of Mr.
> Cote. . . . [A] lock out dedicated specifically for the PTO
> hydraulics would be required to prevent injuries like Mr.
> Cote's. As Frederick Dueck confirmed in his testimony,
> it is feasible to install a solenoid in the hydraulic circuit,
> after the PTO control valve, that would prevent hydraulic
> pressure from flowing to the PTO when activated."[124]

Based on Tarkanian's assessment of the TLX36 transloader and conclusions about

the nature and effect of the identified defects, a reasonable jury could conclude that

the transloader's defects were a substantial factor in causing Cote's injuries.[125] To

---

[124] *Id*. at 2, 7.

[125] In its motion for summary judgment, FB Industries similarly argues that Cote failed to establish causation. *See* Doc. 145 at 8–13. In addition to the argument that human error constituted a superseding cause, FB Industries asserts that dismissal for lack of causation is justified based on the following two prior District Court rulings: *Ream v. Ethicon, Inc.*, 2020 WL 6889238 (M.D. Pa. Nov. 24, 2020) (Kane, J.), and *Martinez v. Rees, Inc.*, 2010 WL 11549299 (E.D. Pa. Mar. 8, 2010). But these cases are inapposite. In *Ream*, the court granted the defendants' motion for summary judgment on the plaintiffs' products liability claims because the plaintiffs' "case-specific expert" failed "to establish specific causation." 2020 WL 6889238 at *4–5. The court explained that the expert's report, which was only two pages long, "fail[ed] to identify a defect in [the product] and explicitly link that defect to the injuries allegedly suffered by [the named plaintiff]." *Id*. at *5. Similarly, in *Martinez*, the court granted summary judgment on the plaintiff's defective product strict liability claims because the plaintiff's expert did not establish that the alleged defect "actually caused the injury." 2010 WL 11549299 at *4. The court explained that although the expert's report "may establish that the [product] was defective," it "says nothing about this alleged defect causing the injury." *Id*.

As explained, Tarkanian identified the alleged defects in the TLX36 transloader and explicitly linked these defects to Cote's injuries—a conclusion bolstered by Tarkanian's opinion that an alternative design would have prevented the accident. Doc. 169, Ex. 1 (Tarkanian Report) at 16–17. Indeed, Schnell's engineering expert agreed that Tarkanian's proposed alternative design would have prevented Cote's injuries. *See* Doc. 169, Ex. 9 (Feb. 18, 2021 A. de Richmond Dep.) 96:2–18. As such, the instant case is more akin to *Richetta v. Stanley*

the extent Schnell (or FB Industries) disagrees with Tarkanian's conclusions or believes that the accident was solely attributable to a superseding cause, "the question of causation is best left for a jury."[126]

Because there are genuine disputes of fact on whether Schnell breached its duty and whether this breach was the proximate cause of Cote's injuries, Schnell's motion for summary judgment on Count I is denied.

## 2.    Strict Liability (Count II)

Restatement (Second) of Torts § 402A (1965) provides that for a plaintiff to establish a strict liability claim, he must prove (1) "the product was defective"; (2) "the defect was a proximate cause of Cote's injuries"; and (3) "the defect causing the injury existed at the time the product left the seller's hands."[127] Here, Schnell's challenge to Cote's strict liability claim centers on the first element: whether the TLX36 transloader was defective.[128]

---

*Fastening Systems, L.P.*, 661 F. Supp. 2d 500, 511–12 (E.D. Pa. 2009), a products liability action involving an allegedly defectively designed nail gun. There, the plaintiffs' expert opined that "notwithstanding Richetta's decision not to disconnect the nail gun from its air compressor—had the nail gun been equipped with a safety lock or trigger switch, Richetta would have been able to avail himself of such a mechanism." *Id*. at 12. According to the plaintiffs' expert, the safety lock or trigger switch "would have prevented a nail from firing while temporarily not in use," thus preventing Richetta's injury. *Id*. Based on the expert's opinions, the court held that the plaintiffs "presented enough evidence for a reasonable jury to conclude that the nail gun's lack of a safety lock was a substantial factor in causing Richetta's injuries. *Id*. at 511–12.

[126] *Richetta*, 661 F. Supp. 2d at 512; *see also DeJesus*, 2016 WL4 702113 at *11 (holding that because the defendant failed "to demonstrate that the accident was solely attributable to a supervening cause," the question of proximate cause is "best left to the jury").

[127] *Sikkelee v. Precision Airmotive Corp.*, 907 F.3d 701, 709–10 (3d Cir. 2018); *see also Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997).

[128] In addition, Schnell argues that the alleged defect was not the proximate cause of Cote's injuries. *See* Doc. 156 at 33. However, Schnell asserts only that because "[t]he issue of

A plaintiff may prove that a "defective condition" exists by showing either (a) "the danger is unknowable and unacceptable to the average or ordinary consumer" (the "consumer expectation standard"), or (b) "a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions" (the "risk-utility standard").[129] Notably, the Pennsylvania Supreme Court cautioned trial courts against making "defective condition" determinations on summary judgment: "Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue."[130]

### a.  Consumer Expectation Standard

Whether a product is in a defective condition under the consumer expectation standard depends on if "the danger is unknowable and unacceptable to the average or ordinary person."[131] A product "is not defective if the ordinary consumer would reasonably anticipate and appreciate the dangerous condition of

---

[129]  causation is common to both a strict liability claim and a negligence claim," its arguments against causation "for Cote's negligence claim applies equally to his strict liability claim." *Id.* (citing *Whyte v. Stanley Black & Decker, Inc.*, 2021 WL 230986, at *12 (W.D. Pa. Jan. 22, 2021)). As explained, there is a genuine factual dispute as to whether the alleged product defect was a "substantial factor in bringing about the accident." *DeJesus*, 2016 WL 4702113 at *10. The Court therefore declines to grant Schnell summary judgment as to Cote's strict liability claim on this basis.

[129]  *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 335 (Pa. 2014).

[130]  *Id.*

[131]  *Id.* at 394.

26

the product and the attendant risk of injury of which the plaintiff complains."[132] To determine "the reasonable consumer's expectations," courts must consider "[t]he nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller."[133]

Here, the parties dispute the degree of surprise associated with the danger based on the nature of the product and the reasonable expectations of the intended user. Specifically, the parties disagree on what safety instructions regarding wet sand in the hopper cars Cote and the other Shale Rail employees received prior to the accident,[134] and what Cote reasonably should have believed regarding the safety of clearing wet sand by hand and the operation of the PTO controls.[135] Additionally, Schnell argues that "[t]here is no evidence of any express or implied representation regarding the transloader by Schnell that minimized or mand

---

[132] *Id*.

[133] *Id*. at 394–95.

[134] *Compare* Doc. 174 at 9 ("Shale Rail employees were instructed on the dangers of putting their hands through the hopper car gate, were instructed not to put any appendage through the hopper car gate and, if necessary, to use a tool to stick through the hopper car gate in necessary to address sand flow issues.") *with* Doc. 185 at 3 ("Plaintiff testified that he was never trained on getting wet sand out of a hopper car, . . . [and] the record demonstrates that there was no 'wet sand protocol' (*i.e.*, 'use only tools to dislodge wet sand') at the time of the incident.").

[135] *Compare* Doc. 156 at 28 ("Cote acknowledged he knew he could be injured if the hopper gate closed with this hand inside and that the gate could be closed with his hand inside while the transloader was operating.") *with* Doc. 168 at 28 ("[W]hile Plaintiff knew a hopper gate could injure a person, he also knew that the translaoder's conveyer belt . . . needed to keep running in order to clear the sand. Further, Plaintiff testified that it was his belief that the person on the ground—*i.e.*, Plaintiff—was the only person who could operate the PTO controls.").

unknowable the obvious danger."[136] But Cote's engineering expert asserts the opposite: "Defendant made various representations, both express and implied, concerning the isolation of hazardous energy in its manual which are internally inconsistent, confusing to users, and in violation of OSHA and ANSI standards."[137]

These disagreements demonstrate that there is a genuine factual dispute as to whether the danger of the PTO closing the gate on a worker clearing jammed sand from the railcar was unknowable and unacceptable to the average or ordinary customer. Given the Pennsylvania Supreme Court's express admonition against issuing a defective condition ruling on summary judgment unless "it is clear that reasonable minds could not differ on the issue,"[138] the Court declines to grant summary judgment for failure to establish the presence of a defective condition under the consumer expectation standard.

### b.      Risk-Utility Standard

The "risk-utility standard" asks whether "a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions."[139] When engaging in the risk-utility calculus, courts consider a number of factors, including "[t]he usefulness

---

[136]  Doc. 156 at 28–29.

[137]  Doc. 168 at 27.

[138]  *Tincher*, 104 A.3d at 335; *see also High v. Pennsy Supply, Inc.*, 154 A.3d 341, 350–51 (Pa. Super. 2017) (holding that "the trial court erred in entering summary judgment based on its finding that concrete is not defective" because "a genuine issue of material fact exists as to whether an ordinary consumer would reasonably anticipate and appreciate the dangerous condition of concrete and the attendant risk of injury).

[139]  *Tincher*, 104 A.3d at 335.

and desirability of the product—its utility to the user and to the public"; "[t]he likelihood that [the product] will cause injury, and the probable seriousness of the injury"; and "[t]he manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility."[140] As with the consumer expectation standard, the Pennsylvania Supreme Court held that in nearly all circumstances, determining whether a product is defective under the risk-utility standard is a task properly left to the factfinder:

> [T]he practical reality . . . is that trial courts simply do not necessarily have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide, as a matter of law, whether a product is unreasonably dangerous except perhaps in the most obvious of cases (*e.g.*, where injury is caused by a knife), where a gate-keeper's function is hardly necessary.[141]

In arguing that the TLX36 transloader was not defective under the risk-utility standard, Schnell mostly reiterates its arguments in opposition to Cote's negligent design claim. Specifically, Schnell asserts that during his deposition, Tarkanian admitted "that turning the ignition key to the off position and removing the key was an energy isolation device that would prevent energization of the transloader."[142] Additionally, Schnell argues that "[t]he suggested disconnect to the hydraulic circuit controlling the PTO, as a simple cost-effective solution to the lack

---

[140]  *Id*. at 389–90.
[141]  *Id*. at 380.
[142]  Doc. 156 at 30–31.

of a 'proper' lock out device on the transloader, would not have made the product safe or its absence a product defect" because "[w]ith the disconnect, the transloader would remain energized and Cote would be in contact with or [in] the vicinity of moving parts including the wheel drive, the conveyor and the stinger which was unsafe."[143] Schnell also reiterates that "a disconnect on the hydraulic circuit controlling the PTO would have prevented the incident only if it were used"; "[i]f not used, the disconnect would not prevent the incident."[144]

As explained, Cote disputes these arguments and has presented sufficient contradictory evidence to establish a genuine factual dispute.[145] Moreover, Cote argues that the "burden or cost[] of taking precautions" is minimal: "[A]s demonstrated by [Cote's] engineering expert, 'There are simple, cost effective solutions to the lack of a proper lockout device on the TLX36, that can be implemented with minimal effort or expense.'"[146] Indeed, Tarkanian opined that one such solution, "a hydraulic directional control valve, costs approximately $170 at retail"—barely a fraction of the $136,000 sticker price of the Schnell transloader.[147]

---

[143] *Id*. at 32–32.

[144] *Id*. at 32.

[145] *See* Doc. 169, Ex. 1 (Tarkanian Report) at 3 (opining that "a keyed ignition is not a lock out device" and, thus, "[t]here is no lock out device on the TLX36 according to OSHA 1910.147"), 7 (opining that Cote's injury could have been avoided if Schnell "install[ed] a solenoid in the hydraulic circuit, after the PTO control valve, that would prevent hydraulic pressure from flowing to the PTO when activated").

[146] Doc. 168 at 29 (citing Doc. 169, Ex. 1 (Tarkanian Report) at 17).

[147] *Id*. at 31.

Consistent with the Pennsylvania Supreme Court's ruling in *Tincher*, the Court finds that based on the evidence available, reasonable minds could disagree whether "the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions."[148] Therefore, the Court declines to grant summary judgment for failure to establish the presence of a defective condition under the risk-utility standard. Schnell's motion for summary judgment as to Cote's strict liability claim is denied.

### 3.      Personal Jurisdiction

In its final argument for summary judgment, Schnell argues that the Court lacks personal jurisdiction. Specifically, Schnell contends that it did not "purposefully direct[] its activities at . . . Pennsylvania" and the litigation does not "arise[] out of or relate[] to [any] such activity."[149] But the Court already considered this argument—and rejected it.

In denying Schnell's motion to dismiss in June 2019, this Court held that it "has specific jurisdiction over Schnell."[150] The Court explained that "Schnell has, for Northeast Freight's *specific* benefit (presumably with the goal of securing a sale to that Pennsylvania customer), taken the trouble to certify that its products qualify as 'steel products' under the Commonwealth's Steel Products Procurement

---

148 104 A.3d at 335.
149 Doc. 156 at 35.
150 Doc. 90 at 5.

Act."[151] As such, the Court ruled that Schnell "'deliberate[ly] target[ed]'

Pennsylvania customers 'as part of its efforts to sell products . . . in Pennsylvania

specifically.'"[152]

In its dispositive motion, Schnell does not point to any new facts or legal

authority that affect whether this Court can properly exercise personal jurisdiction

over Schnell.[153] Instead, Schnell simply repeats and reframes arguments the Court

rejected in June 2019.[154] Because Schnell presents no newly-identified factual or

legal developments relevant to the jurisdictional analysis, the Court declines to

---

[151] *Id*. at 4 (citing *L.B. Foster Co. v. Southeastern Pennsylvania Transp. Authority*, 705 A.2d 164, 166 (Pa. Commw. Ct. 1997)).

[152] *Id*. (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018)).

[153] Schnell asserts that the steel-products certification does not afford a basis for jurisdiction because "[t]he certification was not executed by Schnell until 2016 approximately two years after the transloader was sold." Doc. 156 at 35. But Schnell offers no explanation of how this fact affects the analysis underlying the Court's prior jurisdiction ruling. As Cote explains, this does not constitute "new evidence"; rather this is merely "a 'new twist' on the same information [Schnell] had prior to this Court's ruling." Doc. 168 at 39. Moreover, it is undisputed that Schnell executed the certification on January 7, 2016—nearly two months prior to Cote's injury, *see* Doc. 169, Ex. 8 (Jan. 8, 2020 B. Dueck Dep.) 141:5–18—and that Schnell "interacts directly with Pennsylvania customers regarding warranty issues and part and service issues once [its] products are sold, which customers include Shale Rail and Northeast Freight, the Pennsylvania entities for which Mr. Cote was working when he was injured," Doc. 90 at 3–4 (citation omitted).

[154] *See* Doc. 65 at 8–11 ("Cote's claims against Schnell arise from the negligent or defective design of the transloader not warranty work, parts sales, or any certification provided by Schnell. Because the litigation does not arise out of or relate to the alleged activities, the amended complaint fails to allege a basis for specific personal jurisdiction."); Doc. 156 at 33–35 ("[T]here is no meaningful link between the certification and plaintiff's claims. . . . Given that the certification did not relate to the transloader at issue and was not made until two years after Schnell sold the transloader to FB, this litigation does not and could not arise out of or relate to the certification."); *see also* Doc. 90 at 5 ("Schnell then argues that this litigation does not 'arise out of or relate to' its activities in Pennsylvania because Mr. Cote's claims do not concern any warranty or parts service completed in Pennsylvania, or the steel-products certification completed by Schnell for Northeast Freight. Schnell, however, points to no authority—nor can this Court find any—indicating that jurisdictional analyses should describe the 'purposefully directed' activity so narrowly.").

disturb its prior ruling. Accordingly, Schnell's motion for summary judgment is denied.

### B.      FB Industries' Motion for Summary Judgment

For the products liability causes of action—Count I (Negligence) and Count II (Strict Liability)—Cote also names as a defendant FB Industries.[155] Although these claims, and the supporting allegations, apply equally to FB Industries and Schnell, FB Industries filed a separate motion for summary judgment raising two issues: (1) lack of causation, and (2) the absence of "a cognizable duty of care owed by FB [Industries] separate and distinct from Schnell."[156] Because FB Industries' arguments on causation aligned with those raised by Schnell, the issue was addressed above. All that remains is the question of whether FB Industries owed Cote a duty of care. For the reasons provided below, the Court finds that it did.

The Pennsylvania Supreme Court notes that for more than a century, "all American jurisdictions have accepted the existence of a duty in tort arising from the supplier-consumer relationship."[157] Because Pennsylvania incorporated the Second Restatement into its common law,[158] the Commonwealth recognizes two separate legal duties that all sellers owe their customers: "[T]hose who engage in

---

[155]  Doc. 51 ¶¶ 51–80.
[156]  Doc. 145 at 7–14.
[157]  *Tincher*, 104 A.3d at 382.
[158]  *See Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966) ("We hereby adopt the [Restatement (Second) Torts § 402A (1965)] as the law of Pennsylvania.").

the business of selling a product are subject to both a duty of care in manufacturing and selling a product" (*i.e.*, the duty in products liability actions sounding in negligence) "and a duty to sell a product free from a 'defective condition'" (i.e., the duty in strict liability).[159] The Pennsylvania Supreme Court adopted a broad definition of "seller" in this context, explaining that it refers to "all suppliers of products engaged in the business of supplying products for use or consumption by the public."[160]

Here, the relationship between Cote and FB Industries is not in dispute: FB Industries sold the TLX36 transloader involved in Cote's accident to Northeast Freight Transfer, Cote's employer.[161] Nevertheless, FB Industries argues that Cote "presents no . . . evidence and, in fact, does not even allege a cognizable duty of care owed by FB [Industries]."[162] FB Industries asserts that because it "is not a designer or manufacturer of the TLX36,"[163] it is not subject to the "seller's duty in tort to a consumer."[164] That is wrong.

Contrary to FB Industries' claim, Pennsylvania law does not limit products liability claims to only suits brought by consumers against "designer[s] or

---

[159] *Tincher*, 104 A.3d at 383.
[160] *Francioni v. Gibsonia Truck Corp.*, 372 A.2d 736, 739 (Pa. 1977).
[161] *See* Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) at 59:1–12, 133:1–16 (objections omitted); Doc. 144, Ex. D (Jan. 8, 2020 B. Dueck Dep.) 121:6–122:16.
[162] Doc. 145 at 13.
[163] Doc. 179 at 4.
[164] *Tincher*, 104 A.3d at 383.

manufacturer[s]"[165] of defective products. When the Pennsylvania Supreme Court in *Tincher* sought to clarify the "nature of [the] duty" in the supplier-consumer relationship, it held that "those who engage in the business of selling a product" may be held liable in both negligence *and* strict liability.[166] Instead of limiting the scope a seller's duty, the Pennsylvania Supreme Court affirmed that the duty is expansive.[167] The Pennsylvania Supreme Court gave no indication that this duty—either in negligence or strict liability causes of action—applies only to sellers that designed or manufactured the products at issue.

In support of its proposed understanding of the seller's duty to its customers, FB Industries directs the Court to *Musser v. Vilsmeier Auction Co.*[168] and *Nath v. Nat'l Equip. Leasing Corp.*[169] But neither case offers FB Industries the refuge it seeks. In *Musser*, the Pennsylvania Supreme Court held that auctioneers are not "sellers" subject to strict liability in defective products actions because "[t]he auction company merely provided a market as the agent of the seller."[170] Nevertheless, the Pennsylvania Supreme Court emphasized that this ruling did not

---

[165] Doc. 179 at 4.

[166] 104 A.3d at 383; *see also Sikkelee*, 907 F.3d at 709 ("Under Pennsylvania law, a seller may be liable in strict liability and negligence for injuries caused by its defective products.").

[167] *Tincher*, 104 A.3d at 384 (holding that to establish "breach of duty in a strict liability matter," a consumer need only "prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition,'" regardless of whether the seller "exercise[d] reasonable care"); *see also Phillips*, 841 A.2d at 1008 ("Strict liability examines the product itself, and sternly eschews considerations of the reasonableness of the conduct of the manufacturer.").

[168] 562 A.2d 279 (Pa. 1989).

[169] 439 A.2d 633 (Pa. 1981).

[170] 562 A.2d at 282.

disturb its "broadened" application "of the term 'seller' to anyone who, as a

supplier, enters into the business of supplying the public with products which may

endanger them."[171] Unlike an auction house, FB Industries did not merely create a

market through which independent sellers and consumers could exchange goods

for money; FB Industries was "in[] the business of supplying the public with"

TLX36 transloaders, and indeed sold the transloader on which Cote was injured to

Cote's employer.[172]

In *Nath*, an employee injured while operating a wire and cable stripping

machine brought a strict liability defective product claim against the financing

agency that provided Nath's employer the funding needed to purchase the

machine.[173] The Pennsylvania Supreme Court rejected Nath's claim, explaining

that "there was no intention of extending the coverage of Section 402A"—that is,

imposing strict liability—"to transactions that are designed solely for financing

purposes."[174] Instead, strict liability for the "supplier of products" applies only to

"the one that has the control over the product and places it within the stream of

commerce."[175] Here, FB Industries is not the financier of the TLX36 transloader,

---

[171] *Id*. at 281.

[172] *See* Doc. 170 at 6 ("Fred Dueck then designed the Schnell transloaders, including the subject transloader, which FB [Industries] exclusively distributed throughout North America. [FB Industries] sold the subject transloader to Northeast Freight/Shale Rale with full knowledge that it was designed by non-engineers and without any engineering input to ensure safety compliance.") (citing Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) 105:3–12)).

[173] 439 A.2d at 633–34.

[174] *Id*. at 635.

[175] *Id*. at 636.

uninvolved in the specifics of the transaction; FB Industries *sold* the transloader to Cote's employer, making it directly responsible for "plac[ing] [the transloader] within the stream of commerce."[176]

Moreover, Cote presented substantial evidence establishing that FB Industries was—and should have been—involved in selecting and certifying the safety and reliability of the products it sold. FB Industries' founder and President, Henry Friesen, testified that FB Industries "worked on designs along with outside engineers to design and manufacture frac sand handling equipment for the oil field industry, which consisted of vertical silos and conveying systems."[177] Friesen was directly involved in the discussions with Schnell about building and marketing transloaders—indeed, Friesen went with Schnell's chief principal, Fred Dueck, to North Dakota to "take a look" at an existing transloader before Schnell began designing and manufacturing its transloaders.[178]

Friesen acknowledged that FB Industries' customers have the right to expect that the company's products comply with regulatory and industry standards, and FB Industries often engaged third-party engineers to ensure that certain products it sold were compliant.[179] However, Friesen admitted that FB Industries made no effort to confirm safety compliance for the TLX36 transloader at issue,[180] and

---

[176] *Id.*
[177] Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) 34:20–35:2.
[178] *Id.* at 45:12–24, 48:10–49:9, 57:8–23.
[179] *Id.* at 23:15–22, 34:17–35:24.
[180] *Id.* at 59:6–12.

neither FB Industries nor Schnell conducted any failure mode analyses or risk assessments at any point prior to shipping it.[181] Notwithstanding FB Industries' claims to the contrary, this evidence establishes that FB Industries was actively involved in assessing, and exhibited substantial "control over," the products it sold.[182] The legal duty that FB Industries, as a seller, owes its customers is not obviated simply because it sold "the actual TLX36 at-issue here" without ever "possess[ing]" it or taking any of the expected steps to ensure that it complied with the regulatory and industry standards.

Based on a review of the Pennsylvania Supreme Court's jurisprudence on products liability claims, the Court sees no basis for adopting the more restrictive interpretation of a seller's duty in tort to a consumer that FB Industries proposes. In short, Pennsylvania law does not shelter sellers who are only minimally involved in the design and manufacture of the products they sell. The Court therefore finds that FB Industries, as the company that sold the TLX36 transloader involved in Cote's accident to Cote's employer, owed Cote the widely accepted duty that all sellers owe to their customers. FB Industries' motion for summary judgment is denied.

---

[181]  Doc. 169, Ex. 8 (Jan. 8, 2020 F. Dueck Dep.) 52:6–53:13.
[182]  *Nath*, 439 A.2d at 636.

### C.    U.S. Silica's Motion for Summary Judgment

As noted, Cote's Amended Complaint includes a single cause of action against U.S. Silica: Negligence, based on, among other things, U.S. Silica's alleged improper loading of moist and/or wet sand products into the hopper cars Cote was responsible for unloading.[183] To prevail on a negligence claim, a plaintiff must present evidence sufficient to establish the following four elements:

(1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks;

(2) defendant's failure to confirm to the standard required;

(3) a causal connection between the conduct and the resulting injury; and

(4) actual loss or damage resulting to the plaintiff.[184]

U.S. Silica's motion for summary judgment specifically relates to elements one and three—that is, U.S. Silica argues that Cote has not shown that it owed him a "duty of care . . . to deliver dry sand for transloading or to provide tools for unloading wet sand from rail cars" and, separately, that "any actions or omissions of U.S. Silica caused Cote's injuries."[185] The Court disagrees.

### 1.    Duty of Care

As the Pennsylvania Supreme Court has explained, "[t]he primary element in any negligence cause of action is that the defendant owes a duty of care to the

---

[183]  Doc. 51 ¶¶ 92–102.
[184]  *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005).
[185]  Doc. 155 at 11, 28.

plaintiff."[186] The existence of a duty owed by one party to another "is a question of law for the court to decide."[187] A plaintiff may establish duty by looking to standards of care previously recognized and accepted under state common law.[188] Or, where no relevant duty of care applies, a plaintiff may ask a court to articulate a new duty.[189]

Notably, the Pennsylvania Supreme Court counsels against analyzing whether to create a new duty "simply because appellate decisional law has not specifically addressed a theory of liability in a particular context."[190] Before engaging in the "full-blown public policy assessment" required to establish a new legal duty, courts must first ascertain whether the case is simply "one involving application of an existing duty to a novel factual scenario."[191] In such circumstances, courts need only determine whether the existing common law duty applies in this context as well.[192]

Cote's negligence claim against U.S. Silica concerns an existing duty long recognized by Pennsylvania courts: a company engaged in the shipment of goods

---

[186] *Althaus ex rel. Althuas v. Cohen*, 756 A.2d 1166, 1168–69 (Pa. 2000).

[187] *Manzek*, 888 A.2d at 746.

[188] *See Dittman v. UPMC*, 196 A.3d 1036, 1044–48 (Pa. 2018).

[189] *See Althaus*, 756 A.2d at 1169–70 ("The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.").

[190] *Scampone v. Highland Park Care Center*, 57 A.3d 582, 599 (Pa. 2012).

[191] *Dittman*, 196 A.2d at 1046.

[192] *Id.*

"ha[s] a duty to perform its undertakings in relation to the cargo with due care."[193] In *Kunkle v. Continental Transp. Lines*, the Pennsylvania Supreme Court affirmed a jury verdict against the shipping company Continental Transportation Lines in favor of Kunkle, a truck driver who was injured while transporting cargo on behalf of Continental.[194] Specifically, Kunkle got into an accident when attempting to pass a vehicle on the highway—while maneuvering around the other car, Kunkle lost control of the steering and crashed into a telephone pole.[195] Kunkle brought suit against the shipper for negligently loading the cargo into his delivery truck, arguing that Continental's failure to evenly distribute the weight of the cargo caused him to lose control of the truck.[196] The jury returned a verdict for Kunkle.[197] In affirming the jury verdict, the Pennsylvania Supreme Court held that "it was [Continental's] responsibility to see that no dangerous condition would be created by what was going aboard finally."[198]

Twelve years after the Pennsylvania Supreme Court's ruling in *Kunkle*, the United States District Court for the Eastern District of Pennsylvania in

---

[193] *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 218 –19 (3d Cir. 2010) (citing *Manzek*, 888 A.2d at 747 ("[A] duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others."); *Kimble v. Mackintosh Hemphill Co.*, 59 A.2d 58, 71 (Pa. 1948) ("Although individuals are not required to guard against every risk they conceive to be possible, they are under a legal duty to prevent hazards which they can forecast as possible.")).

[194] 92 A.2d 690 (Pa. 1952).

[195] *Id*. at 690–91.

[196] *Id*.

[197] *Id*. at 691.

[198] *Id*. at 691–92.

*Jablonowski v. United States* applied the legal duty articulated in *Kunkle* to the factually distinct but related circumstance involving an injury that occurred during the unloading of a railcar containing heavy crates.[199] The railcar in question was loaded at the federal prison in Lewisburg, Pennsylvania and shipped to Jablonowski's employer in Philadelphia, where the accident occurred.[200] Jablonowski, along with two other employees, were ordered to unload the railcar.[201] Because the heavy crates were loaded into the railcar without being properly secured in place, when Jablonowski went to unload the railcar, one of the crates "fell upon him causing severe injuries."[202] Analyzing *Kunkle* alongside American Jurisprudence 2d, the court held that "it seems likely that Pennsylvania law would permit recovery by an employee of a consignee when the employee is injured because of improper loading of a railroad freight car by a consignor."[203] As such, the court held that "the defendant was negligent in the way it loaded the boxcar in respect to its duty to exercise reasonable care to protect employees of the

---

[199] 230 F. Supp. 740 (E.D. Pa. 1964).
[200] *Id*. at 742.
[201] *Id*.
[202] *Id*.
[203] *Id*. at 742–43; *see also* 13 Am.Jur.2d Carriers § 357 ("A shipper may have a duty to exercise reasonable care to load a shipment in a manner reasonably safe for unloading and failure to exercise such care may render the shipper liable for personal injury to or the death of a consignee or his or her employee which is proximately caused by such a failure, at least so long as the person injured or killed was entitled to do the unloading and was exercising proper care for his or her own safety.").

consignee from possible injury when they were in the act of unloading the cargo."[204]

In 2010, the United States Court of Appeals for the Third Circuit analyzed *Kunkle* in the case *Spence v. ESAB Group, Inc.*[205] There, the plaintiff was injured when his tractor-trailer overturned as he was rounding a curve.[206] The plaintiff was transporting cargo packed, loaded, and braced by the defendant company.[207] Although the plaintiff raised concerns about the way the load, which consisted of welding supplies packaged in in boxes and cartons, was blocked and braced, the defendant responded that "it never had a problem with any of its loads."[208] The plaintiff asserted that the accident occurred because the load shifted laterally.[209] Applying *Kunkle* and the Restatement (Second) of Torts § 323,[210] the Third Circuit held that "[t]hose who undertake the task of loading, securing, and hauling cargo on tractor-trailers have a duty to exercise due care to protect property and persons

---

[204] *Id*. at 743.

[205] 623 F.3d 212 (3d Cir. 2010).

[206] *Id*. at 213.

[207] *Id*.

[208] *Id*. at 214.

[209] *Id*.

[210] "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323; *see also Gradel v. Inouye*, 421 A.2d 674, 677 (1980) ("Section 323(a) of the Restatement [(Second)] of Torts has been part of the law of Pennsylvania for many years.").

from the risk of harm."[211] Although "[t]he primary duty to assure that a load does not shift in transit generally rests with the carrier and its driver[,] . . . where there is evidence that a shipper undertook to load and secure the cargo being transported by a third party carrier, the shipper also bears an obligation to exercise reasonable care."[212]

Consistent with *Kunkle*, as applied in *Jablonowski* and *Spence*, the Court finds that U.S. Silica owed Cote a duty to load its cargo in a manner reasonably safe for unloading. Specifically, "it was [U.S. Silica's] responsibility to see that no dangerous condition would be created by what was going on board finally."[213] As held in *Jablonowski*, this duty applies equally to the company contracted to unload the shipment (i.e., Shale Rail) and the company's employees responsible for doing the unloading—most notably, Cote.[214]

U.S. Silica contests this interpretation of the case law, arguing that the Third Circuit in *Spence* explicitly narrowed the scope of the duty first articulated in *Kunkle* by holding that courts may impose this duty only "when a shipper goes beyond merely loading a product on a trailer, and takes affirmative actions to secure the product or makes affirmative representations about its statements."[215] U.S. Silica contends that because "there is no evidence that [it] did anything other

---

[211] 623 F.3d at 222.
[212] *Id.*
[213] *Kunkle*, 92 A.2d at 691–92.
[214] 230 F. Supp. At 742–43.
[215] Doc. 155 at 20.

than load its sand into the Norfolk Southern rail cars," it did not owe a duty of care to Cote.[216] That is incorrect.

First, the Third Circuit in *Spence* was confronted with a different type of accident caused by different type of shipping concern. In *Spence*, the plaintiff suffered injuries when his tractor-trailer overturned on the road—an accident allegedly caused by the improperly secured cargo packed, loaded, and braced by the defendant.[217] The Third Circuit's holding regarding the duties a shipper assumes when it "takes affirmative actions to secure the product"[218] thus relates to liability for injuries suffered when loads "shift in transit."[219] Here, the cargo at issue (frac sand) was poured directly into the railcars; the sand was not packaged in separate crates that needed to be "blocked and braced" or secured in some other fashion.[220] Therefore, the limiting language in *Spence* that U.S. Silica cites does render the duty inapplicable.

Second, to the extent there is a corollary in the present case for the required "affirmative actions" articulated in *Spence*, it would relate to the affirmative steps U.S. Silica took to ensure that the sand could be successfully gravity-fed from the railcar through the railcar door and onto the transloader. U.S. Silica asserts that it "did not affirmatively represent to Shale Rail, either through its statements or

---

[216] Doc. 173 at 8.
[217] 623 F.3d at 213–14.
[218] Doc. 155 at 20.
[219] *Spence*, 623 F.3d at 222.
[220] Doc. 166 at 2–3 (citing Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 80:24–81:2).

actions, that Shale Rail's employees would not have to transload sand that, on occasion, would be wet and require additional effort to gravity-feed out of the rail cars."[221] But that's not quite right.

U.S. Silica undertook extensive efforts to dry its frac sand before loading it for transport,[222] and contracted with Norfolk Southern to have its frac sand shipped in "contained" railcars with closed tops, "removable lids," and "gravity-fed bottom-release doors."[223] U.S. Silica went to such lengths to ensure the sand remained dry because it recognized that it could not "process" wet sand—that is, "gravity feeding and running sand through shoots does not work well when the sand is wet."[224] Indeed, based on his understanding of U.S. Silica's operations and relationship with Cote's employer, U.S. Silica's expert, Michael Wick, "acknowledge[d] that U.S. Silica was required to load its sand in a manner that made it safe for unloading—*i.e.*, gravity-feeding onto a transloader."[225]

---

[221] Doc. 155 at 21.

[222] Doc. 146, Ex. C (Sept. 30, 2020 F. Razzano Dep.) 17:7–22:4 (describing the "three different methods that U.S. Silica employs at Mapleton to dry this sand").

[223] Doc. 166 at 32 (citing Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 227:16–20; Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 203:18–21).

[224] Doc. 136, Ex. G (Sept. 30, 2020 F. Razzano Dep.) 22:15–23:7).

[225] Doc. 166 at 17; *see also* Doc. 146, Ex. G (Feb. 3, 2021 M. Wick Dep.) 88:7–9 ("Q. Did US Silica have an obligation to load the sand in a manner that made it safe to unload? A. Yes."), 127:16–22 ("Q. And you already agreed with us, that US Silica has an obligation to load sand in a way that does not create a hazard to unload, correct? A. Yes, they should not load sand— if they can foresee a hazard, they should not load product.") (objection omitted).

For these reasons, the Court rejects U.S. Silica's argument that under *Spence*,

"U.S. Silica did not owe a duty of care to [Cote]."[226] The Court thus declines to grant

U.S. Silica summary judgment on this basis.

### 2.    Causation

After demonstrating that a defendant owed plaintiff a duty of care and

breached that duty, "it is incumbent on [the] plaintiff to establish a causal

connection between defendant's conduct and the plaintiff's injury"—that is, "the

defendant's conduct must be shown to have been the proximate cause of plaintiff's

injury."[227] To establish proximate causation, "a plaintiff must adduce evidence to

show that the defendant's act was a substantial factor in bringing about the

plaintiff's harm."[228] Notably, the Pennsylvania Supreme Court "has never insisted

that a plaintiff must exclude every other possible cause for his or her injury,"; in

fact, it has "consistently held that multiple substantial causes may combine and

cooperate to produce the resulting harm to the plaintiff."[229] As such, "once a

plaintiff has established facts from which a jury could reasonably conclude that

defendant's actions were a substantial factor in bringing about the harm, the fact

that some other cause concurs with the negligence of the defendant in producing an

---

[226] Doc. 173 at 8.
[227] *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978).
[228] *Rost v. Ford Motor Company*, 151 A.3d 1032, 1049 (Pa. 2016).
[229] *Id*. at 1051.

injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence."[230]

Additionally, the Pennsylvania Supreme Court has explained that when the legal duty at issue stems from the Restatement (Second) of Torts § 323, "the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury as to whether a defendant may be held liable for the plaintiff's injuries" is "relax[ed]."[231] Specifically, "[o]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm."[232]

Section 323 provides the following:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognized as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
>> (a) his failure to exercise such care increases the risk of harm, or

---

[230] *Hamil*, 392 A.2d at 1285 (internal quotation marks omitted).

[231] *Id*. at 1286; *see also Estate of Hayes By and Through the Administratrix of His Estate Hayes v. Coatesville Hospital Corp.*, 2021 WL 1853561, at *11 (Pa. Super. May 10, 2021) (affirming that the Pennsylvania Supreme Court's ruling in *Hamil*—that "the effect of Section 323(a) was to relax the degree of certainty ordinarily required of a plaintiff[']s evidence to provide a basis upon which a jury may find causation"—is "the longstanding precedent of this Commonwealth") (internal quotation marks omitted).

[232] *Hamil*, 392 A.2d at 1286.

> (b) the harm is suffered because of the other's
> reliance upon the undertaking." Restatement
> (Second) of Torts § 323.

As the Third Circuit held in *Spence*, the legal duty at issue here "is consistent with," and flows from, Section 323.[233] Therefore, to establish causation at this stage and avoid summary judgment on this basis, Cote need only "introduce[] evidence that [U.S. Silica's] negligent act or omission increased the risk of harm to a person in [Cote's] position, and that harm was in fact sustained."[234] Cote has met this burden.

As proof that U.S. Silica's frac sand loading practices "increased the risk of harm to a person in plaintiff's position,"[235] Cote identifies three predicate facts: (a) in the winter of 2015–2016, U.S. Silica owned every granular of frac sand at the Wysox Rail Yard;[236] (b) on the day of the incident, Cote unloaded several railcars containing U.S. Silica frac sand and each railcar contained wet sand;[237] and (c) Cote was injured while attempting to dislodge from a railcar at the Wysox Rail Yard sand that "was too wet to gravity-feed from the railcar to the transloader."[238] Cote then argues that "[t]he evidence establishes that U.S. Silica's process for loading and shipping its frac sand guaranteed that under sufficiently cold temperatures, as occurred that winter, the sand unloaded at Shale Rail would be

---

[233] 623 F.3d at 222.

[234] *Hamil*, 392 A.2d at 1286.

[235] *Id*.

[236] Doc. 166 at 2, 31 (citing Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 299:11–13; Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 27:10–15).

[237] Doc. 166 at 32; *see also* Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 96:23–97:6.

[238] Doc. 166 at 8–11 (citing Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 60:22–65:10).

wet."[239] For this, Cote directs the Court to the report prepared by his expert,

Thomas Eagar:

> The US Silica Company's Mapleton plant's practice of
> loading hot sand into cold steel rail cars promotes
> moisture condensation in a matter of minutes at a
> boundary layer between the sand and the cold steel,
> creating a layer of caked, jammed sand. As the bulk hot
> sand continues to cool over the span of days, all of the air
> available in the porosity of the sand will continue to
> condense and contribute to jamming. US Silica designed
> the loading process using hot sand with its low relative
> humidity process, so it would flow readily when being
> loaded. Unfortunately, when this hot sand cools down
> after loading, the sand still contains its original moisture,
> which at low temperatures produces high humidity,
> moisture condensation, and clumped sand which makes
> unloading more difficult.[240]

Cote asserts that "[v]iewed in a light most favorable to [him]," the predicate facts

and Eagar's findings establish "that it is more likely than not that U.S. Silica's

process of loading its hot sand into cold railcars had caused, or at least

substantially contributed to, the wet sand that Cote was unclogging when his hand

was partially amputated."[241]

U.S. Silica disagrees, challenging both the sufficiency of Cote's cited

causation evidence and the reliability of Eagar's expert opinions. First, U.S. Silica

argues that "Cote cannot prove causation because he cannot prove that any actions

---

239  Doc. 166 at 40.
240  Doc. 146, Ex. R (Eagar Report) at 15.
241  Doc. 166 at 40.

or omissions of U.S. Silica caused the sand to become wet in the car."[242] U.S.

Silica asserts that based on the evidence, it is equally as likely that the sand may

have become wet while "in transit from the Mapleton Depot plant to the Wysox

Rail Yard" or while "sitting in the rail car at the Wysox Rail Yard."[243] But even if

true, that is not a basis for dismissing Cote's negligence action against U.S. Silica

on summary judgment. As noted, because this is "a situation to which Section

323(a) applies," Cote needs only to demonstrate that U.S. Silica's loading practices

"increased the risk of harm"—whether "that increased risk was a substantial factor

in producing the harm" then "becomes a question for the jury."[244] Here, Cote has

made a prima facie showing that U.S. Silica's conduct increased the risk of injury

Cote suffered; the existence of other plausible explanations for how the accident

occurred does not negate this showing.

Moreover, even if the Court was permitted to engage in the "substantial

factor" analysis at this juncture, the Court would nevertheless find U.S. Silica's

arguments unpersuasive. Under Pennsylvania law, the existence of an alternative

explanation for an accident justifies dismissal on summary judgment only if the

defendant "can show that such other cause would have produced the injury

independently of his negligence."[245] Here, U.S. Silica has made no such showing.

---

[242] Doc. 155 at 30.
[243] Doc. 155 at 28 –30 (citing *Galullo v. Federal Express Corp.*, 937 F. Supp. 392, 394 (E.D. Pa. 1996).
[244] *Hamil*, 392 A.2d at 1286–88.
[245] *Id.* at 1285.

As Cote argues, the railcars used to transport U.S. Silica's frac sand were designed "to prevent its supposedly dry sand from being exposed to water while in transit or while sitting in the rail yard"[246]: the railcars "are 'contained units' having closed tops with 'removable lids' and 'gravity-fed bottom-release doors.'"[247] Additionally, "there is no evidence that Cote unloaded defective railcars on the day of the accident."[248] Given that, whether U.S. Silica's frac sand was exposed to water while in transit or while sitting at the Wysox Rail Yard remains an open question. Such questions are for the jury to answer.

Second, U.S. Silica argues that Eagar's expert opinions "regarding how the sand became wet" are inadmissible because they are based on "several fatal assumptions, including (1) the sand that Cote was transloading was loaded onto the rail car when it was still at an elevated temperature from the drying process, and (2) the sand that Cote was transloading was loaded and shipped within a week of the incident."[249] As a preliminary matter, the Third Circuit has held that "in deciding whether an expert's report meets the reliability factor of a Daubert and Rule 702 analysis, the District Court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein."[250] As such,

---

[246] Doc. 166 at 32 (internal quotation marks omitted).

[247] *Id*. (citing Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 277:16–20; Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 203:18–21).

[248] *Id*. at 31.

[249] Doc. 155 at 31–33 (citing *Fedorcyk v. Caribbean Cruise Lines, Ltd*., 82 F.3d 69, 73 (3d Cir. 1996)).

[250] *Walker v. Gordon*, 46 Fed. Appx. 691, 695 (3d Cir. 2002).

when an expert's testimony is "contradicted by other evidence, . . . the existence of [such] conflicting evidence [is] not a basis on which to exclude [the expert's] testimony."[251] U.S. Silica's disagreements with the factual assumptions underlying Eagar's conclusions thus affect only the weight, not the admissibility, of Eagar's opinions.

Additionally, Cote has presented facts that, when considered in a light most favorable to him, support the assumptions upon which Eagar's opinions rest. During his deposition, U.S. Silica's plant manager, Frank Razzano, testified that U.S. Silica's frac sand remained at an elevated temperature when gravity-fed from the silos into railcars.[252] Further, Cote cites a "Snapshot Report" prepared by U.S. Silica and a Railcar "Release Report" produced by Shale Rail as evidence that fifteen railcars were unloaded at the Wysox Rail Yard during the dates in question (February 27–28, 2016), and the railcars were shipped from either the Mapleton Depot or U.S. Silica's plants in Peru, Illinois and Sparta, Wisconsin.[253] Based on a review of weather reports for those locations as of February 2016, "the temperature was low or lower than the sample temperatures utilized in Eagar's report."[254] And during his deposition, Razzano acknowledged that "same as its Mapleton Depot,

---

[251] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012).

[252] Doc. 146, Ex. C (Sept. 30, 2020 F. Razzano Dep.) 31:4–8 ("Q. And you'd agree with me that the sand, after it is – is heated through the dryer system, remains hot for the rest of that process; correct? A. It does.") (objection omitted).

[253] Doc. 166 at 35–36.

[254] *Id*. at 27–38.

U.S. Silica's plants in Illinois and Wisconsin—where three of the [twelve] cars were loaded—have no radiant cooling system for cooling its frac sand before loading the product into railcars."[255]

As is to be expected, U.S. Silica disputes these facts.[256] But, again, resolving such factual disputes is a task for the jury—not the Court on summary judgment.

### D.   Norfolk Sothern's Motion for Summary Judgment

Norfolk Southern asks the Court to grant summary judgment on U.S. Silica's crossclaim, arguing that U.S. Silica has no evidence to support a claim that moisture in the frac sand was attributable Norfolk Southern's actions or failure to act.[257] In response, U.S. Silica asserts that the evidence presented "makes it equally as plausible, if not more plausible, that the sand that [Cote] was attempting to transload became wet during the water infiltrating the rail car during transport to, or after its arrival at, the Wysox Rail Yard."[258] As such, U.S. Silica argues that if its motion for summary judgment "is denied, including [its] argument that [Cote] cannot establish causation, then Norfolk Southern's [m]otion must also be denied."[259] On this, the Court agrees with U.S. Silica.

As noted, because this is "a situation to which Section 323(a) applies," U.S. Silica (as cross-plaintiff) needs only to demonstrate that water entering Norfolk

---

[255] *Id*. at 38 (citing Doc. 146, Ex. C (Sept. 30, 2020 F. Razzano Dep.) 34:7–35:13).
[256] *See* Doc. 174 at 11–15.
[257] Doc. 151.
[258] Doc. 159 at 10.
[259] *Id*. at 8.

Southern's rail cars "increased the risk of harm"—whether "that increased risk was a substantial factor in producing the harm" then "becomes a question for the jury."[260] Neither U.S. Silica nor Norfolk Southern contests that Cote was injured while attempting to dislodge wet frac sand inside a railcar owned and transported by Norfolk Southern. During their depositions, witnesses testified that sand could become wet in one of two ways: (1) during the loading process; or (2) through exposure to water while in the railcar either during transit or while sitting at the transloading yard.[261]

U.S. Silica argues that the first explanation is undercut by compelling circumstantial evidence—specifically, "wet sand was found in rail cars during the warmer months, not just during months when rail cars would have been loaded when cold,"[262] and "only a small percentage of cars that arrived at the Wysox Rail Yard contained wet sand."[263] Conversely, according to U.S. Silica, the deposition testimony establishes that second explanation is more likely, as multiple witnesses testified that "it is commonly known that sand may become wet through water that infiltrates rail cars that are not properly sealed."[264]

---

[260] *Hamil*, 392 A.2d at 1286–88.

[261] Doc. 159 at 3 (citing Doc. 146, Ex. D (Oct. 21, 2020 J. Tanner Rice Dep.) 17:20–18:4, 29:24–31:5; Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 129:11–130:12).

[262] *Id*. at 11 (citing Doc. 146, Ex. F (Wick Report) at 10; Doc. 146, Ex. H (Dwell Reports)).

[263] *Id*. (citing Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 205:11–15; Doc. 146, Ex. F (Wick Report) at 10, 14 –15; Doc. 146, Ex. H (Dwell Reports)).

[264] *Id*. 10–11 (citing Doc. 146, Ex. D (Oct. 21, 2020 J. Tanner Rice Dep.) 29:17–30:2; Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 129:6–12, 130:3–6; Doc. 146, Ex. G (Feb. 3, 2021 M. Wick Dep.) 102:13–19, 103:4–12).

Norfolk Southern disputes U.S. Silica's characterization of the testimony. Specifically, Norfolk Southern asserts that U.S. Silica's liability expert, Michael F. Wick, admitted that "[i]t is pure speculation as to the origin of the water that created the wet sand in the rail car,"[265] and that neither Shale Rail's Project Manager and Safety Officer (Eric Harkins) nor U.S. Silica's Strategy Manager (John Tanner Rice) offered any "concrete facts" to support U.S. Silica's claim.[266] However, Norfolk Southern does not dispute that the moisture in the railcars was attributable to either U.S. Silica's loading process or water entering Norfolk Southern's railcars. The testimony undercutting the loading process theory thus constitutes circumstantial evidence that the moisture in the frac sand was attributable to Norfolk Southern's railcars.[267]

Because U.S. Silica has presented evidence that Norfolk Southern's railcars are to blame for the wet sand, it has met its burden of showing that Norfolk Southern's actions or omissions "increased the risk of harm."[268] That is enough for U.S. Silica's crossclaim against Norfolk Southern to survive summary judgment.[269]

---

[265]  Doc. 151 at 2 (quoting Expert Report of Michael F. Wick).

[266]  Doc. 162 at 6 (citing Doc. 146, Ex. L (Feb. 6, 2020 E. Harkins Dep.) 130:13–21); Doc. 146, Ex. D (Oct. 21, 2020 J. Tanner Rice Dep.) 17:20–21.

[267]  *See Smith v. Bell Telephone Co. of Pa.*, 153 A.2d 477, 480 (Pa. 1959) ("The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant."); *see also Joseph v. Scranton Times L.P.*, 129 A.3d 404, 429 (Pa. 2015) ("[T]he plaintiff may establish causation with any evidence, direct or circumstantial . . . .").

[268]  *Hamil*, 392 A.2d at 1286–88.

[269]  Even if the Court were to engage in the "substantial factor" analysis, the Court would nevertheless deny Norfolk Southern's motion for summary judgment. As noted, the existence of an alternative explanation for the accident "does not relieve the defendant from liability

## IV.   CONCLUSION

At summary judgment, the role of the Court is to determine only whether a reasonable jury could return a verdict for the non-moving party based on the evidence presented—that is, whether there is a genuine issue for trial. Here, the Court finds that there are genuine factual disputes on issues material to the claims and crossclaim in question. As such, the motions for summary judgment are denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

unless he can show that such other cause would have produced the injury independently of his negligence." *Hamil*, 392 A.2d at 1285 (internal quotation marks omitted). Norfolk Southern has failed to make this showing. Although Cote has presented evidence that "U.S. Silica's process for loading and shipping its frac sand guaranteed that under sufficiently cold temperatures, as occurred that winter, the sand unloaded at Shale Rail would be wet," Doc. 166 at 40, that remains an open question. This question is for the jury to answer**.**

57