# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAYTON COTE,

      Plaintiff,

    v.

U.S. SILICA COMPANY, NORFOLK
SOUTHERN CORPORATION,
SCHNELL INDUSTRIES, and FB
INDUSTRIES,

      Defendants.

No. 4:18-CV-01440

(Chief Judge Brann)

## MEMORANDUM OPINION

### AUGUST 23, 2022

Plaintiff Dayton Cote initiated this products liability action after he nearly lost his hand while operating a large, industrial machine manufactured and distributed by Defendants Schnell Industries and FB Industries, respectively. Schnell and FB Industries now move to preclude the report and testimony of Cote's engineering expert, Michael Tarkanian, P.E., arguing that (a) Tarkanian lacks the qualifications necessary to testify about the machine at issue, and (b) his opinions lack reliability and fit. But these objections are largely without merit. Tarkanian is eminently qualified to testify about the machine's alleged design defects, and his central opinion is factually grounded and relevant to Cote's claims. One of Tarkanian's minor, ancillary opinions has no bearing on disputed factual issues; the rest meet all requirements of Federal Rule of Evidence 702.

Accordingly, the Defendants' *Daubert* motions to preclude Tarkanian's expert report and testimony are granted in part, denied in part.

## I.   BACKGROUND

### A.   Factual Background

On February 27, 2016, Cote was working at a transfer yard in Wysox, Pennsylvania, moving "frac sand" (i.e., sand that oil and gas companies use in hydraulic fracturing, or "fracking," operations) from railcars to tractor-trailers for delivery to fracking customers.[1] For this process, Cote and his coworkers used a piece of equipment called a transloader, which opened a sliding gate at the bottom of the railcars, causing the sand to flow freely onto a conveyor belt that ultimately deposited the sand on the trailers.[2] The transloader involved in the incident—a model TLX36—was designed and manufactured by Schnell and sold to Cote's employer by FB Industries.[3]

At around 6:30 p.m. that day, Cote was unloading a railcar with coworkers Caleb Spencer and Mitchell Jones when they encountered a problem: wet sand inside the railcar clogged, preventing it from flowing freely from the railcar to the transloader's conveyer belt.[4] Cote went down by the railcar's gate, reached his

---

[1]   Doc. 51 ¶¶ 2, 45; *see also* Doc. 146, Ex. E (U.S. Silica-Shale Rail Contract).
[2]   Doc. 51 ¶ 36; *see* Doc. 222-1, Ex. A (Tarkanian Report).
[3]   *See* Doc. 169, Ex. 10 (Mar. 4, 2020 H. Friesen Dep.) 50:14–21, 59:1–12, 133:1–16 (objections omitted); Doc. 144, Ex. D (Jan. 8, 2020 B. Dueck Dep.) 121:6–122:16.
[4]   Doc. 146, Ex. I (Feb. 7, 2020 D. Cote Dep.) 96:23–97:6.

hand inside the railcar, and attempted to manually break up the clumped sand.[5]

When Cote was dislodging the sand, Spencer activated the machine's "power

takeoff" ("PTO"),[6] which opened and closed the railcar's sliding gate with a

hydraulic lever.[7] The gate slammed shut on Cote's hand, nearly severing it from

his arm.[8]

### B.   Tarkanian's Report

For this suit, Cote secured the services of engineering expert Michael

Tarkanian, P.E., asking him to "investigate[] the design and performance of [the]

TLX36 transloader, in relation to its involvement in [the] injury sustained by

[Cote] on February 27, 2016."[9] Tarkanian received his bachelor's and master's

degrees in Materials Science and Engineering from the Massachusetts Institute of

Technology ("MIT").[10] He has twenty years of industry experience and has taught

at MIT since 2007.[11] Additionally, he has published twenty scholarly articles on

various engineering concepts and served as an expert engineering consultant on

more than fifteen different litigations.[12]

---

[5]   *Id*. at 194:16–195:14.
[6]   Doc. 146, Ex. P (Feb. 6, 2020 C. Spencer Dep.) 63:14–64:9; Doc. 169, Ex. 5 (C. Spencer Post-Incident Investigation Statement).
[7]   Doc. 222-1, Ex. A (Tarkanian Report) at 7–9.
[8]   Doc. 146, Ex. P (Feb. 6, 2020 C. Spencer Dep.) 93:22–95:5.
[9]   Doc. 222-1, Ex. A (Tarkanian Report) at 1.
[10]  *Id*. at 18.
[11]  *Id*. at 19–20.
[12]  *Id*. at 22–25.

Based on his investigation, Tarkanian concluded that "the design of the . . . TLX36 transloader is defective."[13] Specifically, Tarkanian formed the following four opinions:

> 1. A keyed ignition is not a lock out device, according to [the Occupational Safety and Health Administration ("OSHA")] and [the American National Standards Institute ("ANSI")].

> 2. At Schnell Industries Inc. and FB Industries Inc. the lack of engineers, failure to hire third-party engineers, and lack of experience with OSHA, ANSI and other relevant safety standards, all contributed to the defective design of omitting a lock out device, and incorrectly relying on a keyed ignition to be a lock out device.

> 3. The manual provided by Schnell Industries Inc. and FB Industries Inc. for the TLX36 contributes to unsafe practices using the machine. The manual does not meet the documentation requirements of ANSI/ASSP Z244.1-2016 (R2020). The manual never mentions "lock out" or "tag out." The manual only refers to OSHA Standard 1928.57, an irrelevant standard for a machine sold into the oil and gas industry. The manual's instructions in regards to general safety, maintenance safety, hydraulic safety, and diesel motor safety are incomplete and contradictory, contributing to a lack of clarity regarding safety for the user, and is symptomatic of the lack of proper lock out capabilities in the TLX36.

> 4. The TLX36 includes [a] number of design defects that directly contributed to the injury of Mr. Cote, and underscore the poor safety-related design practices of Schnell Industries Inc. These include: (1) no capacity for the lock out of hazardous energy of the transloader, (2) the design of the electrical circuit to the scale discourages machine users from shutting off the ignition, (3) improper location of controls for the PTO, (4) the

---

[13]   *Id.* at 1.

dust collector blocking the line of sight to the
PTO/stinger, and (5) the angle of the stairs require the
user to turn their back to the controls, PTO, and stinger
while decending [sic] the catwalk. There are simple, cost
effective solutions to the lack of a proper lock out device
on the TLX36, that can be implemented with minimal
effort or expense.[14]

### C. Procedural Posture

Cote initiated this action on February 26, 2018,[15] and filed an Amended

Complaint on January 16, 2019.[16] The Defendants moved for summary judgment,[17]

but those motions were denied.[18] Schnell and FB Industries then filed separate

*Daubert* motions, seeking to preclude Tarkanian's expert testimony and report.[19]

These motions have been fully briefed and are now ripe for disposition.[20]

## II.   LAW

Federal Rules of Evidence 702 and 703 govern the admissibility of expert

testimony. Expanding upon those rules, the Supreme Court of the United States

explained the standard for admissibility of expert testimony in *Daubert v. Merrell*

---

[14]  *Id*. at 16–17.

[15]  Doc. 1.

[16]  Doc. 51.

[17]  This included Schnell and FB Industries as well as the owner of the quarry where the sand
originated, U.S. Silica Company, and the company that transported U.S. Silica's sand from its
quarry to Cote's worksite, Norfolk Southern Corporation. Doc. 143 (Norfolk Southern's
motion for summary judgment); Doc. 144 (FB Industries' motion for summary judgment);
Doc. 146 (U.S. Silica's motion for summary judgment); Doc. 150 (Schnell's motion for
summary judgment).

[18]  Doc. 186; Doc. 187.

[19]  Doc. 222 (FB Industries' *Daubert* motion); Doc. 225 (Schnell's *Daubert* motion). Following
this Court's summary judgment ruling, Cote reached a settlement with U.S. Silica and Norfolk
Southern. *See* Doc. 204.

[20]  FB Industries' *Daubert* motion: Doc. 223; Doc. 227; Doc. 230; Doc. 234. Schnell's *Daubert*
motion: Doc. 226; Doc. 229-1; Doc. 235.

*Dow Pharmaceuticals, Inc.*[21] There, the Supreme Court delegated a "gatekeeping responsibility" under Rule 702 to district courts, which requires trial judges to determine at the outset whether an expert witness may "testify to (1) scientific knowledge that (2) will assist the trier of fact."[22] That gatekeeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether that reasoning or methodology properly can be applied to the facts in issue."[23] A district court "exercises more control over experts than over lay witnesses," since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[24]

Following *Daubert*, the United States Court of Appeals for the Third Circuit cast expert admissibility determinations in light of three basic requirements: (1) qualification, (2) reliability, and (3) fit.[25] The qualification prong requires the proffered expert to possess sufficient "specialized knowledge" on the subject matter at issue.[26] To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[27] The Third Circuit has set forth eight non-exclusive

---

[21]   509 U.S. 579 (1993).
[22]   *Id*. at 592.
[23]   *Id*. at 592–93.
[24]   *Id*. at 595 (internal quotation marks omitted).
[25]   *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741–43 (3d Cir. 1994).
[26]   *Id*. at 741.
[27]   *Id*. at 742 (quoting *Daubert*, 509 U.S. at 589).

factors that "a district court should take into account" when deciding the reliability of expert testimony:

> (1) whether a method consists of a testable hypothesis;
>
> (2) whether the method has been subject to peer review;
>
> (3) the known or potential rate of error;
>
> (4) the existence and maintenance of standards controlling the technique's operation;
>
> (5) whether the method is generally accepted;
>
> (6) the relationship of the technique to methods which have been established to be reliable;
>
> (7) the qualifications of the expert witness testifying based on the methodology; and
>
> (8) the non-judicial uses to which the method has been put.[28]

Regarding the fit prong, the Third Circuit explained that admissibility depends on "the proffered connection between the scientific research or test result" and the "particular disputed factual issues."[29] As such, "expert testimony based on assumptions lacking factual foundation in the record is properly excluded."[30]

The burden of proof for admissibility of expert testimony falls upon the party that seeks to introduce the evidence.[31] However, as the Third Circuit has emphasized, "[t]he test of admissibility is not whether a particular [expert] opinion

---

[28] *Id*. at 742 n.8.
[29] *Id*. at 743 (internal quotation marks omitted).
[30] *Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009).
[31] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

has the best foundation or whether it is demonstrably correct"; rather, "the test is whether the particular opinion is based on valid reasoning and reliable methodology."[32] The Third Circuit further explained:

> This standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.[33]

District courts must always be cognizant of the fact that "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination."[34]

## III.   ANALYSIS

### A.   Qualifications

FB Industries argues that the Court should preclude Tarkanian's expert report and testimony because he "lacks the specialized knowledge on transloaders to be qualified as an expert on this case."[35] Cote responds that Tarkanian's "extensive education and experience in engineering design and safety" qualify him to offer expert testimony in this "engineering design case."[36] The Court agrees with Cote.

---

[32]  *Id*. at 145–46 (internal quotation marks omitted).
[33]  *Id*. at 145 (internal quotation marks omitted).
[34]  *Id*. at 146 (internal quotation marks omitted).
[35]  Doc. 223 at 8.
[36]  Doc. 227.

As a preliminary matter, FB Industries does not challenge Tarkanian's academic credentials or professional engineering experience.[37] That's for good reason. Tarkanian received both a bachelor's and master's degree in Materials Science and Engineering from MIT.[38] He has taught engineering courses at MIT since 2007 and has been a senior lecturer with MIT's Department of Materials Science and Engineering since 2016.[39] He has twenty years of industry experience, which includes industrial consulting on a wide array of machines and products.[40] He has served as an expert engineering consultant on more than fifteen different litigations, again involving a variety of mechanical devices and processes.[41] And he has co-authored twenty scholarly articles on various engineering concepts.[42] In short, his academic and professional credentials in the field of engineering and materials science are beyond dispute.

The only question here is whether there is something unique about a transloader that would render Tarkanian's education and experience inapplicable. There does not appear to be. During his deposition, Tarkanian testified that "the transloader is an assembly of sort of preexisting parts, almost all of which I am familiar with and have experience with."[43] This comports with the testimony of FB

---

[37]  *See* Doc. 223 at 7–8; Doc. 230 at 2–3.
[38]  Doc. 222-1, Ex. A (Tarkanian Report) at 18.
[39]  *Id*. at 19.
[40]  *Id*. at 20–22.
[41]  *Id*. at 23–24.
[42]  *Id*. at 24–26.
[43]  Doc. 222-2, Ex. B (Jan. 15, 2021 M. Tarkanian Dep.) 12:1–9.

Industries' engineering expert, Albert de Richmond, who affirmed that "transloaders are simple devices made from common components that are used in many machines."[44] Accordingly, the Court finds that Tarkanian possesses the specialized knowledge needed to offer expert testimony on possible defects in the design and manufacture of the TLX36 transloader.

### B.     Reliability and Fit

The Defendants next argue that Tarkanian's proffered expert opinions fail to satisfy the "reliability" and "fit" requirements of Rule 702. But, properly understood, the Defendants' challenge concerns only the third requirement regarding whether Tarkanian's opinions "fit" the case—the Defendants do not contest the methodology Tarkanian employed in reaching his conclusions; rather, they argue his conclusions "lack a factual foundation or are unrelated to Cote's harm."[45] Accordingly, the Court assesses each of Tarkanian's proffered opinions independently to determine whether they "fit" the case and are therefore admissible.

### 1.     Lock Out Device

Tarkanian's central opinion is that the TLX36 transloader lacked a "lock out device"—that is, a mechanism that shuts off all of the transloader's hydraulic circuits except for the conveyer belt, thus preventing anyone from closing the

---

[44]   Doc. 227-6, Ex. 6 (Feb. 18, 2021 A. de Richmond Dep.) 44:15–22.
[45]   Doc. 226 at 13; *see also* Doc. 223 at 8–11.

railcar's sliding door while the conveyor belt continues to move dislodged frac sand—and that this design defect "directly contributed to the injury of Mr. Cote."[46] The Defendants argue that this opinion "does not fit" because "there is no evidence anyone ever intended to de-energize or isolate energy from the machine or deactivate the PTO while Cote placed his hand inside the hopper gate."[47] According to the Defendants, this underlying fact proves that Tarkanian cannot testify "that the product's supposed defect—the absence of an OSHA compliant lockout—in fact caused Cote's injury," which in turn renders Tarkanian's opinion concerning the existence of this alleged defect "irrelevant."[48] The Court disagrees.

Although the Defendants frame this as part of their *Dabuert* analysis, it is, in truth, an effort to relitigate the question of whether Cote presented evidence establishing that the alleged absence of a lock out device proximately caused Cote's injury. Indeed, FB Industries implicitly acknowledges this in its reply brief: "Despite [Cote's] mischaracterization of [FB Industries'] argument, he still fails to establish proximate cause."[49] But the Court considered—and rejected—this argument at summary judgment.

Here, the Defendants argue that "[t]he absence of an OSHA compliant lockout was not the cause of Cote's injury"; instead, they contend that "Cote was

---

[46] Doc. 222-1, Ex. A (Tarkanian Report) at 16–17; *see also id*. at 7 ("[A] lock out dedicated specifically for the PTO hydraulics would be required to prevent injuries like Mr. Cote's.").

[47] Doc. 226 at 15.

[48] *Id*. at 14.

[49] *See* Doc. 230 at 1.

injured because he placed his hand inside the hopper gate while the transloader was

energized and the operator closed the gate to stop the flow of sand."[50] To support

their version of events, the Defendants emphasize that "there is no evidence

anyone ever intended to de-energize or isolate energy from the machine or

deactivate the PTO while Cote placed his hand inside the hopper."[51]

But this is how the Court described the Defendants' causation arguments at

summary judgment:

> Schnell argues that "[t]he alleged absence of a lockout
> was not the cause of Cote's injuries"; rather, the accident
> was caused by human error: "No one operating the
> machine intended to utilize a lockout but, instead,
> intended to keep the machine energized and the hopper
> gate operational."[52]

The arguments are identical. And, as Cote notes, this position proved unavailing at

summary judgment:

> As a preliminary matter, the Court finds this argument
> highly suspect. In effect, Schnell is asserting that because
> Cote and his colleagues did not shut off the TLX36
> transloader, they would not have used any alternative
> safety mechanism—a superseding event that should
> doom Cote's negligent defect claim for lack of causation.
> If given legal effect, this logical leap would bar the
> judicial gates on a multitude of otherwise viable products
> liability claims. Unsurprisingly, Schnell does not cite any
> legal authority for this argument.
>
> Be that as it may, Cote presents evidence that directly
> conflicts this purported superseding cause. Specifically,

---

[50] Doc. 226 at 14–15.
[51] *Id*. at 15.
[52] Doc. 186 at 22.

> Cote notes that Tarkanian and several fact witnesses stated that "[w]hen clearing jammed sand from the hopper car, the conveyor belt of the transloader must stay running to move the sand that is cleared." If deactivated, the transloader would have been unable to move the dislodged sand along the conveyor belt, causing the sand to build up on, and potentially spill off, the transloader. As such, Cote asserts that deactivating the transloader was not an option, and his failure to do so provides no insight into how he and his colleagues would have used Tarkanian's proposed alternative design, which deactivates only the PTO and thus permits the conveyor belt to continue operating.

> Further, Cote reiterates that Tarkanian found that the TLX36 transloader "design defects . . . directly contributed to the injury of Mr. Cote." As explained, Tarkanian's report details the transloader's alleged design defects, concludes that the defects contributed to Cote's injury, and then offers a proposed solution that arguably would have prevented the accident.[53]

The proverb "if at first you don't succeed, try, try again" may have merit in certain circumstances; it does not, however, have purchase in federal court.

Accordingly, the Court affirms the analysis in its summary judgment memorandum opinion. A reasonable jury presented with Tarkanian's expert opinion explicitly linking Cote's injuries and the absence of a proper lock out device on the TLX36 transloader could conclude that the transloader's alleged defects were a substantial factor in causing Cote's injuries.[54] There is, then, the

---

[53]  *Id*. at 22–24 (internal citations omitted).

[54]  The Defendants again cite no legal authority supporting their claim that causation in a strict products liability action requires a showing—at the summary judgment phase—that the plaintiff would have deployed the alternative safety mechanism the plaintiff's expert witness proposes. Indeed, courts have consistently held that such a showing is not required. For

requisite "connection" between Tarkanian's opinion about the absence of a lock out device and the "particular disputed factual issues" (i.e., whether this defect was a proximate cause of the accident).[55] This expert opinion is admissible.

### 2. Third Party Engineers and Experience with Relevant Safety Standards

Tarkanian's second proffered opinion concerns the lack of engineers employed by Schnell and FB Industries or otherwise involved in the design and manufacture of the TLX36 transloader:

> At [Schnell] and [FB Industries] the lack of engineers, failure to hire third-party engineers, and lack of experience with OSHA, ANSI and other relevant safety standards, all contributed to the defective design of omitting a lock out device, and incorrectly relying on a keyed ignition to be a lockout device.[56]

---

example, in *Richetta v. Stanley Fastening Systems, L.P.*, the United States District Court for the Eastern District of Pennsylvania denied the defendant's motion for summary judgment—based on a theory that the harm "was solely attributable to a supervening cause," i.e., the plaintiff's "failure to disconnect the nail gun from its air compressor"—because the plaintiff's expert opined that "had the nail gun been equipped with a safety lock or trigger switch, [the plaintiff] would have been able to avail himself of such a mechanism." 661 F. Supp. 2d 500, 512 (E.D. Pa. 2009). Noting that "[t]his mechanism, according to [the plaintiff's] expert, would have prevented a nail from firing while temporarily not in use," the court held that "it cannot be conclusively said at this juncture that the accident was solely a result of [the plaintiff's] conduct and not related in any way to the alleged defect in the nail gun." *Id.*; *see also DeJesus v. Knight Industries & Associates, Inc.*, 2016 WL 4702113, at *11 (E.D. Pa. Sept. 8, 2016) (holding that the plaintiff "may proceed on his strict liability design defect claim" because "[t]here are sufficient facts on this record to suggest that the product defect—the absence of audio and visual warning on the lift table—proximately caused [the plaintiff's] injury"; the court found that the question of whether "the accident was solely attributable to a supervening cause . . . is accordingly best left to the jury").

55   *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 743 (internal quotation marks omitted).

56   Doc. 222-1, Ex. A (Tarkanian Report) at 16.

In moving to preclude this opinion, the Defendants simply restate their objections to Tarkanian's primary opinion about the absence of a lock out device. Specifically, Schnell asserts that "Tarkanian concedes that the ignition key is an energy isolating device and that turning off the ignition and removal of the ignition key would have prevented the closure of the hopper gate."[57] Schnell emphasizes that "Tarkanian could not say a deficiency in the use of the ignition switch as an energy isolation device, compared to the OSHA standard, was the reason Cote's accident occurred."[58]

But these arguments fail for multiple reasons. First, the Defendants mischaracterize Tarkanian's deposition testimony, cherry picking select quotes to create an impression inconsistent with Tarkanian's actual sworn statements. In truth, Tarkanian never stated that the ignition key was an energy isolating device—he said the opposite:

---

[57]   Doc. 226 at 16 (citing Doc. 222-2, Ex. B (Jan. 15, 2021 M. Tarkanian Dep.) 62:6–7 ("A. The ignition could be used as energy isolation . . . ."), 37:22–38:1 ("[Q.] If Mr. Cote had turned off the transloader before he placed his hand inside the hopper gate, would his accident or incident have happened? A. No."), 41:12–17 ("Q. I'm sorry. If Mr. Cote had turned off the ignition to the transloader, removed the key before he went and placed his hand inside the hopper gate, would he have been injured? A. No.")).

[58]   *Id*. (citing Doc. 222-2, Ex. B (Jan. 15, 2021 M. Tarkanian Dep.) 66:6–14 ("Q. Okay. But here's my, what I'm trying to get at. Is the distinct—is the deficiency in the use of the ignition switch as an energy isolation device, compared to the OSHA standard or requirement, the reason that this accident occurred? A. I can't say it's the reason the accident occurred . . . .")). In this citation, Schnell omits the remainder of Tarkanian's answer: "[B]ut I can say that had it been properly designed, according to the OSHA regulation, that it would have been a lot easier to isolate the PTO, for example, and that could have prevented the accident." Doc. 222-2, Ex. B (Jan. 15, 2021 M. Tarkanian Dep.) 66:14–18.

Q. . . . [W]hy wasn't the ignition an OSHA compliant energy isolation device?

A. Because by OSHA and ANSI standards, an energy isolation device needs to be only used for isolating energy and can only control one circuit. And in the case of this ignition, it controls two circuits. There's the ignition circuit and there's the glow plug circuit and by definition is not only for energy isolation, you use it to start the glow plug, you use it to start the machine. It can't be considered an energy isolation device.

Q. You just put a period there. I thought you said the ignition is an energy isolation device?

A. Not by OSHA. I mean you can shut the machine off with the ignition, but by OSHA standards it is not—it can't be considered an energy isolation device.

Q. At all?

A. No.[59]

Tarkanian was equally unequivocal in his statement that the absence of an

OSHA-compliant energy isolating device contributed to Cote's accident:

Q. Okay. But is the reason that the ignition was not an OSHA compliant energy isolation device material, meaning that it contributed to the accident?

A. Yes, I think it is.

Q. In what respect?

A. If there was a way to properly isolate hazardous energy, particularly to the PTO, that didn't rely on shutting the machine down, that this accident could have been prevented.[60]

---

[59]   Doc. 222-2, Ex. B (Jan. 15, 2021 M. Tarkanian Dep.) 64:10–65:9.
[60]   *Id*. at 63:14–24.

The Court appreciates that the Defendants disagree with Tarkanian's opinions; they cannot, however, claim that Tarkanian did not state these opinions when he indisputably did.

Second, the Defendants' objections based on Tarkanian's supposed failure to draw a causal connection between the defect in the TLX36 transloader and Cote's injuries are without merit. As noted, Tarkanian's opinion that the TLX36 transloader was defective because it lacked a lock out device—and that this defect contributed to Cote's injuries—is admissible. As such, his opinion that the Defendants' failure to employ or otherwise engage engineers led to this defective design is admissible as well.

### 3.    TLX36 Transloader Manual

Tarkanian's third opinion is that "[t]he manual provided by [Schnell] and [FB Industries] for the TLX36 [transloader] contributes to unsafe practices using the machine."[61] Tarkanian notes that the manual "never mentions 'lock out' or 'tag out'" and contains "incomplete and contradictory" safety instructions that "contribut[e] to a lack of clarity regarding safety for the user, and is symptomatic of the lack of proper lock out capabilities in the TLX36 [transloader]."[62]

The Defendants move to preclude Tarkanian from presenting this opinion at trial because they believe it "is not relevant to any issue in the case" and therefore

---

[61]   Doc. 222-1, Ex. A (Tarkanian Report) at 16–17.
[62]   *Id.*

"does not satisfy the Rule 702 fit requirement."[63] Specifically, Schnell argues that the opinion's relevance "depends on whether the manual caused or contributed to the incident"—that is, whether the alleged deficiencies in the manual "caused a misunderstanding or lack of understanding on the part of Cote or Spencer concerning the operation of the transloader which caused the incident"—and the evidence does not establish this causal connection.[64] Indeed, Schnell asserts, the manual's alleged deficiencies "could not have been a factor in Cote's accident because Cote never saw the manual and had no access to it and Spencer never consulted it."[65] But, again, the Court finds the Defendants' arguments unavailing.

In denying the Defendants' motions for summary judgment, the Court rejected Schnell's argument that "[t]here is no evidence to establish the transloader is defective under the consumer expectation standard."[66] The Court noted that contrary to Schnell's claim that "[t]here is no evidence of any express or implied

---

[63]   Doc. 226 at 18.

[64]   *Id.* at 17.

[65]   Doc. 235 at 5; *see also* Doc. 229-2, Ex. 1 (Feb. 7, 2020 D. Cote Dep.) 201:12–202:4 ("Q. And the—the document that you've been drawing on, which is marked Exhibit 6, it's an operator manual; do you see that? A. Yep. Q. Have you seen that document before? A. No. Q. Other people yesterday testified that they recall seeing the—that particular manual, not the specific one but a copy of that. . . . Do you recall that? A. I don't remember seeing it. Q. Have you ever looked at the operator manual? A. No. Q. Was it available to you? A. I don't believe so. I don't remember seeing it. Q. Did you ever ask to see it? A. No, because I was taught visually."); *also* Doc. 229-3, Ex. 2 (Feb. 6, 2020 C. Spencer Dep.) 67:16–68:11 ("Q. Yeah. And that's the operation manual for Schnell Industries TLX-24, 30, 36, and 42 transloader. Do you see that? A. Yep. Q. Have you seen that manual before? A. Yes. Q. And where'd you see it? A. I want to say there was—not 100 percent sure, but I want to say there was, like, an actual spot on the machine for these. . . . Q. It was available for you to consul? A. Yes. Q. Did you ever consult it? A. No.").

[66]   Doc. 156 at 29.

representation regarding the transloader by Schnell that minimized or made unknowable the obvious danger," Tarkanian opined that Schnell "made various representations, both express and implied, concerning the isolation of hazardous energy in its manual which are internally inconsistent, confusing to users, and in violation of OSHA and ANSI standards."[67] The Court concluded that these disagreements demonstrate that there is a genuine factual dispute material to the consumer expectation standard inquiry—that is, "whether the danger of the PTO closing the gate on a worker clearing jammed sand from the railcar was unknowable and unacceptable to the average consumer."[68]

As this ruling establishes, Tarkanian's opinion regarding the TLX36 transloader manual is relevant to a "particular disputed factual issue[]" central to Cote's claim that the transloader was defective under the consumer expectation standard.[69] The opinion therefore satisfies Rule 702's "fit" requirement.[70]

---

[67] Doc. 186 at 27–28 (citing Doc. 156 at 28–29; Doc. 168 at 27).

[68] *Id*. at 30.

[69] *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 743 (internal quotation marks omitted).

[70] In this ruling, the Court takes no position on whether or how Cote's and Spencer's admissions that they did not review the manual affect the viability of Cote's defective condition strict products liability claim based on the consumer expectation standard. Schnell could have (and perhaps should have) raised this issue on summary judgment. It did not. These facts therefore had no bearing on the Court's decision "declin[ing] to grant summary judgment for failure to establish the presence of a defective condition under the consumer expectation standard." Doc. 186 at 28. And they similarly have no bearing the Court's analysis here. Before the Court now is a *Daubert* motion, and, as such, the question it must answer is discrete: whether Tarkanian's opinion regarding the TLX36 transloader manual is relevant to a live claim in this case. As explained, it is.

### 4.   Other Design Defects

In his fourth and final opinion, Tarkanian highlights a "number of design defects" on the TLX36 transloader "that directly contributed to the injury of Mr. Cote, and underscore the poor safety-related design practices of Schnell."[71] The Court has already addressed the primary defect Tarkanian identifies (i.e., "no capacity for the lock out of hazardous energy of the transloader"), but there are three other alleged defects that warrant discussion: (a) "the design of the electrical circuit to the scale discourages machine users from shutting off the ignition"; (b) "improper location of controls for the PTO"; and (c) "the dust collector blocking the line of sight to the PTO/stinger" and "the angle of the stairs require the user to turn their back to the controls, PTO, and stinger while descending the catwalk."[72] The Court considers each opinion in turn.

### a.   Design of the Electrical Circuit to the Scale

First, Schnell argues that "testimony concerning the design of the electrical system to the scale . . . is not relevant to any issue in the case and does not meet the fit requirements of Rule 702."[73] In support, Schnell points to Tarkanian's deposition testimony, in which he allegedly "admit[ted] there is nothing unsafe

---

[71]   Doc. 222-1, Ex. A (Tarkanian Report) at 17.
[72]   *Id.*
[73]   Doc. 226 at 19.

about depriving the scale of power" and stated that "he was not expressing an

opinion that Cote was injured because of the issue with the scale."[74]

   But, again, Schnell's selective reading of Tarkanian's deposition transcript

creates an inaccurate impression of Tarkanian's analysis. Although Tarkanian

testified that there is "[n]othing inherently unsafe" about the design of the TLX36

transloader's electrical circuit, he explained that it is "a symptom of the greater

defective design of the transloader."[75] According to Tarkanian, because the ignition

is the sole energy control for the transloader's scale, conveyer, and PTO, workers

seeking to dislodge clogged sand could not disable the power on the PTO (thereby

locking the hopper door in place, preventing a coworker from closing it) while still

allowing the conveyer and scale to continue operating, moving and weighing the

manually dislodged sand:

> [I]f you shut the machine off, the conveyer would not
> work, which would mean sand would stop moving, and
> you would lose the ability to accurately weigh the sand
> moving on the transloader.[76]

Because of this, Tarkanian opines, the transloader is "designed in a way to

discourage its users from [turning off the machine to unclog sand] because it

---

[74] *Id.* (citing Doc. 222-2, Ex. B (Jan. 15, 2021 M. Tarkanian Dep.) 43:19–44:3 ("Q. Okay. So, what is unsafe, if anything, about depriving the scale of power? A. Nothing inherently unsafe. It's just a symptom of the greater defective design of the transloader. Q. You're not going to— you're not expressing an opinion that Mr. Cote was injured because of the scale; are you? A. No.").

[75] Doc. 222-2, Ex. B (Jan. 15, 2021 M. Tarkanian Dep.) 43:19–23.

[76] *Id.* at 35:9–14.

makes the job difficult or even more difficult."[77] Indeed, that is the reason Cote gave for why "he didn't turn off the machine before he placed his hand inside the hopper gate"—Cote "didn't want the scale to reset and he wanted the conveyer to continue to operate."[78]

The Court therefore agrees with Cote that Tarkanian's opinion about the design of the electrical circuit to the scale is "relevant to the transloader's design defect that caused Cote's injuries—i.e., the inability to deenergize [the] PTO without also deenergizing [the] scale and conveyer."[79] And as such, the opinion is admissible under Rule 702.

### b.   Location of Controls for the PTO

Schnell next argues that Tarkanian's opinion that the controls for the PTO were placed in an improper location does not satisfy the "fit" requirement because "[t]here is no evidence that an inability of the operator to see Cote because of the placement of the PTO control caused or contributed to Cote's injuries."[80] Schnell emphasizes that Caleb Spencer, the transloader operator who closed the hopper gate on Cote' hand, "testified that before he activated the PTO to close the gate, he

---

[77]   *Id*. at 36:24–37:2.
[78]   *Id*. at 36:1–7.
[79]   Doc. 229-1 at 14.
[80]   Doc. 226 at 18.

saw that Cote had his hand out of the railcar,"[81] and that Cote testified "that from his position, by the railcar, he could see the person at the controls."[82]

But the Court agrees with Cote that although Spencer testified that he could see Cote beneath the railcar door at the time of the accident, he did not see or know that Cote's hand was inside the railcar when he activated the PTO and closed the hopper gate.[83] Put differently, there is no argument that Spencer intentionally closed the gate on Cote's arm. And though Cote said there is a "straight line" of site from the hopper gate to the PTO controls, he also testified that he could not recall seeing Spencer or hearing anything from Spencer immediately before the accident.[84]

This testimony, coupled with Tarkanian's opinion that the location of the PTO control panel made the "PTO itself, the hopper gate, and any nearby coworkers . . . much less easily seen or heard," supports a reasonable inference that

---

[81]   Doc. 235 at 6 (citing Doc. 229-3, Ex. 2 (Feb. 6, 2020 C. Spencer Dep.) 29:5–13 ("Q. So you told—gave [Cote] a warning that you were going to close the door? A. Yes. Q. And he got away from the car? A. Yeah. I mean, I saw him—I saw him bring his hand out as if he was getting up to get out of the car. I turned back up, looked at Mitch [Jones]. And then when I turned around and slapped the door, I seen that he was back under there.")).

[82]   *Id*. at 7 (citing Doc. 229-2, Ex. 1 (Feb. 7, 2020 D. Cote Dep.) 197:15–17 ("Q. Can you—can you see the person at the controls from your position, sitting? A. Yeah, direct shot, straight line.")).

[83]   *See* Doc. 229-1 at 16.

[84]   *See* Doc. 229-2, Ex. 1 (Feb. 7, 2020 D. Cote Dep.) 196:22–197:12 ("[Q.] [W]hile you were clearing the clog, did you receive any communication from anybody, Mitch [Jones] or Caleb [Spencer], that the truck was almost full? A. I mean, I was just going by my gauge. I don't think they told me anything about a truck being full up top. Q. Okay. You don't recall hearing anything? A. No, I don't. Q. Do you recall any communication with Mitch and/or Caleb immediately before the accident? A. I don't recall. Q. Did you see Caleb Spencer at the controls before your accident? A. I can't remember, so I can't—I don't recall, like I can't give you a definite answer.").

the location of the PTO controls contributed to Cote's accident.[85] The Defendants may well be able to rebut this argument at trial; that does not, however, render this opinion inadmissible.

### c.    The Dust Collector and Catwalk

Finally, Schnell challenges Tarkanian's opinions that the design of the TLX36 transloader's dust collector and catwalk impairs visibility from the catwalk to the hopper gate.[86] Schnell argues that "because the controls were not located on the catwalk and Spencer was not on the catwalk when he closed the hopper gate," these opinions "are not relevant to the issues in the case [and] do not satisfy the Rule 702 fit requirement."[87] On this, the Court agrees with Schnell. Indeed, Cote admits that neither the dust collector nor the catwalk caused his injuries.[88] Accordingly, Tarkanian's opinion about the defective design of the transloader's dust collector and catwalk, even if true, have no bearing on the issues in this case. These opinions are inadmissible.

## IV.    CONCLUSION

The Defendants use this *Daubert* motion to relitigate an argument this Court rejected on summary judgment. The argument failed then, and it fails now. Cote's engineering expert, Michael Tarkanian, P.E., is qualified to offer expert analysis on

---

[85]  Doc. 222-1, Ex. A (Tarkanian Report) at 9.
[86]  *Id*. at 9–10.
[87]  Doc. 226 at 20.
[88]  *See* Doc. 229-1 at 17.

the TLX36 transloader's alleged design defects, and—aside from an ancillary opinion about the transloader's dust collector and catwalk—Tarkanian's opinions concern disputed factual issues relevant to Cote's claims. As such, these opinions are admissible.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge