## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAYTON COTE,

       Plaintiff,

   v.

SCHNELL INDUSTRIES,

       Defendant.

No. 4:18-CV-01440

(Chief Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 8, 2022

In advance of trial in this strict products liability case concerning a machine involved in a workplace accident that nearly severed Plaintiff Dayton Cote's hand, the parties filed competing motions *in limine*. Although the Court grants Cote's motions to preclude evidence and argument on parties and claims that have been removed from this suit, the remaining motions—most notably, Defendant Schnell Industries' motions that simply restate arguments this Court previously considered and rejected—are denied.

## I.    BACKGROUND

On February 27, 2016, Cote was injured while working at a transfer yard in Wysox, Pennsylvania, moving "frac sand" (i.e., sand that oil and gas companies use in hydraulic fracturing, or "fracking," operations) from railcars to tractor-

trailers for delivery to fracking customers.[1] Cote and his co-workers used a piece of equipment called a transloader, which opened a sliding gate at the bottom of the railcars, causing the sand to flow freely onto a conveyor belt that ultimately deposited the sand on the trailers.[2] Because the sand inside the railcars was wet, it clogged and did not flow from the railcar to the transloader's conveyor belt.[3] Cote reached his hand through the railcar gate to dislodge the clumped sand, but at that moment, his co-worker activated the machine's "power takeoff" ("PTO"), which opened and closed the railcar's sliding gate with a hydraulic lever.[4] The gate slammed shut on Cote's hand, nearly severing it from his arm.[5]

After the accident, Cote initiated this suit against four defendants: (1) Schnell, the manufacturer of the transloader involved in the incident—a model TLX36; (2) FB Industries, Schnell's exclusive distributor in North America and the company that sold the TLX36 transloader to Cote's employer; (3) U.S. Silica Company, the owner of the quarry where the frac sand originated; and (4) Norfolk Southern Corporation, the company that transported U.S. Silica's sand from its quarry to Cote's worksite.[6] In his Amended Complaint, Cote advanced two products liability claims against Schnell and FB Industries, sounding in negligence

---

1   Doc. 272 ¶ 26; *see also* Doc. 146-3, Ex. E (U.S. Silica-Shale Rail Contract).
2   Doc. 272 ¶ 21; *see also* Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report).
3   Doc. 241-1, Ex. 1 (Feb. 7, 2020, D. Cote Dep.) 96:23–97:6.
4   *Id*. at 194:16–195:14.
5   Doc. 241-2, Ex. 2 (Feb. 6, 2020, C. Spencer Dep.) 93:22–95:5.
6   Doc. 1.

and strict liability, and separate negligence claims against U.S. Silica and Norfolk Southern.[7]

In support of his claims, Cote secured the services of several expert witnesses, including engineering expert Michael Tarkanian, P.E., vocation expert Steven D. Shedlin, and economics expert David L. Hopkins.[8] Tarkanian opined on the TLX36 transloader's alleged design defects, whereas Shedlin and Hopkins issued opinions about Cote's lost earning capacity, actual lost earnings, and future lost earnings.[9]

The Defendants likewise produced expert witnesses. Relevant here, Schnell presented an engineering expert of its own, Albert de Richemond, who disputed many of Tarkanian's findings.[10]

Following discovery, the Defendants moved for summary judgment.[11] Those motions were denied.[12] Shortly thereafter, U.S. Silica and Norfolk Southern agreed to settle the claims against them.[13] FB Industries followed suit six months later.[14]

---

[7]  Doc. 51.
[8]  *See* Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report); Doc. 263-8, Ex. 8 (Mar. 20, 2020, S. Shedlin Report); Doc. 263-9, Ex. 9 (Mar. 23, 2020, D. Hopkins Report).
[9]  *Id.*
[10]  *See* Doc. 282-7, Ex. 5 (Jan. 11, 2021, A. de Richemond Report).
[11]  Doc. 143 (Norfolk Southern's motion for summary judgment); Doc. 144 (FB Industries' motion for summary judgment); Doc. 146 (U.S. Silica's motion for summary judgment); Doc. 150 (Schnell's motion for summary judgment).
[12]  Doc. 186; Doc. 187.
[13]  *See* Doc. 204.
[14]  *See* Doc. 265.

In July 2022, Schnell filed a *Daubert* motion seeking to preclude Tarkanian's expert testimony.[15] The Court largely denied this motion the following month.[16] Schnell did not move to exclude Cote's other expert witnesses—namely, Shedlin and Hopkins—and Cote did not file a *Daubert* motion challenging the admissibility of Schnell's engineering expert, de Richemond.

With leave of Court, Cote then filed a Second Amended Complaint, which considerably narrowed the scope of this case.[17] Specifically, Cote removed the settled Defendants—U.S. Silica, Norfolk Southern, and FB Industries—as well as its negligence claim against Schnell.[18] As such, this case proceeds toward trial with only one claim (strict products liability) against one defendant (Schnell).[19]

## II.    LAW

A motion *in limine* "is a device for obtaining rulings on the admissibility of evidence prior to trial."[20] Typically, motions *in limine* are made "for the purpose of prohibiting opposing counsel from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending

---

[15]   Doc. 225. FB Industries filed a separate *Daubert* motion to exclude Tarkanian's report and testimony, Doc. 222, but it reached a settlement with Cote just prior to the Court's ruling on the *Daubert* motions. *See* Doc. 265.

[16]   Doc. 266; Doc. 267.

[17]   Doc. 272.

[18]   *Id*.

[19]   *Id*.

[20]   *Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664, 667 (Pa. Super. 2007) (citing Packel and Poulin, Pennsylvania Evidence, § 103.3 at 12) (internal quotation marks omitted).

matter cannot overcome its prejudicial influence on the jurors' minds."[21] However,

parties can also file motions *in limine* to admit certain evidence, thereby clarifying

in advance of trial the universe of admissible material and the scope of permissible

topics and lines of inquiry.[22]

Although motions *in limine* may serve as a useful pretrial tool that enables

more in-depth briefing than would be available at trial, a court may defer ruling on

such motions "if the context of trial would provide clarity."[23] Indeed, motions *in*

*limine* "often present issues for which final decision is best reserved for a specific

trial situation."[24] Thus, certain motions, "especially ones that encompass broad

classes of evidence, should generally be deferred until trial to allow for the

resolution of questions of foundation, relevancy, and potential prejudice in proper

context."[25] The United States Court of Appeals for the Third Circuit instructs that

"*pretrial* Rule 403 exclusions should rarely be granted . . . [as] a court cannot fairly

ascertain the potential relevance of evidence for Rule 403 purposes until it has a

full record relevant to the putatively objectionable evidence."[26] Regardless, "*in*

---

[21]   *United States v. Davis*, 208 F. Supp. 3d 628, 632 (M.D. Pa. 2016) (citing *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 (5th Cir. 1977)).

[22]   *See, e.g.*, *United States v. Singleton*, 458 F. App'x. 169, 171–73 (3d Cir. 2012) (holding that the District Court "did not abuse its discretion" in granting the government's "pre-trial motion *in limine* to admit certain evidence of other crimes, wrongs, or acts pursuant to Federal Rule of Evidence 404(b)"); *Tourtellote v. Eli Lilly and Co.*, 636 F. App'x. 831, 854–55 (3d Cir. 2016) (holding that the District Court did not abuse its discretion in denying plaintiff's motion *in limine* "to include evidence of [the defendant's] conduct towards other employees").

[23]   *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 707 (E.D. Pa. 2012).

[24]   *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997).

[25]   *Leonard v. Stemtech Health Sciences, Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013).

[26]   *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990).

5

*limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."[27]

## III.   ANALYSIS

### A.    Cote's Motions *in Limine*

Before the Court now are, among other things, six motions *in limine* filed by the Plaintiff, Dayton Cote. Cote's first, third, and fourth motions pertain to evidence of his conduct—specifically, whether Cote acted negligently or recklessly when using, or assumed the risk of injury from, the TLX36 transloader.[28] Cote's second and fifth *in limine* motions concern evidence of negligence by settled Defendants U.S. Silica and Norfolk Southern.[29] And in his final motion, Cote asks the Court to preclude Schnell from presenting certain evidence from its engineering expert, Albert de Richemond.[30] For the reasons provided below, the Court grants Cote's first five motions, but denies the sixth.

### 1.     Cote's Allegedly Negligent or Highly Risky Conduct

Cote's first, third, and fourth motions *in limine* concern evidence and argument about whether his conduct contributed to the accident.[31] Specifically, Cote moves to preclude Schnell from arguing that the accident was caused by

---

[27]   *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

[28]   Doc. 236 (Cote's First Motion *in Limine*); Doc. 240 (Cote's Third Motion *in Limine*); Doc. 242 (Cote's Fourth Motion *in Limine*).

[29]   Doc. 238 (Cote's Second Motion *in Limine*); Doc. 244 (Cote's Fifth Motion *in Limine*).

[30]   Doc. 246 (Cote's Sixth Motion *in Limine*).

[31]   Doc. 236 (Cote's First Motion *in Limine*); Doc. 240 (Cote's Third Motion *in Limine*); Doc. 242 (Cote's Fourth Motion *in Limine*).

Cote's negligence or that he assumed the risk of injury from, or recklessly misused, the TLX36 transloader.[32] The Court addresses each argument in turn.

### a.    Negligent Conduct

First, Cote moves to preclude Schnell from arguing or presenting testimony that Cote's negligence caused the accident.[33] According to Cote, his allegedly negligent conduct is relevant only if this conduct was the sole cause of the accident and unrelated to the alleged defect—a showing Schnell cannot satisfy.[34] Schnell disagrees, arguing that Cote's conduct is admissible as relevant to the issues of causation and defective design (under both the consumer expectation and risk utility standards).[35] The Court agrees with Cote.

Under Pennsylvania law, a defendant generally "cannot use contributory negligence concepts to excuse a product's defect or reduce recovery by comparing fault in a strict product's liability action."[36] Although evidence of a plaintiff's conduct or the conduct of a third party "may be relevant as it relates to causation"—i.e., "to prove the accident was the result of a superseding cause"— evidence of a party's "ordinary negligence" is admissible only if offered "to show that the accident at issue was *solely* the result of [the negligent] conduct."[37] A

---

[32]   *Id.*
[33]   Doc. 240 (Cote's Third Motion *in Limine*).
[34]   Doc. 241 at 1, 9–11.
[35]   Doc. 286 at 10–15.
[36]   *Sullivan v. Werner Co.*, 253 A.3d 730, 748 (Pa. Super. 2021); *see also Jara v. Rexworks Inc.*, 718 A.2d 788, 793 (Pa. Super. 1998) ("[I]t is well-founded in Pennsylvania that questions of negligence should not be introduced in products liability actions.").
[37]   *Jara*, 718 A.2d at 793.

plaintiff's or third party's negligent conduct "is not relevant if the product defect contributed in any way to the harm."[38]

For this, the Court finds instructive the Superior Court of Pennsylvania's ruling in *Sullivan v. Werner Company*. In that case, the plaintiff was injured while attempting to install specialty siding on the exterior of a building; the plaintiff was elevated some distance off the ground, standing on a scaffold designed and manufactured by the defendant, when the scaffold platform collapsed beneath him like a "trapdoor."[39] The plaintiff alleged that the platform and deck pins used to secure it were designed defectively.[40] In response, the defendant sought to argue at trial that the accident was caused by the plaintiff's negligence—that is, the plaintiff's failure to properly assemble the scaffold.[41] The trial court precluded the defendant from arguing for, or introducing evidence about, the plaintiff's contributory negligence, and the Superior Court affirmed.[42] The Superior Court explained that the defendant's "theory of [the plaintiff's] negligence—that he did not set up the scaffold correctly—directly relates to the product," and therefore plaintiff's conduct was not the "sole cause" of the accident.[43]

---

[38] *Id*.
[39] 253 A.3d at 735.
[40] *Id*. at 750.
[41] *Id*. at 749.
[42] *Id*. at 748–50.
[43] *Id*.

In reaching this conclusion, the Superior Court distinguished its prior ruling in *Madonna v. Harley Davidson, Inc.*, a strict liability action concerning the front wheel brakes on a motorcycle.[44] In *Madonna*, the Superior Court affirmed the trial court's decision permitting the defendant to introduce evidence of the plaintiff's contributory negligence because "the evidence was admitted to show that the accident resulted solely from plaintiff's intoxication, which was unrelated in any way to the product."[45] The Superior Court in *Sullivan* held that unlike *Madonna*, the defendant "fail[ed] to explain how Sullivan's alleged failure to properly assemble the scaffold showed that none of the alleged product defects contributed in any way to the accident."[46]

Here, Schnell's theory of Cote's negligence—that he reached his hand through the railcar gate without first deenergizing the TLX36 transloader—relates directly to the alleged product. Cote argues that the TLX36 transloader is defective because "it cannot isolate, deenergize, and lockout its [PTO] so that workers can safely unload jammed sand from a railcar's underside door without risk of the door closing."[47] Schnell responds that Cote acted negligently because "he knew of the danger posed by putting his hand through the hopper gate while the machine was energized."[48] Because the Cote's alleged negligence cannot be causally

---

[44]   *Id*. at 749–50 (citing *Madonna v. Harley Davidson, Inc.*, 708 A.2d 507, 508 (Pa. Super. 1998)).
[45]   *Id*. (citing *Madonna*, 708 A.2d at 508).
[46]   *Id*. at 750.
[47]   Doc. 290 at 6.
[48]   Doc. 286 at 15.

distinguished from the elements of the transloader Cote considers defective,
Schnell is unable to show "that none of the alleged product defects contributed in
any way to the accident."[49]

Apart from the issue of causation, Schnell argues that evidence of Cote's
negligent conduct is admissible as relevant to the issues of defective design under
both the consumer expectation and risk-utility standards articulated by the
Supreme Court of Pennsylvania in *Tincher v. Omega Flex, Inc.*[50] That's incorrect.
Both the consumer expectation standard and the risk-utility standard concern the
knowledge and conduct of an "ordinary person."[51] As the Third Circuit held in
*Surace v. Caterpillar, Inc.*, assessing the knowledge and conduct of the "ordinary
customer" is an "objective inquiry into whether the class of ordinary purchasers of
the product could avoid injury through the exercise of care in use of the product,
not whether this particular plaintiff could have avoided this particular injury."[52]
The Third Circuit instructed that this objective inquiry is not "a vehicle for
injecting a plaintiff's (alleged) failure to exercise due care into the case."[53]

---

[49]  *Sullivan*, 253 A.3d at 750.

[50]  *See* Doc. 286 at 10–14.

[51]  *See Tincher*, 104 A.3d 328, 394 (Pa. 2014) (defining the "consumer expectations test" as whether "the danger is unknowable and unacceptable to the average or ordinary consumer"), 397 (defining the risk-utility standard as whether "a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions").

[52]  111 F.3d 1039, 1051 (3d Cir. 1997). Although this opinion, issued in 1997, pre-dates *Tincher*, it remains instructive as it analyzed the same factors guiding the Pennsylvania Supreme Court's *Tincher* ruling.

[53]  *Surace*, 111 F.3d at 1051.

Following *Tincher*, district courts in this Circuit have affirmed that the "traditional limitations placed on the admissibility of evidence of a product user's alleged negligence" remain intact: a defendant cannot offer evidence of a plaintiff's alleged own lack of due diligence to negate the plaintiff's attempt to establish that the product was defective.[54]

For these reasons, Cote's third motion *in limine* is granted.

### b.    Affirmative Defenses

Although Pennsylvania courts place tight restrictions on defendants' attempts to introduce evidence of plaintiffs' ordinary negligence, it is well established that "evidence of a plaintiff's voluntary assumption of the risk, misuse of a product, or highly reckless conduct is admissible insofar as it relates to the element of causation."[55] Nevertheless, Cote asks the Court to preclude Schnell from arguing or presenting testimony that Cote assumed the risk of injury or acted recklessly and misused the TLX36 transloader.[56] Given the "conceptual nuances between assumption of the risk and highly reckless conduct,"[57] the Court addresses these affirmative defenses separately.

---

[54] *Rapchak v. Haldex Break Products Corp.*, 2016 WL 3752908, at *5–7 (W.D. Pa. July 14, 2016); *see also Lehmann v. Louisville Ladder Inc.*, 2022 WL 2670811, at *2 (E.D. Pa. July 11, 2022) (holding that a plaintiff's conduct using the product is not "relevant to a design defect theory because the product, not the user's conduct, is on trial").

[55] *Sullivan*, 253 A.3d at 748–49 (citation omitted).

[56] Doc. 236 (Cote's First Motion *in Limine*); Doc. 242 (Cote's Fourth Motion *in Limine*).

[57] *Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1097 (Pa. 2012).

To sustain the assumption of the risk affirmative defense, a defendant must "prove that the risk was voluntarily undertaken in addition to being known."[58] That said, "[w]here an employee, in doing a job, is required to use certain equipment as furnished by the employer, this defense is unavailable."[59] Here, there is no dispute that the accident occurred while Cote was on the job, using the TLX36 transloader "furnished by [his] employer," as his employer required.[60] Accordingly, the Court grants Cote's motion to preclude Schnell from arguing or presenting evidence that Cote assumed the risk of injury by placing his hand inside the railcar while the TLX36 transloader remained energized.[61]

For the highly reckless conduct and product misuse affirmative defenses, Pennsylvania courts emphasize "the inherent parallels between these concepts."[62] Indeed, "[b]oth misuse and highly reckless conduct involve a plaintiff's

---

[58]  *Jara*, 718 A.2d at 795.

[59]  *Id*.; *see also Staub v. Toy Factory, Inc.*, 749 A.2d 522, 530 (Pa. Super. 2000) ("[I]n a products liability context, assumption of risk is no longer available as an affirmative defense in an employment situation because the employee cannot voluntarily assume the risk where in doing his job he is required to use equipment furnished by his employer.").

[60]  *Jara*, 718 A.2d at 795.

[61]  In response, Schnell directs the Court to *Reott v. Asia Trend, Inc.*, 55 A.3d at 1090–1101, and *Missimer v. Tiger Machine Co., LTD*, 2005 WL 2396934 (E.D. Pa. Sept. 26, 2005) (Rice, M.J.). But *Reott* is inapposite as it involves a customer using the allegedly defective product for purely personal reasons; it did not involve an employee operating within the scope of his employment when injured. 55 A.3d at 1090 (products liability suit concerning a hunting tree stand, which the plaintiff assembled with his brother presumably in advance of hunting season). Although *Missimer* involves a "machine [the plaintiff] operated during his employment," the opinion, issued by a Magistrate Judge, does not address *Jara* or its progeny. 2005 WL 2396934 at *1–2. Instead, the Magistrate Judge simply details the general rule that "[a]ssumption of the risk is a defense in . . . strict products liability cases" in Pennsylvania. *Id*. at *2. This opinion is neither binding on this Court nor legally sound. As such, it has no bearing on this ruling.

[62]  *Reott*, 55 A.3d at 1097.

unforeseeable, outrageous, and extraordinary use of a product."[63] To succeed on these affirmative defenses, "the burden is on the defendant to demonstrate that the injured party or decedent 'knew or had reason to know of facts which created a high degree of risk of physical harm to himself or that he deliberately proceeded to act, or failed to act, in conscious disregard of that risk.'"[64] Further, the defendant must show that "the highly reckless conduct was the sole or superseding cause of the injuries sustained."[65]

First, Cote correctly argues that Schnell "cannot establish that [his] accident would have occurred despite the curing of the [TLX36] transloader's defect."[66] As explained, Cote has presented uncontroverted evidence supporting his position that the transloader's defects constitute an essential predicate without which the accident would not have occurred. And even Schnell's engineering expert, Albert de Richemond, testified that the proposed alternative design would have prevented the accident.[67] Accordingly, to prove reckless conduct or product misuse, Schnell

---

[63] *Id*.; *see also id*. at 1101 ("[h]ighly reckless conduct is that which occurs when the plaintiff would have been injured despite the curing of any alleged defect, or is so extraordinary and unforeseeable as to constitute a superseding cause."); *Childers v. Power Line Equipment Rentals, Inc.*, 681 A.2d 201, 208 (Pa. Super. 1996) (defining product "misuse" as an "unforeseeable or outrageous" use of the product).

[64] *Reott*, 55 A.3d at 1101 (quoting *Childers*, 681 A.2d at 208)).

[65] *Id*.

[66] Doc. 243 at 8.

[67] *See* Doc. 241-5, Ex. 5 (Feb. 18, 2021, A. de Richemond Report) at 96:2–18 ("Q. Okay. You would agree with me that if there was such a lockout system in place that shut off all of the hydraulic circuits except for the belt while clearing a jam that would have completely eliminated the possibility that this accident could occur, correct? . . . A. My answer was yes.") (objections omitted).

would need to demonstrate that Cote's conduct was "so extraordinary and unforeseeable as to constitute a superseding cause."[68]

To that end, Cote's asserts that his conduct does not, as a matter of law, qualify as an unforeseeable or outrageous use of the TLX36 transloader.[69] Cote contends that the record shows that he "could not deenergize the transloader's PTO while unclogging the sand," and that he "only used his hand to dislodge the sand because—at the time of the accident—that was the only effective means available to Cote to accomplish his work."[70] Schnell counters that Cote and his co-workers "were instructed on the dangers of putting their hands through the rail hopper car gate, [and] instructed not to put their hands through the gate and, if necessary, to use a tool to stick through the hopper car gate when needed to address sand flow issues."[71] Schnell believes that based on this evidence, a jury could conclude that Cote "knew or had reason to know of facts which created a high risk of physical harm to himself" and that he "deliberately proceeded to act . . . in conscious disregard of that risk."[72]

Courts recognize that "misuse and causation are questions of fact," and therefore they should be left to the jury unless "the facts are not in dispute."[73] As

---

[68]   *Reott*, 55 A.3d at 1101 (internal quotation marks and citation omitted).
[69]   *See* Doc. 243 at 8.
[70]   Doc. 292 at 10.
[71]   Doc. 284 at 13.
[72]   *Reott*, 55 A.3 at 1101 (quotation marks and citation omitted).
[73]   *Nathan v. Techtronic Industries North America, Inc.*, 92 F. Supp. 3d 264, 275 (M.D. Pa. Feb. 17, 2015) (Mariani, J.).

this Court held in its November 2021 summary judgment ruling, there are disputed facts relevant to the question of whether Cote's conduct was unforeseeable or outrageous:

> [T]he parties disagree on what safety instructions regarding wet sand in the hopper cars Cote and [his co-workers] received prior to the accident, and what Cote reasonably should have believed regarding the safety of clearing wet sand by hand and the operation of the PTO controls.[74]

Given these factual disputes, the Court declines to remove this question from the province of the jury.

Second, Cote argues that regardless of whether his conduct qualifies as "highly reckless," this evidence should be deemed inadmissible because Schnell cannot show that his conduct was the sole or superseding cause of the injuries he sustained.[75] On this, Cote directs the Court to two rulings by the Superior Court of Pennsylvania: *Jara v. Rexworks* and *Clark v. Bil-Jax, Inc.*[76]

---

[74] *See* Doc. 186 at 27 (*comparing* Doc. 174 at 9 ("Shale Rail employees were instructed on the dangers of putting their hands through the hopper car gate, were instructed not to put any appendage through the hopper car gate and, if necessary, to use a tool to stick through the hopper car gate in necessary to address sand flow issues.") *with* Doc. 185 at 3 ("Plaintiff testified that he was never trained on getting wet sand out of a hopper car, . . . [and] the record demonstrates that there was no 'wet sand protocol' (i.e., 'use only tools to dislodge wet sand') at the time of the incident."); *and* Doc. 156 at 28 ("Cote acknowledged he knew he could be injured if the hopper gate closed with this hand inside and that the gate could be closed with his hand inside while the transloader was operating.") *with* Doc. 168 at 28 ("[W]hile Plaintiff knew a hopper gate could injure a person, he also knew that the transloader's conveyer belt . . . needed to keep running in order to clear the sand. Further, Plaintiff testified that it was his belief that the person on the ground—i.e., Plaintiff—was the only person who could operate the PTO controls.")).

[75] Doc. 243 at 8–11.

[76] *Id.* (citing *Jara*, 718 A.2d at 790–94); *Clark v. Bil-Jax, Inc.*, 763 A.2d 920 (Pa. Super. 2000)).

In *Jara*, the plaintiff was injured on a construction site while cleaning a conveyor belt manufactured by the defendant; the plaintiff was climbing the conveyor when his co-worker pushed the start button, causing the conveyor to throw the plaintiff to the ground.[77] At trial, the defendant offered evidence of the plaintiff's and the co-worker's conduct to prove the accident was the result of a superseding cause—namely, "someone started the belt moving"—and the trial court submitted the question of superseding cause to the jury.[78] The Superior Court ruled that the jury should have received neither the evidence nor the question, as the plaintiff's and his co-worker's conduct "was irrelevant to the [issue] of product defect."[79] The Superior Court explained that "it could not be established that the accident was solely a result of [the plaintiff's] or another's conduct" because "[h]ad the product not been defective, [the plaintiff] would have had warning or been provided a safe location once the belt was activated."[80]

In *Clark*, the plaintiff advanced a strict products liability claim, arguing that scaffolding manufactured by the defendant was defectively designed; the plaintiff's decedent was killed "when the metal scaffolding he was holding onto during its relocation at a construction site came into contact with high voltage power lines."[81] The Superior Court held that the trial court "erred in granting [the defendants]

---

[77]   718 A.2d at 790.
[78]   *Id*. at 793–94.
[79]   *Id*. at 793.
[80]   *Id*. at 793–94.
[81]   763 A.2d at 922.

permission to present evidence of improper actions of the decedent and his coworkers at trial."[82] On the issue of recklessness, the Superior Court found that the defendants "offered nothing . . . which would show" that the decedent's use of the scaffolding was either unforeseeable or outrageous, and regardless, evidence of the decedent's conduct has "relevance only if the defect were not the sole cause of the harm."[83] According to the Superior Court, "[t]hat was not the case herein; had the defect been cured prior to the accident, the decedent would not have been electrocuted."[84]

As this Court reads it, in both *Jara* and *Clark*, the Superior Court improperly conflated the admissibility inquiries for a plaintiff's negligence and recklessness, holding that the defendants could not offer evidence that the plaintiffs' respective conduct constituted "superseding causes" because in neither case could the defendant establish that the accident was "solely" a result of the plaintiff's conduct."[85] As discussed, although evidence of a plaintiff's ordinary negligence is admissible only if the defendant can show that the plaintiff's conduct was solely responsible for the accident,[86] the Pennsylvania Supreme Court in *Reott v. Asia Trend* explained that to advance highly reckless conduct and product misuse affirmative defenses, the defendant is required to prove either "sole cause" or

---

[82]  *Id*. at 925.
[83]  *Id*.
[84]  *Id*.
[85]  *See Jara*, 718 A.2d at 793–94; *Clark*, 763 A.2d at 925.
[86]  *See Sullivan*, 253 A.3d at 749.

"superseding cause."[87] Indeed, the Pennsylvania Supreme Court took pains to articulate the differences between these distinct legal concepts:

> [A] defendant can affirmatively plead and prove "sole cause," i.e., that a curing of any defect would not have prevented the injury because only the plaintiff's conduct caused the injury; or "superseding cause," i.e., that the plaintiff acted in such an outrageous and unforeseeable fashion that the conduct superseded any "but for" or legal causation the product contributed to the injuries.[88]

But as Justice Todd notes in her dissent, the majority then "conclude[d] these theories do not differ substantively, and, as such, need not be considered separately nor treated differently."[89] Emphasizing the "substantial overlap" between sole and superseding cause in the "real world," the majority explains that "Pennsylvania jurisprudence is most faithfully adhered to when trial courts instruct juries solely regarding 'factual cause'"—that is, sole cause.[90]

This Court finds the Pennsylvania Supreme Court's approach to this issue perplexing. It seems insensible to, in the rule, insert a disjunctive delineating two distinct legal concepts, while, in a footnote, explaining that these concepts are substantively indistinguishable. Be that as it may, this Court is not in the business of making laws; instead, it must follow the guidance of the prevailing judicial authority.

---

[87]   *Reott*, 55 A.3d at 1100.
[88]   *Id*.
[89]   *Id* at 1102 (Todd, J., *dissenting*).
[90]   *Id*. at 1100 n.13.

Consistent with the Pennsylvania Supreme Court's ruling in *Reott*, and the Pennsylvania Superior Court's decisions in *Jara* and *Clark*, because Schnell cannot show that Cote's conduct was the sole cause of the accident, Schnell cannot advance its reckless conduct and product misuse affirmative defenses.

Accordingly, Cote's first and fourth motions *in limine* are granted.

### 2.    The Settled Defendants' Alleged Contributory Negligence

In his second and fifth motions *in limine*, Cote asks the Court to preclude Schnell from attempting to apportion negligence liability to U.S. Silica or Norfolk Southern and reading to the jury Cote's prior allegations regarding U.S. Silica's negligence.[91] Although Cote and Schnell debate several possible bases for prohibiting evidence of the settled Defendants' contributory negligence—such as whether expert testimony is required to establish a *prima facie* case against U.S. Silica and Norfolk Southern[92]—this motion turns on a recent procedural development: Cote's filing of the Second Amended Complaint.[93] By excising its prior negligence claims and advancing to trial with only the strict liability cause of action, Cote has rendered questions about U.S. Silica's and Norfolk Southern's negligence immaterial.

As a preliminary matter, Cote's prior allegations of U.S. Silica's negligence contained in the inoperative Amended Complaint do not constitute binding judicial

---

[91]   Doc. 238 (Cote's Second Motion *in Limine*); Doc. 244 (Cote's Fifth Motion *in Limine*).
[92]   Doc. 239 at 5–6; Doc. 283 at 8–11.
[93]   *See* Doc. 272.

admissions. The Third Circuit has long held that an "amended complaint supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading."[94] Although a superseded pleading may be offered as evidence "rebutting a subsequent contrary assertion,"[95] the relevance and admissibility of the superseding pleading is contingent on "a party's assertion of contrary factual positions"[96]—and, even then, "the amending party may offer evidence to rebut its superseded allegations."[97]

Here, Cote's Amended Complaint has been superseded by the Second Amended Complaint, and the Second Amended Complaint contains no "contrary factual positions" that these superseded allegations could be offered to rebut.[98] The Second Amended Complaint advances a single count of strict liability against Schnell; there are no allegations about U.S. Silica's conduct, negligent or otherwise.[99] Therefore, the allegations of U.S. Silica's negligence—which are contained only in the Amended Complaint—are "of no legal effect."[100]

---

[94] *West Run Student Housing Associates, LLC v. Huntington National Bank*, 712 F.3d 165, 171 (3d Cir. 2013) (internal quotation marks and citation omitted).

[95] *Id*. at 172–73 (citing *Giannone v. U.S. Steel Corp.*, 238 F.2d 544, 547 (3d Cir. 1956); *InterGen N.V. v. Grina*, 344 F.3d 134, 144 –45 (1st Cir. 2003); *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002); *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996); *Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705, 707 (2d Cir. 1989); *Raulie v. United States*, 400 F.2d 487, 526 (10th Cir. 1968)).

[96] *Id*. at 172.

[97] *188 LLC*, 300 F.3d at 736.

[98] *West Run*, 712 F.3d at 172.

[99] *See* Doc. 272.

[100] *West Run*, 712 F.3d at 171.

Moreover, even if the allegations of U.S. Silica's and Norfolk Southern's negligence did constitute judicial admissions, these allegations and all evidence related thereto would nevertheless be inadmissible. Because the sole operative claim in this case is Cote's strict liability cause of action against Schnell,[101] substantive evidence is admissible only if relevant to that claim. On that, the analysis underlying this Court's ruling to preclude evidence of Cote's alleged negligence applies equally to questions about the settled Defendant's contributory negligence.

Here, as in *Sullivan*, the alleged third-party negligence (in this case, U.S. Silica and Norfolk Southern providing wet sand unfit for transloading) and the accident that followed relate directly to the alleged defect. As Cote argues, the wet sand stuck in the railcar and the TLX36 transloader's inability to lockout its PTO allegedly resulted in the hopper gate slamming shut on Cote's arm while he was reaching inside the railcar to pry loose the wet sand.[102] Per Cote's formulation of the case, the settled Defendants' alleged negligence and the TLX36 transloader's alleged defect constitute distinct yet interrelated factual predicates, both of which were required for Cote's injury to occur.

As Schnell simply seeks to introduce evidence consistent with Cote's initial arguments about U.S. Silica's and Norfolk Southern's contributory negligence,

---

[101]   *Id.*; *see also* Doc. 287 (Schnell's Answer to Cote's Second Amended Compl.).
[102]   *See* Doc. 288 at 12.

Schnell cannot show that the accident was caused solely by the settled Defendant's conduct, "unrelated in any way to the product."[103] Cote's second and fifth motions *in limine* are therefore granted; at trial, Schnell will not be permitted to introduce evidence of U.S. Silica's and Norfolk Southern's negligent conduct, or argue that this negligence excuses the TLX36 transloader's alleged defects or necessitates a reduced recovery.[104]

### 3. The TLX36 Transloader and OSHA's Definition for Lockout/Tagout Device

In his final motion *in limine*, Cote asks the Court to preclude Schnell from presenting evidence that the TLX36 transloader's ignition key qualifies as a "lockout/tagout device" per Occupational Safety and Health Administration ("OSHA") guidelines.[105] But, as Schnell argues, Cote's motion concerns "the weight to be given to the parties' respective experts," not the admissibility of their opinions.[106]

The Federal Rules of Evidence provide that relevant evidence—that is, evidence that "has any tendency to make a fact more or less probable than it would be without the evidence"[107]—is admissible unless the United States Constitution, a federal statute, or the Rules themselves provide otherwise.[108] To that end, Rule 403

---

[103]  *Sullivan*, 253 A.3d at 749–50 (citation omitted).
[104]  *See id*. at 748.
[105]  Doc. 246 (Cote's Sixth Motion *in Limine*).
[106]  Doc. 282 at 7.
[107]  Fed. R. Evid. 401(a).
[108]  Fed. R. Evid. 402.

permits courts to exclude relevant evidence if its probative value is substantially outweighed by a danger of, among other things, unfair prejudice, confusing the issues, or misleading the jury.[109]

The admissibility of expert testimony, however, is governed by Rules 702 and 703. The Supreme Court of the United States expanded upon these rules in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, delegating to district courts a gatekeeping responsibility centered on the twin concerns of "reliability" (i.e., the basis or "good grounds" for the expert opinion) and "helpfulness" (i.e., the opinion's "fit" or "relevance").[110] Applying *Daubert*, the Third Circuit has cautioned district courts against making admissibility determinations based on its assessment of competing expert testimony: "a district court may not make winners and losers through its choice of which side's experts to admit, when all experts are qualified."[111] The Third Circuit instructs district courts that as long as an expert's testimony "rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."[112] This admonition

---

[109] Fed. R. Evid. 403.
[110] 509 U.S. 579, 589–92 (1993).
[111] *States v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004).
[112] *Id*. at 244 (internal quotation marks and citations omitted); *see also Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight weaknesses through effective cross-examination.").

reflects the Third Circuit's understanding that "[e]xperts with diametrically opposed opinions may nonetheless both have good grounds for their views."[113]

Here, the parties' engineering experts offer competing opinions on whether the TLX36 transloader's ignition key qualifies as a lockout/tagout device under the relevant OSHA rules and regulations. According to Cote's expert, Michael Tarkanian, a keyed ignition does not meet OSHA's standards for lockout/tagout devices because it is not "singularly identified" as a lockout device or the only device "used for controlling energy," and it is "used for other purposes."[114] Conversely, Schnell's expert, Albert de Richemond, opines that the TLX36 transloader's "key lock was effectively an OSHA lockout device in that it deactivated the diesel engine, the hydraulic system that controlled the conveyor and PTO and ultimately the rail car hopper gate."[115]

Unsurprisingly, both parties dispute the opinions propounded by the other's expert witness. But although Schnell filed a *Daubert* motion challenging the admissibility of Tarkanian's report and testimony (which this Court denied),[116] Cote declined to file a corresponding motion to exclude de Richemond's report and testimony. Instead, Cote now argues that de Richemond's opinions should be

---

[113] *Mitchell*, 365 F.3d at 245.
[114] Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 3 (citing OSHA 1910.147(c)(5)(ii)).
[115] Doc. 282-7, Ex. 5 (Jan. 11, 2021, de Richemond Report) at 6.
[116] *See* Doc. 225 (Schnell's *Daubert* motion); Doc. 267 (Order largely denying Schnell's *Daubert* motion).

excluded under Rule 403 as "blatantly misleading and unfairly prejudicial."[117] The Court is not persuaded. Lacking a well-reasoned and fully briefed *Daubert* motion, the Court will not bar the admission of de Richemond's expert opinions simply because Cote disagrees with them. Instead, Cote can test de Richemond's conclusions "by the adversary process—competing expert testimony and active cross-examination."[118]

### B.      Schnell's Motions *in Limine*

For its part, Schnell filed eight separate motions *in limine*, primarily concerning issues this Court addressed previously when it denied Schnell's summary judgment and *Daubert* motions. Aside from Schnell's fifth motion, which (in part) seeks relief consistent with the Court's *Daubert* ruling, these *in limine* motions are either procedurally improper or without merit—or both. As such, they are denied.

### 1.      TLX36 Transloader Manual: Alleged Inadequate Warnings

In its first motion *in limine*, Schnell asks the Court to preclude Cote from presenting evidence or otherwise arguing that the TLX36 transloader lacked adequate warnings and that this alleged defect caused Cote's injuries.[119] Schnell asserts that Tarkanian "offers no opinion that the machine lacked adequate warnings or that the lack of adequate warnings on the machine caused or

---

[117] Doc. 291 at 3.
[118] *Mitchell*, 365 F.3d at 244.
[119] Doc. 248.

contributed to [Cote's] accident," and therefore Cote "should be precluded from expressing a contention at trial that the machine lacked adequate warnings which was the cause of [Cote's] injuries."[120] But Schell misstates Tarkanian's opinion. Moreover, this motion is little more than an effort to relitigate an issue this Court considered and rejected when it mostly denied Schnell's *Daubert* motion—a motion that itself sought to rehash arguments the Court rejected on summary judgment.

In its *Daubert* motion, Schnell argued that Cote's engineering expert, Michael Tarkanian, should not be allowed to present his opinion that "[t]he manual provided by [Schnell] and [FB Industries] for the TLX36 [transloader] contributes to unsafe practices using the machine" because it "never mentions 'lock out' or 'tag out'" and contains "incomplete and contradictory" safety instructions that "contribut[e] to a lack of clarity regarding safety for the user, and is symptomatic of the lack of proper lock out capabilities in the TLX 36 [transloader]."[121] According to Schnell, Tarkanian's opinion "is not relevant to any issue in the case" because the opinion's relevance "depends on whether the manual caused or contributed to the incident" and the evidence does not establish this causal connection.[122] The Court rejected this argument, citing its ruling on summary judgment that Tarkanian's opinion regarding the inadequate warnings and

---

[120]  Doc. 249 at 1–2.
[121]  Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 16–17.
[122]  Doc. 226 at 17–18.

misrepresentations in the TLX transloader manual is "relevant to a particular

disputed factual issue central to Cote's claim that the transloader was defective

under the consumer expectation standard."[123]

Having failed to exclude Tarkanian's opinion regarding the inadequate

warnings and misrepresentations in the TLX transloader manual, Schnell now asks

the Court to pretend this opinion does not exist. This Court won't do that. Having

previously failed to convince the Court that this opinion is inadmissible for want of

causation, Schnell again asks the Court to exclude the opinion on this basis. This

Court won't do that either. The motion is denied.

## 2.    Non-Compliance with OSHA Standards

As with the first, Schnell's second *in limine* motion simply restates twice-

rejected arguments. Specifically, Schnell argues that Cote "should be precluded

from presenting evidence and contentions at trial that the transloader failed to

comply with OSHA and ANSI [i.e., the American National Standards Institute]

standards related to a lockout device," asserting that the ignition key constitutes an

"effective lockout" and "the absence of an OSHA or ANSI compliant lockout was

not the cause of Cote's injury."[124] But Schnell raised this argument on summary

judgment and then again in its *Daubert* motion, and it proved unavailing both

---

[123] Doc. 266 at 19 (internal quotation marks, brackets, and citation omitted); *see also* Doc. 186 at 27–30.
[124] Doc. 251 at 7–8.

times.[125] As this Court wrote in its memorandum opinion largely denying Schnell's *Daubert* motion, "[a] reasonable jury presented with Tarkanian's expert opinion explicitly linking Cote's injuries and the absence of a proper lock out device on the TLX36 transloader could conclude that the transloader's alleged defects were a substantial factor in causing Cote's injuries."[126] Accordingly, Cote will be permitted to present evidence that the TLX36 transloader failed to comply with OSHA and ANSI standards.[127]

### 3.    Tarkanian's Proposed Alternative Design

In its third motion *in limine*, Schnell asks the Court to preclude Cote from presenting evidence regarding Tarkanian's proposed alternative design for the TLX36 transloader[128]—a lock out device, such as a solenoid in the hydraulic circuit coupled with a dedicated locking switch, that would prevent the railcar hopper gate from closing while permitting the conveyer belt and other components of the machine to continue operating.[129] According to Schnell, this alternative design "is not, by [Tarkanian's] own admission, safer than turning off the ignition key."[130] That is not correct.

---

[125] *See* Doc. 186 at 22–24; Doc. 266 at 10–14.

[126] Doc. 266 at 13.

[127] In this motion, Schnell also seeks to preclude Cote from presenting evidence that the TLX36 transloader's manual did not comply with OSHA and ANSI standards. Doc. 251 at 8–9. As explained, this argument was likewise considered and rejected in this Court's *Daubert* opinion. *See* Doc. 266 at 17–19. Cote may present this evidence as well.

[128] Doc. 252.

[129] Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 2–3.

[130] Doc. 253 at 7.

During his deposition, Tarkanian testified that the design of the TLX36 transloader "discourages" users from turning off the machine to unclog inside the railcar: "if you shut the machine off, the conveyor would not work, which would mean sand would stop moving, and you would lose the ability to accurately weigh the sand moving on the transloader."[131] Tarkanian concluded that this design defect "directly contributed to the injury of Mr. Cote."[132] And then Tarkanian offered the following testimony about the "best" and "safest" alternative design:

> [B]ecause the belt needs to keep running during transloading, in my opinion the best design, the safest design would be to isolate, have the ability to isolate components of the transloader like the PTO and then in that case you could put a valve in the hydraulic line of the PTO that could isolate energy to the PTO while the rest of the machine runs and that's done with commercially available components that are talked about in my report.[133]

Notwithstanding this testimony, Schnell insists that Tarkanian conceded that the proposed alternative design is not safer than the current TLX36 transloader, seizing upon the following exchange:

> Q. Wouldn't it have been safer if the machine had been turned off entirely using the ignition key, and the key removed, than to activate a disconnect of the hydraulic circuit controlling the power takeoff?

---

[131]  Doc. 251-6, Ex. 6 (Jan. 15, 2021, M. Tarkanian Dep.) at 34:12–35:14, 36:21–37:12.

[132]  Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 17.

[133]  Doc. 251-6, Ex. 6 (Jan. 15, 2021, M. Tarkanian Dep.) at 72:7–22.

> A. Yes, because it would have neutralized, it would have
> shut down all of the energy to the entire machine.[134]

But Schnell omits the remainder of Tarkanian's answer: "[b]ut as we've talked

about again and again, that's problematic during operation of these things."[135] As

Tarkanian explained repeatedly in his deposition, it is his position that because the

conveyor belt needs to keep running to move the dislodged sand, the current design

of the TLX36 transloader is unsafe because it "discourages" users from using the

ignition key to power off the machine; the "best" and "safest" design would require

allowing the user to power off the PTO (thereby preventing the railcar hopper gate

from closing) while permitting the rest of the machine, including the conveyor belt,

to continue operating.[136] Indeed, that is the heart of Tarkanian's opinion.

This Court has already admonished Schnell about "mischaracterize[ing]

Tarkanian's deposition testimony, cherry picking select quotes to create an

impression inconsistent with Tarkanian's actual sworn statements."[137] It does so,

again, in this writing.

### 4.    Engineering Input During the Design Process

Schnell's fourth motion *in limine* concerns Tarkanian's opinion that

Schnell's failure to hire and employ third-party engineers and lack of experience

with OSHA, ANSI, and other relevant safety standards contributed to the TLX36

---

[134]  *Id*. at 91:21–92:5.
[135]  *Id*. at 92:5–7.
[136]  *Id*. at 34:12–35:14, 36:21–37:12, 72:7–22.
[137]  Doc. 266 at 15.

transloader's defective design.[138] Specifically, Schnell seeks to preclude Cote from introducing evidence "concerning a lack of engineers at Schnell, engineering input with the design, or review of the Schnell transloader or testing post-design," arguing that there is "no connection" between these alleged deficiencies and Cote's accident.[139] But, again, Schnell presented this same argument in its *Daubert* motion—and the Court rejected it. Because this Court held that "Tarkanian's opinion that the TLX36 transloader was defective because it lacked a lock out device—and that this defect contributed to Cote's injuries—is admissible," it ruled that his opinion that Schnell's "failure to employ or otherwise engage engineers led to this defective design is admissible as well."[140] The Court affirms this ruling here. The motion is denied.

### 5.    Other Design Defects

As with Schnell's first, second, and fourth *in limine* motions, Schnell's fifth motion *in limine* concerns issues this Court disposed of when it largely denied Schnell's *Daubert* motion. Specifically, Schnell moves to preclude evidence related to Tarkanian's opinions about (a) "the design of the electrical circuit to the scale," (b) the "location of controls for the PTO," and (c) the location of the "dust collector" and stairs.[141] As the Court explained in its *Daubert* Memorandum

---

[138] Doc. 254; *see also* Doc. 255 at 4 (citing Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 2).

[139] Doc. 255 at 1.

[140] Doc. 266 at 17.

[141] Doc. 257 at 5–6 (citing Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 17).

Opinion, Tarkanian's opinions about the design of the electrical circuit and location of the PTO controls are admissible; his opinions about the location of the dust collector and stairs is not.[142] Consistent with this ruling, Cote may offer evidence and argument about the design of the electrical circuit and location of the PTO controls, but he cannot present evidence or argument about the location of the dust collector or stairs.[143]

### 6.   Known or Knowable Danger

In its sixth motion *in limine*, Schnell asks the Court to preclude Cote from presenting evidence at trial "that the danger associated with putting one's hand through a railcar gate while the transloader and gate opener were energized was unknown and unknowable."[144] According to Schnell, "[t]he danger, in fact, was knowable and known to Cote and, as such, [he] should not be permitted to contend to the contrary."[145] But this argument is both without merit and procedurally improper.

---

[142]  Doc. 266 at 20–24.

[143]  In this motion, Schnell also restates the objections to evidence about the TLX36 transloader manual that he raised in his first and second motions *in limine*. *Compare* Doc. 257 at 11 ("With regard to the manual for the transloader, there is no evidence to support a contention that it caused or contributed to [Cote's] accident because Cote never saw the manual before his accident and Spencer, the operator, also never consulted with the manual."), *with* Doc. 251 ("Whether the manual did or did not comply with OSHA or ANSI standards because it did not instruct Cote or Spencer on a proper lockout method, or was confusing and lacked clarity[,] could not have been a factor in Cote's accident because Cote never saw the manual and says he had no access to it and Spencer also never consulted the manual."). As explained, the Court finds these objections to be without merit.

[144]  Doc. 259 at 1.

[145]  *Id.*

Although Schnell frames this as an "evidentiary issue," the motion is dispositive to one of Cote's theories of liability: because the "consumer expectation standard" for defective condition liability "depends on whether 'the danger is unknowable and unacceptable to the average or ordinary customer,'"[146] prohibiting Cote from offering evidence and arguing that the danger was knowable or known would prevent Cote from advancing this theory of liability. It is altogether unsurprising, then, that Schnell presented the same argument he raises here—that "[t]here is no evidence to support a contention that the transloader was in a defective condition under the consumer expectation standard"[147]—as a basis for summary judgment in its prior dispositive motion.[148] Indeed, it appears Schnell simply copied and pasted the language from the relevant portion of his summary judgment moving brief, as the moving brief for this motion *in limine* repeats this language essentially verbatim.[149]

---

[146] *Id*. at 7 (quoting *Tincher*, 104 A.3d at 387).

[147] *Id*. at 8.

[148] *See* Doc. 156 (Schnell's Mot. for Summary Judgment Br.) at 27–29 ("There is no evidence of any express or implied representation regarding the transloader.").

[149] *Compare* Doc. 156 (Schnell's Mot. for Summary Judgment Br.) at 27–29 ("Far from the danger being unknowable, employees of Shale Rail were instructed on the dangers of putting their hands through the rail hopper car gate, were instructed not to put their hands through the gate and, if necessary, to use a tool to stick through the hopper car gate when needed to address sand flow issues. Cote's expert acknowledges Cote was aware of the danger or risk of putting his hand through the railcar gate when the transloader and the PTO were energized."), *with* Doc. 259 at 8–9 ("Employees of Shale Rail were instructed on the dangers of putting their hands through the rail hopper car gate, were instructed not to put their hands through the gate and, if necessary, to use a tool to stick through the hopper car gate when needed to address sand flow issues. Cote's expert also acknowledges Cote was aware of the danger or risk of putting his hand through the railcar gate when the transloader and the PTO were energized.").

This presents two problems for Schnell. First, the Court rejected this argument on summary judgment. After reviewing the summary judgment record and considering the parties' competing positions, this Court held that "there is a genuine factual dispute as to whether the danger of the PTO closing the gate on a worker clearing jammed sand from the railcar was unknowable and unacceptable to the average or ordinary customer."[150] The Court therefore declined to grant summary judgment for failure to establish the presence of a defective condition under the consumer expectation standard.[151]

Schnell attempts to minimize the significance of this prior ruling, arguing that it "has no bearing on the issue of preclusion of evidence concerning whether the danger associated with putting one's hand through a railcar gate while the transloader and related gate opener were energized was unknown or unknowable."[152] The Court respectfully disagrees. Although motions for summary judgment and motions *in limine* serve different functions,[153] the instant motion seeks the same relief based on the same factual record as Schnell's appropriately filed (if ultimately unsuccessful) motion for summary judgment. Accordingly, just as Schnell's summary judgment motion failed, so to must this motion *in limine*.

---

[150]   Doc. 186 at 28.

[151]   *Id*.

[152]   Doc. 296 at 8–9.

[153]   *See Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064, 1069 (3d Cir. 1990) ("Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.").

Second, the substantial overlap between the instant motion and Schnell's prior dispositive motion proves that it is, in truth, a motion for summary judgment masquerading as a motion *in limine*. Indeed, Schnell all but admits as much.[154] Applying the Third Circuit's ruling in *Bradley v. Pittsburgh Board of Education*, district courts in this Circuit have deemed improper motions *in limine* that "seek to preclude all evidence that would support the other party's claims," explaining that such motions are "essentially acting like . . . motion[s] for summary judgment."[155] That is precisely what Schnell has attempted to do in this case.

For these reasons, Schnell's sixth motion *in limine* is denied.

### 7.    The Term "Lock-Out"

For its seventh motion *in limine*, Schnell moves to preclude Cote from using the term "lockout"—a term of art defined by OSHA and ANSI—arguing that the term "is not genuinely relevant" to Cote's claims, and, therefore, its use at trial would confuse the issues, mislead the jury, and unfairly prejudice Schnell.[156] Specifically, Schnell asserts that Cote's strict products liability claim "is based not

---

[154] *See* Doc. 259 at 8 ("There is no evidence to support a contention that the transloader was in a defective condition under the consumer expectation standard.").

[155] *Davis v. General Accident Insurance Co. of America*, 2000 WL 1780235, at *4 (E.D. Pa. Dec. 4, 2000); *see also Dubois Country Club, LTD v. Depositors Insurance Co.*, 2022 WL 13837784, at *6–7 (W.D. Pa. Oct. 21, 2022) (denying defendant's motion *in limine* because it is "actually a dispositive motion that the [defendants] filed after the deadline for such motions passed": "because the [defendants] are asking the Court to find that the [plaintiffs] have failed to offer sufficient evidence of their damages claim" and "because damages is an essential element of a claim for breach of contract, the [defendants] are effectively asking the Court to dispose of the [plaintiff's] breach of contract claim altogether").

[156] Doc. 261 at 1, 6–7.

on the absence of a 'lockout' device on the [TLX36] transloader but rather on the idea that the transloader lacked an energy isolating feature that would prevent energization of the PTO to close [the] railcar gate while [Cote's] hand was inside the railcar."[157] But that's incorrect.

In his expert report, Tarkanian explains that he believes the TLX36 transloader was defectively designed in that, among other things, it has no means "for a user to properly lock out sources of hazardous energy," as is required to be "in compliance with industry safety standards."[158] According to Tarkanian, the TLX36 transloader's "keyed ignition is not a lock out device" as defined in OSHA 1910.147(c)(5)(iii) because it is not "singularly identified as a lockout device" or "the only device used for controlling energy, as separate devices can be used to operate the lights, scales, and hydraulics on the transloader."[159] As discussed, Tarkanian believes this alleged design defect "directly contributed to Cote's injury" because Cote was unable to prevent the railcar gate from closing without completely powering off the TLX36 transloader, thereby stopping the conveyor belt from moving from the railcar to the scale whatever sand Cote unclogged.[160] To prevent accidents like the one that caused Cote's injury, Tarkanian proposes an alternative design: a "solenoid in the hydraulic circuit" that prevents "hydraulic

---

157   *Id*. at 1.
158   Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 2.
159   *Id*. at 3.
160   *Id*. at 17; *see also* Doc. 251-6, Ex. 6 (Jan. 15, 2021, M. Tarkanian Dep.) at 34:12–35:14, 36:21–37:12.

pressure from flowing to the PTO when activated" (i.e., an energy-isolation device), coupled with a "dedicated locking switch" (i.e., a lock out device), which together "would ensure that the hazardous energy from the PTO hydraulics could be safely lockout out and isolated while other work on the machine continued."[161]

In denying Schnell's *Daubert* motion, the Court ruled that these opinions are admissible.[162] As the term "lock out" is central to, and fully enmeshed in, Tarkanian's expert opinions, the Court will permit Cote to use the term at trial. The term is relevant to Cote's claims, and its use at trial will not mislead the jury, unfairly prejudice Schnell, or confuse the issues—indeed, given the prominence of the term "lock out" in Tarkanian's report, the witnesses' depositions, and the parties' briefing, prohibiting the parties from using the term would be far more confusing than permitting it.

### 8. Lost Earning Capacity, Lost Wages After Recovery, and Losses Related to Total Disability

In his final motion *in limine*, Schnell asks the Court to preclude Cote from presenting evidence about the losses he suffered or will suffered due to the injury.[163] Properly understood, Schnell is seeking to exclude the testimony and reports of Cote's vocation and economics experts—Steven D. Shedlin and David

---

[161] Doc. 247-4, Ex. 4 (Nov. 3, 2020, Tarkanian Report) at 7 (cleaned up).
[162] Doc. 266 at 10–14.
[163] Doc. 262.

L. Hopkins, respectively.[164] The Court denies the motion, as it is both untimely and without merit.

As a preliminary matter, Schnell challenges the factual foundation of, and the methodologies underlying, Shedlin's and Hopkins's opinions about Cote's lost earning capacity, actual lost earnings, and future lost earnings.[165] Specifically, Schnell argues that "the facts of record do not support a basis for lost earnings or lost earning capacity"; Sheldon's opinion, upon which Hopkins's opinion is predicated, is "based upon pure speculation"; and Cote's "model concerning lost past and future earning capacity is not sufficient to establish that [Cote's] earning power has been or will be reduced in the future."[166] These arguments concern the admissibility of expert testimony, and, as such, they should have been raised in a *Daubert* motion.[167] Schnell instead raises them for the first time in a motion *in limine* filed on August 18, 2022.[168] *Daubert* motions were due July 8, 2022.[169] Accordingly, this motion is dismissed as untimely.

---

[164] *See* Doc. 263.

[165] *Id*. at 6–8.

[166] *Id*. at 7; Doc. 297 at 2.

[167] *See Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (holding that for the "fit" prong of the *Daubert* analysis, "expert testimony based on assumptions lacking factual foundation in the record is properly excluded"); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 742 n.8 (detailing the factors district courts should "take into account" when deciding on the reliability of expert testimony in a *Daubert* analysis, including whether the method employed "consists of a testable hypothesis," "has been subject to peer review," and "is generally accepted").

[168] Doc. 262.

[169] Doc. 221 (May 10, 2022, Scheduling Order).

Moreover, even if the motion was timely, it would nevertheless fail. As proof of his lost earning capacity, Cote offers the report and opinions of his vocation expert, Shedlin, who calculated Cote's pre-injury earning capacity, identified Cote's current professional prospects based on his medical situation and corresponding physical limitations, assessed Cote's current earning capacity, and then determined lost earning capacity by subtracting Cote's current earning capacity from his pre-injury capacity.[170] As proof of his past and future lost earnings, Cote presents the report and opinions of his economics expert, Hopkins, who used Shedlin's findings to calculate Cote's past lost earnings from the date of accident through March 2020, and then employed the "total offset method" to calculate Cote's future lost earnings as well as his lost fringe benefits and household services.[171]

In seeking to exclude this expert testimony, Schnell does not challenge Shedlin's or Hopkins' qualifications, the reliability of the methodologies they employ, or their application of those methodologies.[172] Instead, Schnell disputes certain factual assumptions underlying these opinions, arguing that there is "no evidence to indicate" that Cote "sought employment since 2016" or "was disabled from working during this period," and likewise no "evidentiary support that Cote has been unable to be hired or disabled from being employed because of his

---

[170]  Doc. 263-8, Ex. 8 (Mar. 20, 2020, S. Shedlin Report) at 3–4.
[171]  Doc. 263-9, Ex. 9 (Mar. 23, 2020, D. Hopkins Report) at 3–7.
[172]  *See* Doc. 263 at 6–8; Doc. 297 at 1–4.

injury."[173] But Shedlin, relying on Cote's medical records, identifies possible positions Cote could work, and then he calculates Cote's current earning capacity by using the Economic Research Institute's salary figures for those positions.[174]

As the Third Circuit has emphasized, "[t]he test of admissibility is not whether a particular [expert] opinion has the best foundation or whether it is demonstrably correct"; rather, "the test is whether the particular opinion is based on valid reasoning and reliable methodology."[175] Importantly, "[t]his standard is not intended to be a high one."[176] Parties seeking to admit expert evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."[177]

Cote has met this burden. To the extent Schnell disputes the factual foundation underlying Shedlin's and Hopkins's opinions, he can raise these concerns on cross examination.

## IV.    CONCLUSION

At this stage in the litigation, Cote and Schnell fundamentally disagree about what this case is about and thus what evidence is relevant and admissible at trial. To Cote, this is a strict products liability action concerning the TLX36

---

[173]    Doc. 6–7.
[174]    *See* Doc. 263-8, Ex. 8 (Mar. 20, 2020, S. Shedlin Report) at 4.
[175]    *Oddi*, 234 F.3d at 145–46.
[176]    *Id*. at 145.
[177]    *Id*. (internal quotation marks and citation omitted).

transloader's alleged design defects; the machine itself is on trial, not the conduct of Cote or any third party. To Schnell, this case is about apportioning blame; the jury will have to determine whether the accident that nearly severed Cote's hand was caused by defects with the transloader or instead by Cote's and his colleague's misuse of the machine or the alleged negligence of the settled Defendants. Per Pennsylvania law, Cote is correct.

Because Cote excised from the operative complaint all allegations and claims of negligence, and Schnell cannot establish that the TLX36 transloader's alleged defects played no role in the accident, Schnell will not be permitted to introduce evidence of, or present arguments that, Cote's or any third party's conduct contributed to the accident. Cote's first five motions *in limine* are granted. And as Schnell's fifth *in limine* motion seeks (in part) relief consistent with this Court's *Daubert* ruling, that motion is granted in part. All other motions *in limine* are denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge